**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **CHARLES & COLVARD, LTD.** | ) | **Case No. 26-00969-5-DMW** |
| | ) | |
| Debtor. | ) | **Chapter 11** |
| | ) | |

**DECLARATION OF MICHAEL LEVIN IN SUPPORT OF CHAPTER 11**
**PETITION AND FIRST DAY PLEADINGS**

I, Michael Levin, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that:

1.      I am the Executive Chairman of the Board of Directors of Charles & Colvard, Ltd. (the "Company" and/or "Debtor"), the above-captioned debtor-in-possession.

2.      As part of my role as Executive Chairman of the Board of Directors of the Debtor, I am familiar with the day-to-day operations as well as the business and financial matters, books and records, and employees of the Debtor.

3.      Except as otherwise indicated, all statements in this declaration (the "Declaration") are based upon (a) my knowledge as Executive Chair; (b) my review of relevant documents, including the Debtor's books and records, (c) information supplied to me by other members of the Company's management team and/or third-party advisors, (d) my opinion based on my experience and knowledge of the Debtor's operations and financial affairs, and (e) my significant financial, accounting, investment, audit, and marketing expertise derived from positions I have previously held with private and public operating companies and investment companies.

4.      As Executive Chairman, I participated in the decision and board deliberations to cause the Debtor to file a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code, §§ 101-1532 (the "Bankruptcy Code").   The Board of Directors of the Debtor

authorized the bankruptcy filing and the Debtor filed this case (the "Chapter 11 Case") on March 2, 2026 (the "Petition Date").

5.       To minimize any adverse effects on its business as a result of the commencement of the Chapter 11 Case, the Debtor has filed certain contemporaneous motions seeking "first day" relief (collectively, the "First Day Motions").

6.       The goals of the First Day Motions, among other things, are to: (a) continue with the Debtor's operations in the ordinary course of business while operating in chapter 11 with minimal disruption; (b) maintain the confidence and support of key constituencies; and (c) establish procedures for the smooth and efficient administration of these Chapter 11 Cases.  I have reviewed the First Day Motions, and I believe that the relief they request is necessary to avoid immediate and irreparable harm to the Debtor's business and estate from the filing of the Chapter 11 Case.

7.       I am authorized to submit this Declaration on behalf of the Debtor in support of the First Day Motions, and to provide additional background regarding the events leading to the filing of the Chapter 11 Case and the Debtor's efforts to maintain the value of its operations.

8.       Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of relevant documents, or my opinion based upon my experience and my knowledge of the Debtor's operations and financial condition.  If I were called upon to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of documents, or opinion.

## I.       GENERAL BACKGROUND

### A.  The Chapter 11 Case

2

9.     As discussed above, the Debtor commenced the Chapter 11 Case on this date by filing a voluntary chapter 11 petition in the United States Bankruptcy Court for the Eastern District of North Carolina (the "Court").

10.     The Debtor continues to operate its business and manage its locations as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### B. General Background

11.     Charles & Colvard, Ltd. is a North Carolina corporation founded in 1995 and headquartered in Morrisville, North Carolina. The Debtor was founded as C3 Diamante, Inc., and changed its name to C3, Inc. by Articles of Amendment filed on April 10, 1996. The Debtor subsequently changed its name to Charles & Colvard, Ltd. by Articles of Amendment filed on May 17, 2000.

12.     Charles & Colvard is a globally recognized fine jewelry company specializing in lab created gemstones. Its common stock is quoted on the OTC Experts Market under the symbol "CTHR." Charles & Colvard, Ltd. manufactures, markets, and distributes Charles & Colvard Created Moissanite® including its premium moissanite gemstone brand, Forever One™, as well as Caydia®, its brand of premium lab grown diamonds. Charles & Colvard, Ltd. offers gemstones and finished jewelry featuring its proprietary moissanite jewels, premium lab grown diamonds, created color gemstones, and most recently, lab grown diamonds in color, for sale in the worldwide fine jewelry market through two operating segments: its Online Channels segment, which encompasses its digital properties components, comprised of its charlesandcolvard.com, moissaniteoutlet.com, charlesandcolvarddirect.com, and madenetwork.com websites, e-commerce outlets, including marketplaces, drop-ship customers, and other pure-play, exclusively e-commerce customers; and its Traditional segment, which consists of domestic and international

distributors and retail customers, including end-consumers through its first Charles & Colvard Signature Showroom, which opened in October 2022.  As of the Petition Date, Charles & Colvard, Ltd. had a total of 25 full-time employees and 1 part-time employee.

### C. Corporate Governance Structure and Recent Operating Results

13.     The Company is operated by an executive leadership team appointed by the Company's Board of Directors. Currently, the executive leadership team is composed of myself, as Executive Chair of the Board of Directors, and Clint Pete as Chief Financial Officer.

14.     The Board of Directors is comprised of (4) members, including myself, as of the Petition Date.

15.     The Board of Directors has adopted two separate codes of conduct: a Code of Ethics for Senior Financial Officers that applies to persons holding the offices of the Chief Executive Officer, Chief Financial Officer, Treasurer, and Principal Accounting Officer of our Company, and a Code of Business Conduct and Ethics that applies to all of our officers, directors, employees, agents, and representatives (including consultants, advisors, and independent contractors).

16.     The Company's annual revenues in 2025 were approximately $16 million.  The Company has operated at a loss for FY 2026 year-to-date; FY 2025; FY 2024; and FY 2023.

### D. Debt Structure

17.     As stated in the Cash Collateral Motion, it appears that certain proceeds generated from the Debtor's continuing operations may constitute cash collateral of Essential Diamonds, Wolfspeed, Inc. ("Wolfspeed"), and Ethara Capital, LLC ("Ethara", together with Essential Diamonds and Wolfspeed, the "Secured Parties") within the meaning of § 363 of the Bankruptcy Code.  Essential Diamonds appears to assert a security interest in "[l]oose laboratory-grown diamonds…delivered on consignment terms by [Essential Diamonds] pursuant to Consignment Agreement, Consignment and Security Agreement, and/or Consignment Memoranda, to or for the

4

account of the Debtor…together will all products and proceeds of any nature (including insurance proceeds), and all receivable and contract rights created by the sale of the Collateral." Wolfspeed appears to assert a security interest in all of the Debtor's assets "but expressly excluding assets that constitute precious metals, regardless of form." Ethara appears to assert a blanket security interest in all of the Debtor's assets.

18.     The Debtor does not own any real property.

19.     The Debtor estimates that it has approximately $4,503,120.00 of secured debt and $3,538,341.00 of trade and other unsecured debt as of the Petition Date.[1]

**E.  Events Leading to the Chapter 11 Case – History of Operations and Recent Challenges**

20.     As set forth above, Charles & Colvard specializes in the production and sale of lab-created gemstones, including premium lab-grown diamonds. In the last decade, lab-grown diamonds and gemstones have transformed the diamond industry; consumers have shifted towards lab-grown diamonds and gemstones as a more affordable alternative to natural diamonds in fine jewelry and engagement rings. The market has seen a steep increase in consumer demand for lab-grown diamonds and gemstones; however, increasing saturation in the market of companies producing lab-grown diamonds and gemstones continues to drive down the value of these gems. Our Company has seen increasing competition in e-commerce for consumer fine jewelry (Blue Nile, Brilliant Earth, others).

21.     In recent years, there has been a dramatic decline in prices for moissanite and lab-grown diamond gemstones, relative to our investment in moissanite inventory. This has been

---

[1] This amount is approximated based on information reasonably available to me as of the preparation of this Declaration and may not reflect payments made or debts incurred in the ordinary course of business in the immediate period leading up to the filing of the Chapter 11 petition. The Debtor will update this figure in connection with the filing of the Schedules and Statements (as such terms are defined herein).

coupled with a significant increase in prices for precious metals, which we use in settings for finished jewelry.

22.     Additionally, inflation, economic headwinds, and an evolving competitive landscape have negatively impacted the jewelry and gemstone industry in recent years.

23.     In 2025, due to inflationary concerns, continued economic headwinds, and an evolving competitive landscape that continued to negatively impact the jewelry industry, the Company took steps to mitigate the effects on our business.  These strategic measures included a reduction in headcount, a review and renegotiation of vendor contracts, consolidation of our supply chain, and a shift to a more cost-effective freight partner.

24.     In addition to these market pressures, Charles & Colvard has faced a variety of financial and legal difficulties in the last few years, including, but not limited to, major changes in the company's Board of Directors and executive leadership, the company's delisting from the Nasdaq Stock Exchange in April of 2025, a confidential arbitration dispute with Wolfspeed, Inc., as well as legal challenges to certain corporate actions by Riverstyx Fund, L.P., and litigation commenced by Ethara Capital, LLC.  In the months leading to the Petition Date, the Company has struggled to recover from the hardships it has faced over the past several years, and the filing was precipitated by these various factors.  Additionally, in the months leading to filing, Charles & Colvard unsuccessfully sought alternative financing and exhausted all alternative transactions.

25.     The Company ultimately filed this chapter 11 proceeding on March 2, 2026 for the benefit of all creditors.

## II.     THE FIRST DAY MOTIONS

26.     The Debtor has filed several First Day Motions which address issues necessary to operate during the pendency of this Chapter 11 Case.  The Debtor has also requested that the Court

conduct a hearing as soon as possible to hear the First Day Motions (the "<u>First Day Hearing</u>").  A description of each of the First Day Motions is provided below.

**A.  <u>Debtor's Motion for Entry of Interim and Final Orders Authorizing the Debtor to Pay and Perform All Employee Obligations and Granting Related Relief</u>**

27.     The Debtor has requested that this Court enter an order authorizing payment of pre-petition employee wages and employee benefits (the "<u>Wage Motion</u>").

28.     The continued maintenance of employee pay and benefits is essential to the ongoing and valued services of the Debtor's employees. Accordingly, the Debtor has sought authority to pay certain pre-petition obligations to its employees.  These pre-petition obligations include various sums for: wages, federal and state withholding taxes, payment of health insurance premiums and all other employee benefits that the Debtor pays in the ordinary course of business as described in the Wage Motion (collectively, the "<u>Employer Obligations</u>").

29.     As of the Petition Date, the Debtor's workforce consists of approximately twenty-six (26) employees (the "<u>Employees</u>"). Twenty-five (25) employees are full-time, and one (1) employee is part-time. Of the full-time employees, fourteen (14) are salaried, and twelve (12) are paid hourly. The one (1) part-time employee is paid hourly. All Employees are paid bi-monthly.

30.      The Debtor pays its employees directly, by direct deposit and check.

31.     The Employees are not unionized.

a.  **<u>Wages, Salaries and Compensation.</u>**

32.     The Employees are paid wages (collectively, the "<u>Wages</u>").  All employees are paid semi-monthly.

33.     All full-time employees were paid in full pre-petition for work performed through February 27, 2026. The aggregate payroll for the bi-monthly payroll for salaried employee(s) covering the period of March 1, 2026, through March 2, 2026, will be approximately $3,290.00 of

which all may be deemed to have arisen pre-petition The aggregate payroll for the bi-monthly payroll for hourly employee(s) covering the period of February 21, 2026, through March 2, 2026, will be approximately $10,719.00 of which all may be deemed to have arisen pre-petition (collectively, the "Wages").

34.     As of the Petition Date, approximately all gross Wages are accrued and owed to Employees on the payroll dates noted above.  As more fully described in the Wage Motion, the Debtor requests authority to pay all unpaid Wages to the Employees and to continue to otherwise pay the Employees in the ordinary course of business.

35.     As of the Petition Date, the Debtor has also accrued $4,789.00 in pre-petition payroll tax obligations that constitute the company's share of payroll taxes. The Debtor seeks authority to honor and process its pre-petition obligations with respect to the payroll taxes, including authority to pay the payroll taxes to the applicable taxing authorities, as needed.

b.     **Employee Benefits.**

36.     The Debtor has established certain benefit plans for eligible Employees, including without limitation specifically employee-only health insurance coverage through Blue Cross Blue Shield, as well as employee-only short-term disability, long term disability, and life/AD&D insurance through USAble Life (all together, the "Employee Benefit Plans").  In general, all full-time Employees are eligible to participate in the Employee Benefit Plans.

37.     By the Wage Motion, the Debtor seeks authority to continue to provide the Employee Benefit Plans outlined above and in the Wage Motion; to pay, in the ordinary course of business, any obligations, charges, fees and premiums that may arise, or that may have arisen, under the Employee Benefit Plans, whether accrued pre- or post-petition.

B.     **Debtor's Emergency Motion for Authorization to Use Cash Collateral pursuant to 11 U.S.C. §§ 361, 363 and 506(c).**

38.     As noted herein, various secured creditors assert liens on all or substantially all of the Debtor's assets, including the Debtor's cash.  One of the Debtor's pressing concerns is the need for the immediate use of cash subject to the creditors' liens (the "Cash Collateral"). The Debtor requires the use of Cash Collateral in order to meet its expenses and maintain the operation of its business. Without the use of Cash Collateral, the Debtor's operations will be substantially and irreparably harmed, and the continued successful operation of the Debtor's business is essential to its operations during this case.  In order to avoid immediate and irreparable harm to the Debtor's estate, the Debtor requires the use of Cash Collateral to pay, among other things, payroll, utilities, taxes, insurance, post-petition vendors and other ordinary business costs and expenses.

39.     Accordingly, the Debtor requests authority to utilize cash collateral generated by the Debtor's business (the "Cash Collateral Motion") pursuant to a budget setting forth its anticipated receipts and disbursements during the initial phase of this Chapter 11 Case, which will be provided prior to the interim hearing.

40.     As adequate protection for any interest in Cash Collateral which the secured creditors may have, the Debtor is willing to grant the secured creditors replacement liens in the Debtor's post-petition Cash Collateral, to the same extent, priority and validity as its pre-petition liens as further described in the Cash Collateral Motion. The proposed replacement liens should provide sufficient adequate protection to prevent any diminution in value to the collateral.

41.     Finally, in order to avoid immediate and irreparable harm caused by the inability to utilize Cash Collateral, the Debtor further requests that the Court schedule an interim hearing on the Cash Collateral Motion.

C. **Debtor's Application for Approval of Officer and Director Compensation and Employment.**

42.     The Debtor seeks Court approval to employ and compensate me as the Executive Chairman of the Board of Directors of the Debtor in accordance with my pre-petition compensation arrangements.

43.     As Executive Chair, I hold a critical operational, leadership and corporate management position within the Debtor's business.  I am responsible for, among other things, overseeing the affairs of the Company, leading the executive team, and conducting a search for a Chief Executive Officer for an initial term of three months.  Additionally, I am involved in essential day-to-day and strategic business functions, formulating and executing the Debtor's business plans, leading and providing strategic direction to the Debtor's employees, implementing the operational goals of the Debtor's Chapter 11 Case, assisting the Debtor's bankruptcy counsel in preparing essential reporting documents, and providing critical strategic and operational leadership in our Company's restructuring.  My role as Executive Chair is vital to the Debtor's reorganization efforts.  My salary as requested in the application is in line with industry standards.  Accordingly, I believe the Court should authorize and approve the requested employment and compensation as set forth in the application.

44.     The Debtor seeks Court approval to employ and compensate Clint J. Pete as the Debtor's Chief Financial Officer in accordance with his pre-petition compensation arrangements.

45.     As Chief Financial Officer, Mr. Pete holds a critical operational role in the Debtor's business. Among other things, Mr. Pete is responsible for continuous engagement and coordination with the Board of Directors and executive leadership team, management of investor relations, completion of SEC and financial reporting, management of internal controls, overseeing banking and credit facility relationships, and is responsible for supervision and oversight of all accounting and taxation functions of the Debtor.

46.     Mr. Pete's role as CFO is critical to the success of the Debtor's reorganization efforts. Mr. Pete's salary as requested in the application is in line with industry standards. Accordingly, I believe the Court should authorize and approve the requested employment and compensation as set forth in the application.

**D.  Application of the Debtor pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 2014(a) for an Order Authorizing the Employment and Retention of Hendren, Redwine & Malone, PLLC as Bankruptcy Counsel for the Debtor.**

47.     The Debtor seeks to employ and retain Hendren, Redwine & Malone, PLLC ("Hendren Redwine") as its principal bankruptcy counsel to represent it as debtor in possession in this bankruptcy case effective as of the Petition Date.   Accordingly, the Debtor has filed an application for entry of an order authorizing it to employ and retain Hendren Redwine as its attorney to perform the necessary legal services during this Chapter 11 Case (the "Hendren Redwine Application").

48.     The Debtor has selected Hendren Redwine because this case is likely to be complex and will require Debtor's counsel to have extensive experience in chapter 11, restructuring and bankruptcy litigation. Hendren Redwine has extensive experience and knowledge in the field of reorganization, restructuring, debtors' and creditors' rights, business reorganizations under chapter 11 of the Bankruptcy Code and attendant litigation.  In addition, Hendren Redwine has worked with the Debtor pre-petition and become familiar with the Debtor's business and affairs and many of the potential legal issues which may arise in the context of these Chapter 11 Cases.  I believe that Hendren Redwine is both well-qualified and able to assist the Debtor in this Chapter 11 Case, and that the firm's retention is in the best interests of the Debtor's estate and its creditors.

**E.  Emergency Motion for Authorization to (I) Waive the Requirement to List Equity Security Holders and (II) Authorize the Debtor to Redact Certain Personal Information**

49.     The Debtor seeks an Order from this Court waiving the requirements to file the Equity List and to provide notice directly to equity security holders.  The common stock of the Debtor is traded on the OTC Expert Market under the symbol "CTHR", with approximately 3,118,273 shares of common stock outstanding as of the Petition Date.  The Debtor does not maintain a list of its equity security holders and, therefore, would need to obtain the names and addresses of its shareholders from a securities agent.

50.     Preparing the Equity List with last known addresses for each equity security holder and sending notices to all parties thereon would create undue expense and administrative burden with limited corresponding benefit to the estate or parties in interest.  Equity security holders are subject to change daily given stock trades.

51.     The Company has taken or will take several actions to inform its equity security holders of the commencement of the Chapter 11 case.  On or about the date hereof, the Debtor intends to issue a press release announcing the filing.  To the extent persons or entities have significant holdings of the Debtor's outstanding common stock, the Debtor disclosed any such persons or entities on the Corporate Ownership Statement and List of Equity Security Holders filed with its petition.  The Debtor will also issue a press release announcing the commencement of the Chapter 11 case.  The Debtor intends to file a Form 8-K with the SEC notifying investors and other parties of the commencement of the Chapter 11 case.  The Debtor is confident that taking these steps will reach most, if not all, of the equity security holders.

52.     The Debtor also seeks entry of an order authorizing the redaction of personal information from any document filed or to be filed with the Court in this Chapter 11 case, so as to protect individuals and to prevent the Debtor from potentially violating applicable data privacy and protection laws or regulations.

53.    Recognizing the need for transparency, the Debtor proposes to provide an unredacted version of any document filed or to be filed with the Court in this case (including the creditor matrix (the "Creditor Matrix") and any schedule of assets or liabilities (the "Schedules") or statement of financial affairs (the "Statement")) to (a) the Court, the Bankruptcy Administrator, and counsel to any official committee appointed in this case, and (b) any party in interest upon a request to the Debtor (email being sufficient) or to the Court that sets forth a reasonable basis for the request that is reasonably related to this case.  Furthermore, to the extent notice and/or service by mail (as opposed to email) is required or requested, the Debtor will serve individuals at their personal home addresses, ensuring that each individual will receive the same notices in the case as all other creditors without the unnecessary public disclosure of their home address.

54.    I believe that the request to waive the requirement to list equity security holders is reasonable and in the best interests of the Estate in light of the circumstances, as is the request to redact certain personal information, and the Court should allow the Debtor to do so as set forth in the motion.

### F.    Emergency Motion for Order Directing Wells Fargo Bank, N.A. to Release Hold on Debtor's Bank Accounts

55.    The Debtor seeks an order of the Court directing Wells Fargo Bank, N.A. to release a hold imposed on the Debtor's pre-petition bank accounts, as set forth more particularly in the motion.

56.    Prior to the bankruptcy filing, the Debtor maintained an operating account and deposit account at Wells Fargo, N.A., Account Nos. #2516 and #2180 (collectively, the "Pre-Petition Accounts").

57.     Following the filing of the Debtor's bankruptcy petition, Wells Fargo placed a hold on the Debtor's Pre-Petition Accounts, freezing the Debtor's Pre-Petition Accounts such that the Debtor is unable to access the funds in the Pre-Petition Accounts.

58.     As of the Petition Date, the combined balance in the Pre-Petition Accounts was approximately $146,908.99.  Without an Order from the Court, the Debtor will be unable to access these funds, which are critical to the Debtor's ongoing business operations.  Accordingly, I believe that the Debtor's request for an order directing Wells Fargo to restore the Debtor's full access to the Pre-Petition Accounts is reasonable, and the Court should grant the Debtor's motion.

59.     As discussed above, I am familiar with the various types of relief requested in the Debtor's First Day Motions described above, and for the reasons set forth above, I believe that the relief requested in the First Day Motions is in the best interest of the Debtor and its creditors.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 3rd day of March, 2026.

/s/ Michael Levin
Michael Levin
Executive Chairman of the Board of Directors of
Charles & Colvard, Ltd.