**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | |
| **CHARLES & COLVARD, LTD.** | ) | **Case No. 26-00969-5-DMW** |
| | ) | |
| **Debtor.** | ) | **Chapter 11** |
| | ) | |

**EMERGENCY MOTION FOR APPROVAL OF**
**DEBTOR-IN-POSSESSION FINANCING AND APPROVAL OF SECURITY**
**INTERESTS, LIENS, AND ENCUMBRANCES TO VAN LANG JEWELRY LLC**

NOW COMES Charles & Colvard, Ltd. (the "Debtor"), by and through its undersigned counsel, and pursuant to 11 U.S.C. §§ 105(a), 363(b) and 364 of the Bankruptcy Code, and hereby moves the Court for approval of, and authorization to obtain, debtor-in-possession financing and credit from Van Lang Jewelry LLC ("VLJ") upon the terms and conditions set forth herein. In support hereof, the Debtor shows unto the Court as follows:

INTRODUCTORY STATEMENT, SUMMARY OF RELIEF
REQUESTED, AND EXIGENT CIRCUMSTANCES

1.     By and through this *Emergency Motion for Authorization of Debtor-in-Possession Financing and Approval of Security Interests, Liens, and Encumbrances to Van Lang Jewelry LLC* (the "DIP Financing Motion"), and pursuant to §§ 105, 363(b), and 364 of the Bankruptcy Code, on an interim and final basis, the Debtor requests entry of an Order—on an interim and final basis (the "Interim Order" or the "Final Order" and, collectively referred to as, the "DIP Financing Orders"), authorizing the Debtor to enter into a post-petition financing and credit transaction with VLJ, in the maximum principal amount of $1,500,000.00, which would be secured by security interests, liens, and encumbrances in the following:

> a.     A first-priority security interest in all assets of the Debtor that constitute precious metals, regardless of form (the "Precious

1

Metals")[1] and the proceeds of any of the Debtor's estate's causes of action with the exception of the Avoidance Action Proceeds.[2]

b.   A second-priority security interest in all other assets of the Debtor. i.e., other than Precious Metals and the proceeds of any of the Debtor's estate's causes of action with the exception of the Avoidance Action Proceeds, junior only to any perfected and non-avoidable security interest in favor of Wolfspeed (the "Other Collateral").

(the collateral described in a. and b. above shall be collectively referred to herein as the "DIP Loan Collateral" and the entire credit transaction with VLJ, including any and all attendant loan documents necessary to consummate the transaction with VLJ are referred to collectively as the "DIP Loan Transaction" or the "DIP Loan").  The DIP Loan would further be secured by a superpriority administrative claim with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code.

2.   The relief requested herein is sought, on an emergency basis, because the Debtor does not have sufficient funding or income to continue its operations without additional back-stop funding, which will not be possible or attainable absent granting the relief requested herein.  The Debtor has unsuccessfully sought alternative funding options.

3.   In order to maintain existing operations and retain the maximum value of its business, the Debtor will be required to incur certain operating expenses. Absent receiving

---

[1] For the avoidance of doubt, the term "Precious Metals" shall include, but not be limited to, the Debtor's finished precious-metal jewelry inventory (i.e., the Debtor's finished jewelry inventory incorporating precious metals as a whole SKU, meaning the entire finished ring/necklace/bracelet item that incorporates precious metals, including any gemstones set in those finished items, and all proceeds thereof, but excluding loose gems not incorporated into finished jewelry).  The DIP Loan Documents (defined below) specify that the obligation of VLJ to make any advance under the DIP Facility is conditioned on Wolfspeed, Inc. first stipulating that VLJ has a first priority, fully perfected security interests in and liens upon the Precious Metals and all of the Debtor's rights in such property acquired post-petition (and proceeds thereof), whether now existing or hereafter acquired or arising (and such first priority security interest being reflected in the Interim Order or the Final Order, as applicable).  Wolfspeed, Inc. has so stipulated, and its stipulation is reflected in the Interim Order attached hereto as **EXHIBIT A**.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Term Sheet (defined below).

approval of the DIP Loan, the Debtor will not be able to continue its operations uninterrupted, reducing the amount available for payment of all creditors.

4.     In accordance with Fed. R. Bankr. P. 4001, set forth below is a summary of the terms of the proposed DIP Transaction:[3]

| | |
|---|---|
| **Borrower(s)/Applicant(s):** | Charles & Colvard, Ltd. |
| **Lender:** | Van Lang Jewelry LLC |
| **Total Maximum Commitment Amount:** | $1,500,000.00 |
| **Term/Repayment:** | June 30, 2026 |
| **Interest Rate:** | Non-default interest at 9% per annum; default interest at 12% per annum. |
| **Fees:** | The reasonable and documented fees and out-of-pocket expenses incurred or accrued by the DIP Lender (the foregoing to include all unpaid reasonable and documented prepetition fees, out-of-pocket costs and expenses incurred by the DIP Lender in connection with the DIP Facility) in connection with any and all aspects of the Debtor's Case shall be paid by the DIP Borrower from a DIP Facility reserve in the total amount of $100,000.00 (the "DIP Lender Expense Reserve"). The DIP Lender will provide regular statements of such fees and expenses so that the DIP Borrower can track the reduction of the DIP Lender Expense Reserve. |
| **Security Interests, Liens, Encumbrances, and Collateral:** | VLJ shall be granted, pursuant to §§ 364(c)(2) and 364(c)(3) of the Bankruptcy Code, a continuing, valid, binding, |

---

[3] The description of the terms and conditions of the DIP Loan and the Interim Order, set forth in this DIP Financing Motion, are intended solely for informational purposes to provide the Court and parties-in-interest with an overview of the significant terms thereof and should only be relied upon as such. The summaries are qualified in their entirety by the documents evidencing the DIP Loan (referred to herein as the "DIP Loan Documents") and the Interim Order. In the event there is a conflict between this Motion, the DIP Loan Documents, and the Interim Order, the terms, conditions and provisions of the DIP Loan Documents and the Interim Order, as applicable, shall control in all respects. A more detailed summary of the terms of the DIP Loan is set forth on the non-binding term sheet attached hereto as **EXHIBIT B**.

| | |
|---|---|
| | enforceable, non-avoidable, and automatically perfected, post-petition first-priority security interest in the Precious Metals and the Causes of Action. VLJ shall further be granted, pursuant to §§ 364(c)(2) and 364(c)(3) of the Bankruptcy Code, a continuing, valid, binding, enforceable, non-avoidable, and automatically perfected, post-petition second-priority security interest in the Other Collateral. VLJ shall further be allowed a superpriority administrative claim with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code. |
| **Use of Proceeds:** | The funds, financing, and credit provided by VLJ under the DIP Loan Transaction shall be used by the Debtor to fund and pay operating expenses incurred by the Debtor; necessary costs and expenses associated with the administration of this Bankruptcy Case; if necessary, any required debt-service payments in the underlying bankruptcy proceeding of the Debtor; and any applicable interest premiums, attorneys' fees, costs, expenses, penalties, and other amounts owed on account of the DIP Loan, to the extent applicable. In each case, such funds shall be used solely in accordance with the Approved Budget and the Financing Orders (each as defined below) incorporating the terms hereof. |
| **Covenants:** | The DIP Loan shall have customary covenants for a loan of this type. |
| **Representations and Warranties:** | The Debtor shall make the representations and warranties that are customary for a loan of this type. |
| **Events of Default:** | The DIP Loan shall have those events of default that are customary for a loan of this type. |

4

5.     Federal Rule of Bankruptcy Procedure 4001(c) provides that a final hearing on a motion to obtain post-petition credit and financing may not be commenced earlier than fifteen (15) days after the service thereof. However, and upon request, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit and financing if necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing. In accordance with Fed. R. Bankr. P. 4001(c), the Debtor requests that the Court (a) conduct an expedited preliminary hearing on the Motion and authorize the Debtor to execute any and all documentation to consummate the Post-Petition Loan Transaction and extension of credit up to the principal amount of $1,500,000.00, on an interim basis, to maintain and finance the ongoing operations of the Debtor, and avoid immediate and irreparable harm and prejudice to the Debtor, its bankruptcy estate, creditors, and all parties-in-interest; and (b) schedule a final hearing on the relief requested herein.

JURISDICTION AND AUTHORITY

6.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

7.     This Court, likewise, has authority to hear this matter pursuant to the General Order of Reference entered by the United States District Court for the Eastern District of North Carolina on August 3, 1984.

FACTUAL BACKGROUND

8.     The Debtor filed a voluntary petition seeking relief under chapter 11 of the Bankruptcy Code on March 2, 2026 (the "Petition Date"), Case No. 26-00969-5-DMW (the "Bankruptcy Case") and, since that date, has operated as Debtor-in-Possession.

9.     The events leading up to the Petition Date and the facts and circumstances

supporting the relief requested in this Motion are set forth in the *Declaration of Michael Levin in Support of Chapter 11 Petition and First Day Pleadings* (the "Levin Declaration").

10. The Debtor is a North Carolina corporation founded in 1995 and headquartered in Morrisville, North Carolina. The Debtor was founded as C3 Diamante, Inc., and changed its name to C3, Inc. by Articles of Amendment filed on April 10, 1996. The Debtor subsequently changed its name to Charles & Colvard, Ltd. by Articles of Amendment filed on May 17, 2000.

11. The Debtor is a globally recognized fine jewelry company specializing in lab-created gemstones. Its common stock is quoted on the OTC Experts Market under the symbol "CTHR." The Debtor manufactures, markets, and distributes Charles & Colvard Created Moissanite® including its premium moissanite gemstone brand, Forever One™, as well as Caydia®, its brand of premium lab-grown diamonds. The Debtor offers gemstones and finished jewelry featuring its proprietary moissanite jewels, premium lab-grown diamonds, created color gemstones, and most recently, lab-grown diamonds in color, for sale in the worldwide fine jewelry market through two operating segments: its Online Channels segment, which encompasses its digital properties components, comprised of its charlesandcolvard.com, moissaniteoutlet.com, charlesandcolvarddirect.com, and madenetwork.com websites; e-commerce outlets, including marketplaces, drop-ship customers, and other pure-play, exclusively e-commerce customers; and its Traditional segment, which consists of domestic and international distributors and retail customers, including end-consumers through its first Charles & Colvard Signature Showroom, which opened in October 2022. As of the Petition Date, the Debtor had a total of 26 full-time employees and 1 part-time employee.

12. The Debtor believes and represents that in order to maximize the value of its assets, the Debtor will be required to incur certain operating expenses.

13.     Prior to the Petition Date, Essential Lab Grown Diamonds Inc. ("Essential Diamonds") filed a UCC-1 financing statement against the Debtor with the North Carolina Secretary of State on April 4, 202123, bearing File No. 20210042326C, covering certain "[l]oose laboratory-grown diamonds . . . delivered on consignment terms by [Essential Diamonds] pursuant to Consignment Agreement, Consignment and Security Agreement, and/or Consignment Memoranda, to or for the account of the Debtor . . . together with all products and proceeds of any nature (including insurance proceeds), and all receivables and contract rights created by the sale of the Collateral."  As of the Petition Date, the outstanding balance owed to Essential Diamonds is believed to be approximately $66,024.00.

14.     Prior to the Petition Date, Wolfspeed filed a UCC-1 financing statement against the Debtor with the North Carolina Secretary of State on May 8, 2023, bearing File No. 20230058140G, in connection with an Exclusive Supply Agreement dated December 12, 2014, as amended, and a Confidential Settlement Agreement dated on or about February 7, 2025 (the "Wolfspeed Agreement").  Wolfspeed's filed UCC-1 states "All assets of the Debtor, whether now owned or hereafter acquired, together with all proceeds, products, accessions and additions with respect to each of the foregoing from time to time, including, without limitation, any insurance proceeds, but expressly excluding assets that constitute precious metals, regardless of form." (Emphasis added.)  As of the Petition Date, the outstanding balance owed to Wolfspeed under the Wolfspeed Agreement is believed to be approximately $2,437,096.00.

15.     Prior to the Petition Date, Ethara filed a UCC-1 financing statement against the Debtor with the North Carolina Secretary of State on December 4, 2025, bearing File No. 20250178577F, in connection with a Convertible Secured Note Purchase Agreement dated June 24, 2025 and a Secured Convertible Note dated July 3, 2025 (the "Ethara Agreement").  Ethara's

filed UCC-1 purportedly covers "All fixtures and personal property of every kind and nature".  As of the Petition Date, the outstanding balance owed to Ethara under the Ethara Agreement is believed to be approximately $2,000.000.00.  On March 16, 2026, the Debtor initiated an adversary proceeding against Ethara for avoidance of preferential transfers and preservation of avoided liens pursuant to 11 U.S.C. §§544, 547 and 551.

16. Prepetition, the Debtor explored and attempted to obtain credit and financing from a variety of third-party sources, both secured and unsecured.  Despite its best efforts, the Debtor was unable to secure the necessary and required credit and financing in an amount sufficient to meet the Debtor's ongoing capital needs.

17. The Debtor has an immediate and critical need to obtain the requisite financing and credit through the DIP Loan addressed herein, to—*inter alia*: (a) Satisfy working capital, operational, and general corporate needs; (b) Pay and fund those costs and expenses related to the Bankruptcy Case; (c) Pay any applicable interest premiums, attorneys' fees, costs, expenses, penalties, and other amounts owed on account of the DIP Loan, to the extent applicable; and (d) If necessary, pay any required debt-service payments in the underlying bankruptcy proceeding of the Debtor.  The ability of the Debtor to maintain business relationships with its vendors, suppliers, and customers requires the availability of necessary capital for the payment of ongoing operating costs and expenses from the DIP Loan, the absence of which would immediately and irreparably harm the Debtor, the bankruptcy estate, creditors, and parties-in-interest.  Absent approval of the DIP Loan Transaction outlined herein, the Debtor does not have sufficient available sources of working capital and financing to continue operations. In the absence of the DIP Loan and the use thereof, the Debtor's business and bankruptcy estate would suffer immediate and irreparable harm and all operations would cease. Access to, and use of the proceeds available from, the DIP Loan,

will provide the Debtor with sufficient working capital and liquidity to continue operations.

18.     If authorized, the DIP Loan will provide the Debtor with adequate capital to continue operations and meet its financial obligations.  If the DIP Loan is not authorized and approved, the Debtor will not be able to meet its immediate need for capital to continue operations and maintain business relationships with its vendors, suppliers, and customers.

BASIS FOR RELIEF

19.     Sections 363 and 364 of the Bankruptcy Code, collectively, authorize trustees and debtors-in-possession, who are authorized to operate the business of the debtor under §1108, to obtain unsecured and secured post-petition credit.  Section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  The use, sale or lease of property of the estate, other than in the ordinary course of business, is authorized when there is a "sound business purpose" that justifies such action. See Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc. (In re Cont'l Airlines), 780 F.2d 1223, 1225-26 (5th Cir. 1986); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that judicial approval under § 363(b) requires a showing that the proposed action is fair and equitable, in good faith and supported by a good business reason).  Whether seeking approval under §§ 364(c) or 364(d) of the Bankruptcy Code, debtors-in-possession must demonstrate the following by a preponderance of the evidence:

(1)     the proposed financing is an exercise of sound and reasonable business judgment;

(2)     no alternative financing is available on any other basis;

(3)     financing is in the best interests of the estate and its creditors; and

(4)     no better offers, bids, or timely proposals are before the court.

9

In re Clouter Creek Res. LLC (Clouter Creek), 669 B.R. 764, 781 (Bankr. D.S.C. 2025) (citations omitted); accord In re DB Capital Holdings, LLC, 454 B.R. 804, 822 (Bankr. D. Colo. 2011).

20.     The business judgment rule is a "policy of judicial restraint born of the recognition that directors are, in most cases, more qualified to make business decisions than are judges." Int'l Ins. Co. v. Johns, 874 F.2d 1447, 1458 n.20 (11th Cir. 1989); see F.D.I.C. v. Castetter, 184 F.3d 1040, 1044 (9th Cir. 1999) ("The general purpose of the business judgment rule is to afford directors broad discretion in making corporate decisions and to allow these decisions to be made without judicial second-guessing in hindsight."). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." See Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Where a valid business justification exists, the debtor's decision to use property out of the ordinary course of business enjoys a strong presumption that "in making a business decision the . . . corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992).

21.     The Debtor's business judgment, in this case and under these circumstances, does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. Courts grant debtors considerable deference in exercising their sound business judgment. See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit

reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."). See also In re Funding Sys. Asset Mgmt. Corp., 72 B.R. 87, 88 (Bankr. W.D. Pa. 1987); In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985); In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981).  Here, the Debtor has determined that financing is available only under § 364(c) of the Bankruptcy Code and that entering into the DIP Loan Transaction is in the best interests of the Debtor and its estate.

22.     To obtain post-petition financing under 11 U.S.C. § 364(c), the court must find, after notice and a hearing, that the debtor "is unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 364(c). See In re Crouse Grp., Inc., 71 B.R. 544, 549 (Bankr.E.D.Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code, specifically looking at whether (i) the debtor is unable to obtain unsecured credit under 11 U.S.C. § 364(b) (i.e., by allowing a lender only an administrative claim); (ii) the transaction is necessary to preserve the assets of the estate; and (iii) the terms are fair, reasonable and adequate given the circumstances of the debtor-borrower and proposed lender(s).  See, e.g., In re Aqua Assocs., 123 B.R. 192, 195–96 (Bankr.E.D.Pa. 1991); In re Ames Dep't Stores, 115 B.R. at 37-40; see also In re St. Mary Hosp., 86 B.R. 393, 401-02 (Bankr.E.D.Pa. 1988); Crouse Grp., 71 B.R. at 549.

23.     As described above and as set forth in the Levin Declaration, the Debtor is in need of an immediate capital infusion, yet substantially all of the Debtor's existing assets are encumbered under its existing capital structure.  Considering these circumstances and following

11

discussions with potential lenders regarding post-petition financing, the Debtor, in consultation with its advisors, concluded that the DIP Loan would be the best financing option.  Without post-petition financing, the Debtor lacks sufficient funds to operate its enterprise, continue paying its debts as they come due, and cover the projected costs of this Chapter 11 case.  Absent the DIP Loan, the value of the bankruptcy estate would be significantly impaired to the detriment of all stakeholders.  The Debtor therefore believes that the terms of the DIP Loan, as set forth in the DIP Loan Documents, are fair, reasonable, and adequate, all as more fully set forth herein.  For all these reasons, the Debtor submits that it has met the standard for obtaining post-petition financing.

24.  In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under Section 503(b)(1) of the Bankruptcy Code, Section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt-- (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien."  As described herein, the Debtor is unable to obtain unsecured credit.  Therefore, approving superpriority claims to the extent and as set forth in the DIP Loan Documents is also reasonable and appropriate.

25.  A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by Section 364(c) of the Bankruptcy Code. In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986); see also In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr.N.D.Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr.N.D.Ga. 1988), aff'd sub nom. Anchor Sav. Bank FSB v.

Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D.Ga. 1989); In re Stanley Hotel, Inc., 15 B.R. 660, 663 (D.Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); In re Ames Dep't Stores, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

26.     As noted above and as borne out by the Debtor's efforts, the Debtor does not believe that any alternative sources of financing exist or are reasonably available given the realities imposed by the Debtor's existing capital structure and its unsuccessful solicitation of alternative financing proposals.  Substantially all of the Debtor's existing assets are encumbered under their existing capital structure.  Thus, the Debtor has determined that the DIP Loan provides the most favorable terms available to the Debtor under the circumstances to fund this bankruptcy case.  Therefore, the Debtor submits that the requirement that alternative credit on more favorable terms be unavailable is satisfied.

27.     The Debtor has negotiated with VLJ at arms-length, in good faith, and pursuant to its sound business judgment and, as a result, the terms and conditions of the DIP Loan Transaction, as summarized herein, are fair and reasonable under the circumstances.  Accordingly, VLJ and all obligations incurred under the DIP Loan Transaction should be afforded the benefits of § 364(e) of the Bankruptcy Code.

28.     Absent authorization from the Court to obtain the Interim Order, authorizing the Debtor to enter into the DIP Loan Transaction and execute the DIP Loan Documents, the Debtor will be immediately and irreparably harmed.  As set forth above, the Debtor's ability to enter into the DIP Loan Transaction is critical to its ability to preserve any value for its creditors.  Without immediate liquidity provided by access to the DIP Loan with VLJ, the Debtor will simply be

unable to conduct normal business operations, and its estate, creditors, employees, and equity holders will be immediately and irreparably harmed.

29. The Debtor requests that the Court conduct a hearing to consider entry of the Interim Order authorizing the Debtor, from and after entry of the Interim Order until the Final Hearing, to receive initial funding under the DIP Facilities on the terms and conditions set forth in the Interim Order attached hereto as **EXHIBIT A**. This relief will enable the Debtor to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to its estate and all parties in interest.

### REQUEST FOR FINAL HEARING

30. Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtor requests that the Court set a date for the Final Hearing as soon as is practicable, and in no event more than thirty (30) days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

### WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

31. To successfully implement the foregoing, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale or lease of property under Bankruptcy Rule 6004(h).

### RESERVATION OF RIGHTS

32. Nothing contained herein is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtor under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtor's or any other party in interest's right to dispute any claim, (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion;

14

(e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to Section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, extent. enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtor's estate; or (g) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.

NOTICE

33.     Notice of this Motion will be provided to the following parties: (a) the office of the Bankruptcy Administrator; (b) those creditors holding the 20 largest unsecured claims against the Debtor's estate; (c) Wolfspeed; and (d) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").   Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtor respectfully submits that no other or further notice is required.

CONCLUSION

WHEREFORE, and based on the foregoing, the Debtor requests that the postpetition financing and credit transaction, as memorialized, summarized, and referred to herein as the DIP Loan Transaction, be approved on an interim basis, as reflected in the proposed *Interim Order Allowing Emergency Motion for Authorization of Debtor-in-Possession Financing and Approval of Security Interests, Liens, and Encumbrances to Van Lang Jewelry LLC* (the "Interim Order") attached hereto as **EXHBIIT A** and incorporated herein by reference, that the Debtor be authorized to execute any and all documentation necessary to consummate said transaction, and for such other relief that is just and proper.

15

DATED: March 18, 2026

HENDREN, REDWINE & MALONE, PLLC

s/*Rebecca Redwine Grow*
Jason L. Hendren (NC State Bar No. 26869)
Rebecca Redwine Grow (NC State Bar No. 37012)
Benjamin E.F.B. Waller (NC State Bar No. 27680)
Lydia C. Carpenter (NC State Bar No. 56697
4600 Marriott Drive, Suite 150
Raleigh, NC 27612
Telephone:  (919) 573-1422
Facsimile:   (919) 420-0475
Email: jhendren@hendrenmalone.com
        rredwine@hendrenmalone.com
        bwaller@hendrenmalone.com
        lcarpenter@hendrenmalone.com
*Counsel for the Debtor*

16

**EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | |
| **CHARLES & COLVARD, LTD.** | ) | **Case No. 26-00969-5-DMW** |
| | ) | |
| **Debtor.** | ) | **Chapter 11** |
| | ) | |

**FIRST INTERIM ORDER APPROVING DEBTOR-IN-POSSESSION**
**FINANCING AND APPROVING SECURITY INTERESTS, LIENS, AND**
**ENCUMBRANCES TO VAN LANG JEWELRY LLC**

THIS MATTER coming before the Court upon the *Emergency Motion for Authorization of Debtor-in-Possession Financing and Approval of Security Interests, Liens, and Encumbrances to Van Lang Jewelry LLC* (the "DIP Financing Motion") filed by Charles & Colvard, Ltd. (the "Debtor") seeking entry of an Order pursuant to 11 U.S.C. §§ 105(a), 363(b) and 364 of the Bankruptcy Code, on an interim and final basis, for approval of, and authorization to obtain, debtor-in-possession financing and credit from Van Lang Jewelry LLC ("VLJ") upon the terms and conditions set forth in the DIP Financing Motion in the maximum principal amount of $1,500,000.00, which would be secured by (i) a first-priority security interest in all assets of the

1

Debtor that constitute precious metals, regardless of form (the "Precious Metals")[1] and the proceeds of any of the Debtor's estate's causes of action with the exception of the Avoidance Action Proceeds (the "Causes of Action");[2] (ii) a second-priority security interest in all other assets of the Debtor, i.e., other than Precious Metals and the proceeds of any of the Debtor's estate's causes of action with the exception of the Avoidance Action Proceeds (the "Other Collateral" and together with the Precious Metals and the Causes of Action, the "DIP Collateral"), junior only to any perfected and non-avoidable security interest in favor of Wolfspeed, Inc. ("Wolfspeed"); and (iii) a superpriority administrative expense claim with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code.

The Court having considered the DIP Financing Motion, the record in the above-captioned case, the arguments and evidence at the hearing held in Raleigh, North Carolina on March 23, 2026, and after due deliberation and consideration and good and sufficient cause appearing, the Court finds that the DIP Financing Motion should be allowed and the transaction, as summarized therein, is in the best interests of the estate and is a proper exercise of the Debtor's business judgment.

The Court hereby makes the following **FINDINGS OF FACT** and **CONCLUSIONS OF LAW**:

---

[1] For the avoidance of doubt, the term "Precious Metals" shall include, but not be limited to, the Debtor's finished precious-metal jewelry inventory (i.e., the Debtor's finished jewelry inventory incorporating precious metals as a whole SKU, meaning the entire finished ring/necklace/bracelet item that incorporates precious metals, including any gemstones set in those finished items, and all proceeds thereof, but excluding loose gems not incorporated into finished jewelry). The DIP Loan Documents (defined below) specify that the obligation of VLJ to make any advance under the DIP Facility is conditioned on Wolfspeed, Inc. first stipulating that VLJ has a first priority, fully perfected security interests in and liens upon the Precious Metals and all of the Debtor's rights in such property acquired post-petition (and proceeds thereof), whether now existing or hereafter acquired or arising (and such first priority security interest being reflected in the Interim Order or the Final Order, as applicable). Wolfspeed, Inc. has so stipulated, and its stipulation is reflected herein.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Term Sheet (defined below).

1.      This Court has jurisdiction over this matter and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.  Consideration of the DIP Financing Motion constitutes a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      No request has been made for the appointment of a trustee or examiner and no statutory committee ("Committee") has been appointed in this matter.

3.      The Debtor filed a voluntary petition seeking relief under chapter 11 of the Bankruptcy Code on March 2, 2026 (the "Petition Date"), Case No. 26-00969-5-DMW (the "Bankruptcy Case") and, since that date, has operated as Debtor-in-Possession.

4.      The events leading up to the Petition Date and the facts and circumstances supporting the relief requested in the DIP Financing Motion are set forth in the *Declaration of Michael Levin in Support of Chapter 11 Petition and First Day Pleadings* (the "Levin Declaration").

5.      The Debtor is a North Carolina corporation founded in 1995 and headquartered in Morrisville, North Carolina.  The Debtor was founded as C3 Diamante, Inc., and changed its name to C3, Inc. by Articles of Amendment filed on April 10, 1996.  The Debtor subsequently changed its name to Charles & Colvard, Ltd. by Articles of Amendment filed on May 17, 2000.

6.      The Debtor is a globally recognized fine jewelry company specializing in lab-created gemstones.  Its common stock is quoted on the OTC Experts Market under the symbol "CTHR."   The Debtor manufactures, markets, and distributes Charles & Colvard Created Moissanite® including its premium moissanite gemstone brand, Forever One™, as well as Caydia®, its brand of premium lab-grown diamonds.  The Debtor offers gemstones and finished jewelry featuring its proprietary moissanite jewels, premium lab-grown diamonds, created color

3

gemstones, and most recently, lab-grown diamonds in color, for sale in the worldwide fine jewelry market through two operating segments: its Online Channels segment, which encompasses its digital properties components, comprised of its charlesandcolvard.com, moissaniteoutlet.com, charlesandcolvarddirect.com, and madenetwork.com websites; e-commerce outlets, including marketplaces, drop-ship customers, and other pure-play, exclusively e-commerce customers; and its Traditional segment, which consists of domestic and international distributors and retail customers, including end-consumers through its first Charles & Colvard Signature Showroom, which opened in October 2022. As of the Petition Date, the Debtor had a total of 26 full-time employees and 1 part-time employee.

7. The Debtor believes and represents that in order to maximize the value of its assets, the Debtor will be required to incur certain operating expenses.

8. Prior to the Petition Date, Essential Lab Grown Diamonds Inc. ("Essential Diamonds") filed a UCC-1 financing statement against the Debtor with the North Carolina Secretary of State on April 4, 202123, bearing File No. 20210042326C, covering certain "[l]oose laboratory-grown diamonds . . . delivered on consignment terms by [Essential Diamonds] pursuant to Consignment Agreement, Consignment and Security Agreement, and/or Consignment Memoranda, to or for the account of the Debtor . . . together with all products and proceeds of any nature (including insurance proceeds), and all receivables and contract rights created by the sale of the Collateral." As of the Petition Date, the outstanding balance owed to Essential Diamonds is believed to be approximately $66,024.00.

9. Prior to the Petition Date, Wolfspeed filed a UCC-1 financing statement against the Debtor with the North Carolina Secretary of State on May 8, 2023, bearing File No. 20230058140G, in connection with an Exclusive Supply Agreement dated December 12, 2014, as

amended, and a Confidential Settlement Agreement dated on or about February 7, 2025 (the "Wolfspeed Agreement").  Wolfspeed's filed UCC-1 covers "All assets of the Debtor, whether now owned or hereafter acquired, together with all proceeds, products, accessions and additions with respect to each of the foregoing from time to time, including, without limitation, any insurance proceeds, <u>but expressly excluding assets that constitute precious metals, regardless of form</u>." (Emphasis added.)  As of the Petition Date, the outstanding balance owed to Wolfspeed under the Wolfspeed Agreement is believed to be approximately $2,437,096.00.

10.     Prior to the Petition Date, Ethara filed a UCC-1 financing statement against the Debtor with the North Carolina Secretary of State on December 4, 2025, bearing File No. 20250178577F, in connection with a Convertible Secured Note Purchase Agreement dated June 24, 2025 and a Secured Convertible Note dated July 3, 2025 (the "Ethara Agreement").  Ethara's filed UCC-1 purportedly covers "All fixtures and personal property of every kind and nature".  As of the Petition Date, the outstanding balance owed to Ethara under the Ethara Agreement is believed to be approximately $2.1 million.

11.     Prepetition, the Debtor explored and attempted to obtain credit and financing from a variety of third-party sources, both secured and unsecured.  Despite its best efforts, the Debtor was unable to secure the necessary and required credit and financing in an amount sufficient to meet the Debtor's ongoing capital needs.

12.     The Debtor has an immediate and critical need to obtain the requisite financing and credit through the DIP Loan addressed herein, to—*inter alia*: (a) Satisfy working capital, operational, and general corporate needs; (b) Pay and fund those costs and expenses related to the Bankruptcy Case; (c) Pay any applicable interest premiums, attorneys' fees, costs, expenses, penalties, and other amounts owed on account of the DIP Loan, to the extent applicable; and (d) If

necessary, pay any required debt-service payments in the underlying bankruptcy proceeding of the Debtor.  The ability of the Debtor to maintain business relationships with its vendors, suppliers, and customers requires the availability of necessary capital for the payment of ongoing operating costs and expenses from the DIP Loan, the absence of which would immediately and irreparably harm the Debtor, the bankruptcy estate, creditors, and parties-in-interest.  Absent approval of the DIP Loan Transaction outlined herein, the Debtor does not have sufficient available sources of working capital and financing to continue operations. In the absence of the DIP Loan and the use thereof, the Debtor's business and bankruptcy estate would suffer immediate and irreparable harm. Access to, and use of the proceeds available from, the DIP Loan, will provide the Debtor with sufficient working capital and liquidity to continue operations.

13.     The Debtor is unable to obtain the required funds, financing and credit (i) in the form of unsecured credit or debt allowable under section 503(b)(1) of the Bankruptcy Code, an administrative expense pursuant to section 364(a) or (b) of the Bankruptcy Code, or (ii) terms more favorable than those offered by VLJ as part of the DIP Loan Transaction summarized in this Order and any other Orders or agreements, documents, notes, or instruments delivered pursuant hereto or the DIP Financing Motion or in connection herewith or the DIP Financing Motion.

14.     The terms of the financing, as summarized in the DIP Financing Motion and more particularly set forth in the DIP Loan Documents, are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties and constitute reasonably equivalent value and fair consideration.

15.     The Debtor has requested that, pursuant to the terms of the DIP Loan Transaction, VLJ be allowed and permitted to make loans and advances and provide other financial accommodations to the Debtor, to be used by the Debtor solely in accordance with the terms of

the DIP Loan Documents.

16.     VLJ, as a condition for extension of credit and financing to the Debtor in the amounts set forth in the DIP Loan Transaction, is conditioned upon it receiving (i) a first-priority security interest in the Precious Metals and the Causes of Action; (ii) a second-priority security interest in the Other Collateral, junior only to any perfected and non-avoidable security interest in favor of Wolfspeed; and (iii) a superpriority administrative expense claim with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code.

17.     Wolfspeed is entitled to receive adequate protection to the extent of any diminution in value of its interest in the prepetition collateral in exchange for their consent to the DIP Financing Transaction, including the priming of its liens on the Precious Metals.

18.     Accordingly, the relief requested in the DIP Financing Motion is necessary, essential, and appropriate for the continued operation of the Debtor's business, the management and preservation of its assets, and is in the best interests of the Debtor, the estate, and creditors.

19.     In accordance with Fed. R. Bankr. P. 4001, set forth below is a summary of the terms of the proposed DIP Loan Transaction: DIP Transaction:[3]

| Borrower(s)/Applicant(s): | Charles & Colvard, Ltd. |
|---|---|
| Lender: | Van Lang Jewelry LLC |
| Total Maximum Commitment Amount: | $1,500,000.00 |
| Term/Repayment: | June 30, 2026 |

---

[3] The description of the terms and conditions of the DIP Loan and the Interim Order, set forth in this DIP Financing Motion, are intended solely for informational purposes to provide the Court and parties-in-interest with an overview of the significant terms thereof and should only be relied upon as such. The summaries are qualified in their entirety by the documents evidencing the DIP Loan (referred to herein as the "DIP Loan Documents") and the Interim Order. In the event there is a conflict between this Motion, the DIP Loan Documents, and the Interim Order, the terms, conditions and provisions of the DIP Loan Documents and the Interim Order, as applicable, shall control in all respects.

7

| | |
|---|---|
| **Interest Rate:** | Non-default interest at 9% per annum; default interest at 12% per annum. |
| **Fees:** | The reasonable and documented fees and out-of-pocket expenses incurred or accrued by the DIP Lender (the foregoing to include all unpaid reasonable and documented prepetition fees, out-of-pocket costs and expenses incurred by the DIP Lender in connection with the DIP Facility) in connection with any and all aspects of the Debtor's Case shall be paid by the DIP Borrower from a DIP Facility reserve in the total amount of $100,000.00 (the "DIP Lender Expense Reserve"). The DIP Lender will provide regular statements of such fees and expenses so that the DIP Borrower can track the reduction of the DIP Lender Expense Reserve. |
| **Security Interests, Liens, Encumbrances, and Collateral:** | VLJ shall be granted, pursuant to §§ 364(c)(2) and 364(c)(3) of the Bankruptcy Code, a continuing, valid, binding, enforceable, non-avoidable, and automatically perfected, post-petition first-priority security interest in the Precious Metals and the Causes of Action. VLJ shall further be granted, pursuant to §§ 364(c)(2) and 364(c)(3) of the Bankruptcy Code, a continuing, valid, binding, enforceable, non-avoidable, and automatically perfected, post-petition second-priority security interest in the Other Collateral. VLJ shall further be allowed a superpriority administrative claim with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code. |
| **Use of Proceeds:** | The funds, financing, and credit provided by VLJ under the DIP Loan Transaction shall be used by the Debtor to fund and pay operating expenses incurred by the Debtor; necessary costs and expenses associated with the administration of this Bankruptcy |

| | Case; if necessary, any required debt-service payments in the underlying bankruptcy proceeding of the Debtor; and any applicable interest premiums, attorneys' fees, costs, expenses, penalties, and other amounts owed on account of the DIP Loan, to the extent applicable. In each case, such funds shall be used solely in accordance with the Approved Budget and the Financing Orders (each as defined below) incorporating the terms hereof. |
|---|---|
| **Covenants:** | The DIP Loan shall have customary covenants for a loan of this type. |
| **Representations and Warranties:** | The Debtor shall make the representations and warranties that are customary for a loan of this type. |
| **Events of Default:** | The DIP Loan shall have those events of default that are customary for a loan of this type. |

20.     Based on the record before the Court, the terms of the DIP Loan Transaction, including the provisions of the DIP Loan Documents, pursuant to which the loan, advances and other credit and financial accommodations will be made or provided to the Debtor by VLJ, have been negotiated at arms' length and in "good faith," as that term is used in § 364(e) of the Bankruptcy Code, and are in the best interests of the Debtor, its estate and creditors.  Based on the record presented to the Court by the Debtor, it appears that VLJ and its respective partners, employees, representatives, advisors, and consultants are entitled to a finding of "good faith" pursuant to § 364(e) of the Bankruptcy Code, and are entitled to the full protection and benefits of the provisions of § 364(e) of the Bankruptcy Code in the event that this Order or any provision herein is vacated, reversed or modified, on appeal or otherwise.

21.     It is in the best interests of the bankruptcy estate that the Debtor be allowed to enter

into the DIP Loan Transaction.  The relief requested by the DIP Financing Motion is necessary to avoid immediate and irreparable harm to the Debtor's estate, and good, adequate, and sufficient cause has been shown to justify the granting of the relief requested therein, and the immediate entry of this Order.

22.     Notice of the DIP Financing Motion was provided to all affected parties who are entitled to notice of said Motion under the Federal Rules of Bankruptcy Procedure and, under the circumstances, the Court finds that the Notice provided was adequate and sufficient.

**WHEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:**

1.     The DIP Financing Motion is **ALLOWED**.

2.     This Order shall become effective immediately upon its entry and shall be valid and binding on all parties in interest.

3.     The Debtor is hereby authorized and directed to take the following actions with respect to the DIP Loan Transaction:

   a.     Execute the DIP Loan Documents effectuating the DIP Loan Transaction, substantially in the form described, summarized and detailed for the Court at the Hearing, and any other attendant loan documents that are necessary to consummate the DIP Loan Transaction;

   b.     Borrow funds, incur debt, reimbursement obligations and other obligations, grant liens, make deposits, provide indemnities and perform its obligations in accordance with the terms and conditions of the DIP Loan Documents and any other measures necessary and appropriate to consummate the DIP Loan Transaction;

   c.     Draw and receive distributions and credit from VLJ, pending the Final Hearing, and as permitted under the DIP Loan Documents, that are necessary and essential to continue operations and to otherwise avoid irreparable harm to the Debtor, the bankruptcy estate, creditors, and parties in interest; and

   d.     Place and otherwise segregate any and all amounts received from VLJ, by virtue of execution and consummation of the DIP Loan Transaction, into an operating account, maintained at a financial

institution insured by the Federal Insurance Deposit Commission (the "FDIC"), and apart from any and all monies which may constitute cash collateral, within the meaning of § 363 of the Bankruptcy Code.

4.      Prior to execution of the DIP Loan Documents, counsel for the Debtor shall furnish copies thereof to the Bankruptcy Administrator for review.

5.      Upon execution and delivery of the DIP Loan Documents by the Debtor to VLJ, the DIP Loan Documents shall constitute valid and binding obligations of the Debtor, enforceable against the Debtor in accordance with their terms.  No obligation, payment, transfer or grant of security under this Order or the DIP Loan Documents shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

6.      The Debtor shall use the loans or advances made under or in connection with the DIP Loan Documents solely as provided therein.

7.      VLJ, in accordance with the DIP Loan Documents, shall receive the following security interests and superpriority administrative claim interest in the following DIP Collateral:

a.      A first-priority security interest in the Precious Metals (as defined in this Order) and the Causes of Action (the "Priming DIP Liens");

b.      A second-priority security interest in the Other Collateral, junior only to any perfected and non-avoidable security interest in favor of Wolfspeed; and

c.      A superpriority administrative expense claim with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code.

8.      As adequate protection for any diminution in value of its interest in its prepetition collateral resulting from its agreement to subordinate its existing liens on the Precious Metals to the Priming DIP Liens, Wolfspeed is entitled, to the extent of any diminution in value of its prepetition collateral, to (i) replacement liens to the extent of its prepetition liens, which shall be

11

subject and subordinated only to the Priming DIP Liens (and which, for the avoidance of doubt, shall be valid and perfected without the necessity of any filing or recording), (ii) an administrative expense claim, which shall be subject and subordinate only to VLJ's superpriority administrative expense claim but shall have priority over all other administrative expenses, and (iii) monthly interest accruing at the North Carolina statutory post-judgment rate.  The receipt by Wolfspeed of the adequate protection provided herein shall not be deemed an admission that its interests are adequately protected, and Wolfspeed shall be entitled to seek further adequate protection.

9.      The Debtors admit and acknowledge that Wolfspeed's liens and security interests in the Other Collateral were valid, binding, enforceable, non-avoidable and properly perfected as of the Petition Date and that no portion thereof or the claims they secure are subject to avoidance, disallowance, disgorgement, recharacterization or subordination.  The Debtors do not admit to, and this Order does not establish, the validity, nature, extent, priority, or perfection of any security interest of Wolfspeed with respect to the Precious Metals, and the Debtor reserves the right for itself and for the bankruptcy estate to challenge, contest, and dispute any of these Precious Metal matters in the future, and Wolfspeed reserves all claims and defenses with respect thereto, except that Wolfspeed has irrevocably consented to the DIP Loan Transaction and the Priming DIP Liens.

10.      The Debtor does not admit to, and this Order does not establish, the validity, nature, extent, priority, or perfection of any security interest of Ethara, the amount of indebtedness owed to Ethara, or the characterization of any of its property as Ethara's cash collateral or otherwise, and the Debtor reserves the right for itself and for the bankruptcy estate to challenge, contest, and dispute any of these matters in the future.

11.      For the avoidance of doubt, nothing herein shall be deemed an admission or acknowledgement by Wolfspeed regarding (a) its collateral (including, without limitation, whether

12

its collateral encompasses the Precious Metals), (b) the amount, status, or priority of its claims, (c) the validity, priority, perfection, enforceability, or extent of its liens and security interests, or (d) the adequate protection of its interests. Wolfspeed expressly reserves the right to assert all rights, claims and/or defenses in respect of the Debtor and its property, and seek any and all other relief in these cases.

12.     This Order shall constitute the Findings of Fact and Conclusions of Law made by the Court based upon the evidence, testimony, and arguments presented and received at the Hearing.

13.     In the event that any provision of this Order shall conflict with any term of the DIP Loan Documents, the terms and provisions of this Order shall govern and control.

14.     The Debtor shall serve a copy of this Order on all parties entitled to receive notice hereof and file a Certificate of Service with the Court within seven (7) days of the entry of this Order.

**END OF DOCUMENT**

**EXHIBIT B**

**NON-BINDING TERMSHEET FOR
SENIOR SECURED SUPERPRIORTY
DIP CREDIT FACILITY**

Charles & Colvard Ltd.
As Debtor and Debtor-in-Possession
March 17, 2026

*This non-binding term sheet dated March 17, 2026 ("**DIP Credit Facility Term Sheet**") is a summary of the terms pursuant to which, subject to certain conditions set forth herein, the DIP Lender (as defined below) agrees to provide debtor in possession financing to Charles & Colvard Ltd., which has filed a chapter 11 case in the Bankruptcy Court (as defined below) (the "Debtor"). This DIP Credit Facility Term Sheet is non-binding and any obligation of the DIP Lender to advance funds to the DIP Borrower is subject to a duly executed credit facility agreement (the "**DIP Credit Agreement**") in a form satisfactory to the DIP Lender and subject to authorization and approval by the Bankruptcy Court.*

| | |
|---|---|
| **DIP Borrower:** | Charles & Colvard Ltd., as debtor and debtor in possession (the "**DIP Borrower**") under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") in the case of the DIP Borrower (the "**Case**" of the "**Debtor**") in the United States Bankruptcy Court for the Eastern District of North Carolina (the "**Bankruptcy Court**"), commenced on the March 2, 2026 (the "**Petition Date**"). |
| **DIP Lender:** | Van Lang Jewelry LLC (the "**DIP Lender**") |
| **DIP Facility:** | The DIP Lender will provide to the DIP Borrower a senior secured, superpriority debtor-in-possession credit facility (the "**DIP Facility**") consisting of a multiple-draw term loan facility in the aggregate maximum principal amount of up to $1.5 million (the "**DIP Facility Commitment**"). |
| **Use of DIP Proceeds and Cash Collateral:** | The DIP Facility Advances and Cash Collateral (as defined below) may be used only for: <br><br> i.  post-petition working capital purposes of the Debtor; <br><br> ii.  current interest, fees, and expenses under the DIP Facility; <br><br> iii.   the allowed adequate protection expenses and administrative costs and expenses of the Case, including professional fees and expenses; <br><br> iv.  any forecasted cash outlays included in any Approved Budget (as defined below); or |

1

|  | v.  as otherwise agreed;<br><br>in each case, solely in accordance with the Approved Budget and the Financing Orders (each as defined below) incorporating the terms hereof.<br><br>All cash and cash equivalents of the Debtor, whenever or wherever acquired, and the proceeds of all collateral pledged to the DIP Lender, shall constitute cash collateral in which the DIP Lender has an interest, as contemplated by section 363 of the Bankruptcy Code ("**Cash Collateral**"). |
|---|---|
| **DIP Facility Interest Rate and Fees:** | All DIP Facility Advances (defined below) shall accrue interest at 9.00%, with a default interest rate of an additional 3.00%, each of which shall be payable monthly in kind and added to the principal balance of the DIP Facility. |
| **Priority and Security:** | Subject to the Carve-Out (as defined below), all obligations of the DIP Borrower under the DIP Facility (the "**DIP Obligations**") shall be:<br><br>i.  entitled to superpriority claim status under section 364(c)(1) of the Bankruptcy Code with priority over all administrative expense claims under section 503(b) or 507(b) of the Bankruptcy Code and unsecured claims existing as of the Petition Date or arising thereafter under the Bankruptcy Code, subject only to the Carve-Out (the "**DIP Superpriority Claims**").  The DIP Superpriority Claims may be repaid from any cash of the Debtor, including without limitation, Cash Collateral and, following entry of the Final Order (as defined below), the proceeds of any of the estate's causes of action, including but not limited to its causes of action under Chapter 5 of the Bankruptcy Code and property received or recovered thereby (the "**Avoidance Action Proceeds**");<br><br>ii.  secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by valid, enforceable, first priority, fully perfected security interests in and liens on (1) all the Debtor's precious metals regardless of form (the "**Precious Metal Collateral**")[1], (2) the proceeds of any of the estate's causes of action with the exception of the Avoidance Action Proceeds, and (3) any assets of the Debtor that were unencumbered as of the Petition Date; and |

[1] For the avoidance of doubt, the term "Precious Metal Collateral" shall include, but not be limited to, the Debtor's finished precious-metal jewelry inventory (i.e., the Debtor's finished jewelry inventory incorporating precious metals as a whole SKU, meaning the entire finished ring/necklace/bracelet item that incorporates precious metals, including any gemstones set in those finished items, and all proceeds thereof, but excluding loose gems not incorporated into finished jewelry).

2

|  |  |
|---|---|
|  | iii. secured, pursuant to section 364(c)(3) of the Bankruptcy Code, by valid, enforceable, fully perfected security interests in and liens on all of the Debtor's rights in property of the Debtor's estate (other than Avoidance Action Proceeds) as of the Petition Date that, as of the Petition Date, were subject to valid, perfected and non-avoidable liens and unavoidable liens in existence immediately prior to the Petition Date or that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (the "**Permitted Prior Liens**"),[2] which security interests and liens shall be junior and subordinate only to such Permitted Prior Liens and the Carve-Out (such liens, together with the liens described in clause (ii) above, collectively, the "DIP Liens" and such collateral, together with the collateral described in clause (ii) above, collectively, the "DIP Collateral").<br><br>The DIP Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of any Debtor and their estates under section 551 of the Bankruptcy Code, (ii) any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of any Debtor, or (iii) any intercompany or affiliate liens of any Debtor.<br><br>The DIP Collateral will be free and clear of other liens, claims and encumbrances except for Permitted Prior Liens.<br><br>The DIP Liens will automatically attach to the DIP Collateral and become valid and perfected immediately upon entry of the Interim Order (as defined below) without the requirement of any further action by the DIP Lender; provided that if the DIP Lender determines to file any financing statements, notice of liens or similar instruments, the Debtor will cooperate and assist in any such filings and the automatic stay shall be modified to allow such filing. |
| **Closing Date:** | The first business date on which the DIP Conditions Precedent below shall have been satisfied and the making of the first DIP Facility Advance shall have occurred (the "**Closing Date**"), which is expected to be within one (1) business day of entry of the Interim Order (as defined below). |
| **DIP Conditions Precedent:** | The closing of the DIP Facility and the Debtor's right to use Cash Collateral after the Closing Date will be subject to the satisfaction of all conditions precedent to be set forth in a final DIP Credit |

---

[2] The DIP Loan Documents shall include a schedule of Permitted Prior Liens.

3

<table>
<tr><td></td><td>Agreement duly executed by the DIP Borrower, which shall include the following terms and conditions:

i. The DIP Borrower shall reserve its exclusive right to file a plan under Bankruptcy Code §1121, provided however that the DIP Lender shall have the right to co-sponsor and prosecute a Chapter 11 plan in coordination with the DIP Borrower;

ii. prior to execution of the DIP Credit Agreement, the DIP Lender shall have received a cash forecast for at least the four-week period following the entry of the Interim Order setting forth projected cash flows and disbursements acceptable to the DIP Lender (the "**Initial Approved Budget**");

iii. an interim debtor-in-possession financing order authorizing and approving the terms of the DIP Credit Agreement (and otherwise acceptable to the DIP Lender in its sole discretion) (the "**Interim Order**"), shall have been entered by the Bankruptcy Court no later than March 24, 2026 and shall not have been vacated, reversed or stayed, appealed, or modified or amended without the prior written consent of the DIP Lender. Notwithstanding anything to the contrary contained herein, funding of any DIP Facility Advance shall be subject to entry of the Interim Order, and funding of the balance of the DIP Facility Commitment and continued authority to use Cash Collateral shall be subject to entry, no later than April 8, 2026, of a final debtor-in-possession financing/use of cash collateral order, substantially on the terms contemplated by this DIP Term Sheet and in form and substance acceptable to the DIP Lender (the "**Final Order**" and, together with the Interim Order, collectively, the "**Financing Orders**"), which shall not have been vacated, reversed or stayed, appealed (and for which the appeal period has expired or has been waived), or modified or amended without the prior written consent of the DIP Lender; and

iv. such other deliverables as the DIP Lender may reasonably require.

Modification of the Financing Orders shall require the consent of the DIP Lender in its sole and reasonable discretion.</td></tr>
<tr><td>**Conditions Precedent to All Credit Extensions:**</td><td>The obligation of the DIP Lender to make any advance under the DIP Facility (a "**DIP Facility Advance**") will be subject to conditions precedent customarily found in loan documents for similar debtor-in-possession financings, including, but not limited to:</td></tr>
</table>

4

| | |
|---|---|
| | i. (a) prior to entry of the Final Order, the Interim Order shall have been entered in a form acceptable to the DIP Lender in its sole and exclusive discretion and shall be in full force and effect, shall not have been vacated or reversed, and shall not be subject to any stay and (b) with regard to the balance of the DIP Facility Commitment, the Final Order shall have been entered in a form acceptable to the DIP Lender in its sole and exclusive discretion and shall be in full force and effect, shall not have been vacated or reversed, and shall not be subject to any stay; |
| | ii. with regard to all DIP Facility Advances, the "**DIP Credit Agreement** and related security agreement(s), security documents, and other agreements, instruments and documents required by the DIP Lender (collectively, and together with the DIP Credit Agreement, the "**DIP Documents**") shall have been executed and delivered by the Debtor to the DIP Lender, in form and substance acceptable to the DIP Lender in its sole and exclusive discretion; |
| | iii. the DIP Borrower shall be in compliance with the terms of the Interim Order or the Final Order, as applicable; |
| | iv. with regard to any DIP Facility Advance after the Closing Date, all "second day orders" approving on a final basis any first day orders intended to be entered on or prior to the date of entry of the Final Order shall have been entered by the Bankruptcy Court, shall be acceptable to the DIP Lender, in its sole and exclusive discretion, shall be in full force and effect, shall not have been vacated or reversed, shall not be subject to a stay and shall not have been modified or amended other than as acceptable to the DIP Lender in its sole and exclusive discretion; |
| | v. the Approved Budget (as defined below) shall demonstrate a need for the funds to be advanced within the next two weeks, there shall be at least two weeks between each drawing, and the DIP Borrower shall have delivered at least 3 business days prior to the applicable draw date (or such shorter period as the DIP Lender may agree in its sole discretion) a borrowing notice showing the proposed use of such funds within the next two weeks in accordance with an Approved Budget that was approved within the last week; |
| | vi. Wolfspeed, Inc. shall have stipulated that the DIP Lender has a first priority, fully perfected security interests in and liens upon the Precious Metal Collateral and all of the Debtor's rights in such property acquired post-petition (and proceeds thereof), whether now existing or hereafter acquired or |

|  | arising (and such first priority security interest shall be reflected in the Interim Order or the Final Order, as applicable); |
|  | vii.  the Debtor shall have provided a certificate confirming that all of the representations and warranties of the Debtor in the DIP Documents remain true and correct, unless otherwise agreed by the DIP Lender; and |
|  | viii.  there shall be no defaults or Events of Default under this DIP Term Sheet or the DIP Documents, as applicable, or any defaults or Events of Default shall have been waived by the DIP Lender. |
|  | Subject to Bankruptcy Court availability, the Debtor will agree to comply with the following deadlines (each of which may be extended or waived with the prior written consent of the DIP Lender, which may be by e-mail, without further order of the Bankruptcy Court) (collectively, the "**Milestones**"): |

i.   The Bankruptcy Court shall have entered the Interim Order no later than March 24, 2026.

ii.   The Bankruptcy Court shall have entered the Final Order no later than April 8, 2026.

iii.   The DIP Borrower shall have filed a motion for sale of substantially all assets and approval of sale procedures no later than April 15, 2026.

iv.   The Bankruptcy Court shall have entered an order approving sale procedures in substance acceptable to the DIP Lender no later than April 30, 2026 and setting a hearing on the sale of assets no later than June 10, 2026.

v.   The Bankruptcy Court shall have entered an order authorizing the sale of substantially all assets of the DIP Borrower no later than June 12, 2026.

vi.   The closing of the sale of substantially all assets of the DIP Borrower shall have occurred no later than June 30, 2026.

If, no later than April 30, 2026, the DIP Borrower provides the DIP Lender with a term sheet for a plan of reorganization that the DIP Lender is willing to support together with a budget demonstrating that the DIP Borrower can operate until plan confirmation without financing in addition to the $1.5 million DIP Facility Commitment, then the DIP Lender will agree that the DIP Borrower may prosecute

6

| | |
|---|---|
| | confirmation of such plan in lieu of the sale motion and will negotiate in good faith a modification of the Approved Budget to accommodate prosecution of such plan. |
| **Prepayments:** | The DIP Borrower may voluntarily, at any time, prepay any of the DIP Obligations and/or reduce the commitments under the DIP Facility at par plus accrued interest.<br><br>Until the DIP Facility has been repaid in full, the following mandatory prepayments will be required to be made toward the DIP Facility within three (3) business days of receipt by the Debtor: (i) 100% of any net cash proceeds from any asset disposition following satisfaction of any Permitted Prior Liens; (ii) 100% of any proceeds received (x) under any insurance policy on account of the damage or destruction of any assets or property of the Debtor following satisfaction of any Permitted Prior Liens and (y) due to any taking or condemnation of any assets or property following satisfaction of any Permitted Prior Liens; and (iii) 100% of the net cash proceeds of the incurrence or issuance of any indebtedness or equity by any Debtor; <u>provided that</u> the Debtor shall not incur or issue any additional postpetition indebtedness or liens unless such amount shall be sufficient to prepay the DIP Facility in cash in full; (iv) 100% of any proceeds received or any cash received by or paid to or for the account of the Debtor not in the ordinary course of business, including but not limited to tax refunds, pension plan reversions, indemnity payments and any purchase price adjustments (other than casualty and condemnation event proceeds) following the satisfaction of any Permitted Prior Liens. |
| **Reporting and Information:** | Without limiting the generality of the foregoing, the Debtor shall deliver to the DIP Lender (i) Variance Reports (as defined below); (ii) copies of any pleadings or motions filed by or on behalf of the Debtor in the Case, (iii) all notices required to be given to all parties specified in any Financing Order; and (iv) such other information (including access to the Debtor's books, records, personnel and advisors during normal business hours) as the DIP Lender may reasonably request. All such reporting shall be in form and with sufficient detail as is acceptable to the DIP Lender in its sole discretion. |
| **Budget; Variance Covenant; Other Financial Covenants:** | The Debtor shall provide for the DIP Lender's review and approval a four-week (4-week) detailed rolling cash projection in a form acceptable to the DIP Lender, which shall be thereafter updated, as necessary, but shall not be updated less than once every two weeks (each, a "**Proposed Budget**"). Upon the Debtor's receipt of the DIP Lender's approval (in its sole and exclusive discretion) of a Proposed Budget, such budget shall become an "**Approved Budget**" and shall replace the then-operative Approved Budget for all purposes. The Initial Approved Budget shall be the Approved Budget until such time as a new Proposed Budget is approved, following which such Proposed Budget shall constitute the Approved Budget until a subsequent Proposed Budget is approved. The Debtor shall operate in accordance with the Approved Budget, |

and all disbursements shall be consistent with the provisions of the Approved Budget (subject to the Permitted Variance (as defined below)). The Debtor may submit additional Proposed Budgets to the DIP Lender, but until the DIP Lender approves such Proposed Budget, it shall not become an Approved Budget and the Debtor shall continue to comply with the then-operative Approved Budget. The DIP Lender's failure to respond to any submitted Proposed Budget within three (3) business days following submission thereof shall be deemed to be the DIP Lender's approval of the same, whereupon such Proposed Budget shall constitute an Approved Budget.

Beginning on April 15, 2026 (the "**Initial Reporting Date**"), and on every other Wednesday thereafter (collectively with the Initial Reporting Date, each a "**Reporting Date**"), the Debtor shall deliver to the DIP Lender, in a form consistent with the form of the Approved Budget, a variance report describing in reasonable detail, by line item, (i) the actual disbursements of the Debtor and actual receipts during the applicable Testing Period (as defined below); and (ii) any variance (whether positive or negative, expressed as a percentage) between the actual receipts or disbursements, as applicable, during such Testing Period against the estimated receipts or disbursements, as applicable, for the applicable Testing Period, as set forth in the applicable Approved Budget (a "**Variance Report**").

As used herein, "**Testing Period**" shall mean the two-week period ending on the Sunday immediately preceding the applicable Reporting Date. The last day of each Testing Period shall be a "**Testing Date**".

As of any applicable Testing Date:

1.   Cash receipts may vary from the Approved Budget by no more than 10% to the downside for each Testing Date thereafter (the "**Cash Receipt Variance**"); and

2.   Cash disbursements may vary from the Approved Budget by no more than 10% to the upside for each Testing Date thereafter (the "**Line Item Disbursement Variance**") (together with Cash Receipt Variance, the "**Permitted Variances**").

P rovided, that the Debtor may carry forward favorable variances on a line-item basis from the immediately preceding Testing Period when calculating the Permitted Variances for (2) above, and from the immediately preceding two Testing Periods when calculating the Permitted Variances for (1) above.

The Debtor shall be deemed to be in compliance with the Approved Budget for all purposes under the DIP Credit Agreement and the

8

| | |
|---|---|
| | Financing Orders unless, as of any Testing Date, the Debtor's actual cash receipts or disbursements vary from the Approved Budget by more than the applicable Permitted Variance as measured on any Testing Date (the "**Variance Covenant**"). |
| **Affirmative Covenants:** | The DIP Credit Agreement will contain affirmative covenants customarily found in the loan agreements for similar debtor in possession financings and other affirmative covenants deemed by the DIP Lender appropriate or as otherwise required by them in relation to this specific transaction, including, without limitation, the following: compliance with the Milestones and the Approved Budget, compliance with reporting and information delivery requirements, compliance with the Financing Orders, preservation of existence, maintenance of insurance, maintenance of books and records, access to properties and inspection rights, operation and maintenance of properties, use of proceeds, further assurances and collateral, delivery of all pleadings, motions and other documents filed with the Bankruptcy Court on behalf of the DIP Borrower to the DIP Lender and its counsel, and compliance with covenants consistent with the section above titled "Budget; Variance Covenant; Other Financial Covenants". |
| **Negative Covenants** | The DIP Credit Agreement will contain negative covenants customarily found in loan agreements for similar debtor in possession financings and other negative covenants deemed by the DIP Lender appropriate including, without limitation, the following: limitations on incurring or permitting liens or encumbrances; debt outside the ordinary course of business, superpriority claims or the grant of adequate protection; limitations on maintaining deposit, securities or commodities accounts; selling assets outside of the ordinary course of business; modifying or altering in any adverse manner the nature of the DIP Borrower's business or its organizational documents; limitations on paying prepetition indebtedness; limitations on investments, debt repayments or dividends; and changing any order and limitations on ability to assume, assume and assign, or reject any executory contracts or unexpired leases under the Bankruptcy Code without consent of the DIP Lender. <br><br> Additionally, the DIP Credit Agreement will contain a negative covenant prohibiting the DIP Borrower from selling or otherwise disposing of finished jewelry inventory in any bulk, clearance, close-out, fire-sale, liquidation, or similar transaction (including any promotional event materially deviating from ordinary-course pricing and cadence) at a price less than thirty percent (30%) of the applicable book value of such inventory, in each case without the prior written consent of the DIP Lender.  The DIP Borrower shall maintain complete and accurate records sufficient to verify compliance with |

9

| | |
|---|---|
| | this covenant and shall make such records available to the DIP Lender upon reasonable notice. The DIP Lender's failure to object to any proposed or completed sale shall not be deemed a consent or waiver of this covenant, and any consent, if given, shall be specific, in writing, and may be limited in scope and duration. The DIP Borrower shall implement such additional commercially reasonable procedures, reporting, and controls as the DIP Lender may reasonably request from time to time to ensure ongoing compliance with this covenant. |
| **Events of Default:** | "**Events of Default**" under the DIP Facility shall include events of default customary to DIP credit facilities, including the occurrence of any of the following without the advance written consent of the DIP Lender in its sole and exclusive discretion: <br><br> i.   the Interim Order at any time ceases to be in full force and effect, or shall be vacated, reversed or stayed, or modified or amended, or shall not have been entered by March 24, 2026; <br><br> ii.   the Final Order at any time ceases to be in full force and effect, or shall be vacated, reversed or stayed, modified or amended, or shall not have been entered by April 8, 2026; <br><br> iii.   failure of the Debtor to comply in any material respect with the terms of the applicable Financing Order; <br><br> iv.   the failure of any Debtor to (a) comply with the Variance Covenant, (b) have an Approved Budget; (c) comply with any negative covenant or certain other customary affirmative covenants in the DIP Term Sheet or with any other covenant or agreement contained in the Financing Orders or DIP Documents in any respect or (d) comply with any other covenant or agreement contained in this DIP Term Sheet subject, in the case of the foregoing clause (d), to a grace period of 5 days; <br><br> v.   the Case shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code; a Chapter 11 trustee or an examiner (other than a fee examiner) with enlarged powers relating to the operation of the business of the Debtor (powers beyond those expressly set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed, (b) any other claim or grant of any other lien (including any adequate protection lien) other than as provided for herein which is *pari passu* with or senior to the claims and liens of the DIP Lender shall be granted in the Case, or (c) the filing of any pleading by the Debtor seeking or otherwise consenting to or supporting any of the matters set forth in clause (a) or clause (b) of this subsection (v); |

10

| | |
|---|---|
| | vi.     the Debtor petitions the Bankruptcy Court to obtain additional financing *pari passu* or senior to the DIP Facility; |
| | vii.    the Debtor's "exclusive period" under section 1121 of the Bankruptcy Code for the filing of a plan of reorganization terminates; |
| | viii.   the consummation of a sale of any material portion of the DIP Collateral (other than through a sale in the ordinary course of business that is contemplated by the Approved Budget); |
| | ix.     the confirmation of a plan of reorganization or liquidation that does not provide for payment in full in cash of the DIP Facility Advances or such other treatment acceptable to the DIP Lender, or the Debtor proposes or supports, or fails to contest in good faith, the entry of such a plan of reorganization or liquidation; |
| | x.      the Debtor (A) engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of the DIP Facility or the liens on or security interest in the assets of the Debtor securing the DIP Obligations, including without limitation seeking to equitably subordinate or avoid the liens securing such indebtedness or (B) engages in or supports any investigation or asserts any claims or causes of action (or directly or indirectly support assertion of the same) against the DIP Lender; |
| | xi.     the entry of an order by the Bankruptcy Court in favor of any statutory committee appointed in the Case (each, a "**Committee**"), any ad hoc committee, or any other party in interest, sustaining an objection to claims of the DIP Lender arising under the DIP Facility; |
| | xii.    the inaccuracy in any material respect of any representation of the Debtor when made or deemed made; |
| | xiii.   the failure to meet any Milestone; |
| | xiv.   entry of an order by the Bankruptcy Court in favor of any Committee, any ad hoc committee, or any other party in interest, (i) granting such party standing to pursue any claims against the DIP Lender, or (ii) avoiding any liens held by the DIP Lender; and |
| | xv.    the Termination Date (as defined below) shall have occurred. |

11

Upon the occurrence and during the continuance of any Event of Default, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to take any of the following actions, at the same or different times:

    a.  issue a written notice (the "**Remedies Notice**") (which may be by email) to the Debtor and its counsel, counsel for any Committee, and the Bankruptcy Administrator (the "**Remedies Notice Parties**") declaring the occurrence of the Termination Date (as defined below);

    b.  issue a Carve-Out Notice (as defined below);

    c.  declare all DIP Obligations to be immediately due and payable without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Debtor;

    a.  declare the suspension or termination of the DIP Facility as to any further liability or obligation of the DIP Lender thereunder, but without affecting the DIP Liens or DIP Obligations (the "**Termination Notice**"); and

    b.  charge the default rate of interest under the DIP Facility.

Prior to terminating the rights of the Debtor to use Cash Collateral or exercising any remedies against the DIP Collateral, the DIP Lender shall be required to file a motion with the Court seeking emergency relief from the automatic stay (the "**Stay Relief Motion**") on at least three (3) business days' written notice to the Remedies Notice Parties of the DIP Lender's intent to exercise its rights and remedies (the "**DIP Remedies Notice Period**").  In the event the Bankruptcy Court determines during a hearing on the Stay Relief Motion (a "Stay Relief Hearing") that an Event of Default has occurred, the Bankruptcy Court may fashion an appropriate remedy, which may include the exercise of any and all rights available to the DIP Lender under this DIP Term Sheet, the DIP Credit Agreement, the Interim Order, and/or the Final Order, as applicable.

| | |
|---|---|
| **Maturity/Termination Date:** | The DIP Facility and the Debtor's right to use Cash Collateral (as applicable) shall automatically terminate without further notice or court proceedings on the earliest to occur of:<br><br>i.    June 30, 2026 (the "**Scheduled Maturity Date**");<br><br>ii.    the effective date of a Chapter 11 plan for the Debtor confirmed in the Case;<br><br>iii.    the date of termination of the commitments under the DIP Facility and/or acceleration of any outstanding borrowings |

12

| | |
|---|---|
| | under the DIP Facility, in each case, by the DIP Lender following the occurrence of an Event of Default and upon the delivery of a Termination Notice to the Remedies Notice Parties, in each case, subject to the Debtor's right to use Cash Collateral during the Remedies Notice Period as set forth above, and pending the outcome of the Stay Relief Hearing;<br><br>iv.   the first business day on which the Interim Order expires by its terms or is terminated, unless the Final Order has been entered and become effective prior thereto;<br><br>v.   the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code unless otherwise consented to in writing (which may be e-mail) by the DIP Lender;<br><br>vi.   the dismissal of the Case, unless otherwise consented to in writing (which may be e-mail) by the DIP Lender; and<br><br>vii.   the repayment in full in cash of all obligations and termination of all commitments under the DIP Facility.<br><br>(the "**Termination Date**"), unless extended, with the prior written consent (which may be by e-mail) of the DIP Lender. |
| **Carve-Out:** | The Carve-Out shall include (a) all fees required to be paid to the Clerk of the Court and to the Office of the United States Bankruptcy Administrator under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the Carve-Out Notice), (b) all reasonable fees and expenses up to $20,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the Carve-Out Notice), (c) to the extent allowed by the Bankruptcy Court at any time, unpaid fees and expenses ("**Allowed Professional Fees**") of estate professionals incurred through the date of delivery of a Carve-Out Notice (defined below) up to the amounts for such professional included in the Approved Budget through the date of the Carve-Out Notice, and (d) to the extent allowed by the Bankruptcy Court at any time, up to $100,000 of fees and expenses incurred by persons or firms retained by (i) the Debtor pursuant to Sections 327, 328, or 363 of the Bankruptcy Code or (ii) any committee appointed in the Case ((i) and (ii) together, the "**Estate Professionals**") after the first business day following delivery of a Carve-Out Notice (excluding, for the avoidance of doubt, any success fee, transaction fee, deferred fee or other similar fee set forth in any professional's engagement letter, the amounts set forth in this clause (d) being the "**Post Carve-Out Notice Cap**").<br><br>"**Carve-Out Notice**" means a written notice (which may be by email) by the DIP Lender to the Debtor, Debtor's counsel, the |

13

| | Bankruptcy Administrator, and counsel to any Committee stating that the Post Carve-Out Notice Cap has been invoked, which notice may be delivered only following the occurrence and during the continuation of an Event of Default.<br><br>Delivery of a Carve-Out Notice shall constitute a demand to the Debtor to utilize all cash on hand (including the proceeds of the DIP Facility) to fund a reserve in an amount equal to the Carve-Out, which shall be earmarked and held in trust to pay unpaid fees and expenses incurred by Estate Professionals, to the extent allowed by the Bankruptcy Court at any time, prior to any and all other claims in the Case (the "**Carve-Out Reserve**").<br><br>All funds in the Carve-Out Reserve shall be used first to pay the obligations set forth in clauses (a)-(d) in the above definition of "Carve-Out" until paid in full, and second, to pay the DIP Lender until paid in full.  Notwithstanding anything to the contrary in this DIP Term Sheet or the Financing Orders, the failure of the Carve-Out Reserve to satisfy in full the fees of Estate Professionals shall not affect the priority of the Carve-Out.<br><br>The Carve-Out shall be reduced to the extent unencumbered Avoidance Action Proceeds are recovered by the Debtor that can be used to pay for the items included in the Carve-Out. |
|---|---|
| **Credit Bidding:** | The Final Order shall provide that DIP Lender shall have the right to credit bid (pursuant to section 363(k) of the Bankruptcy Code and/or applicable law) all amounts due under the DIP Facility in whole or in part, in connection with any sale or disposition of assets by the Debtor in the Case and shall not be prohibited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code. |
| **Section 506(c) Waiver:** | The Final Order shall include a ruling that, except to the extent of the Carve-Out, no expenses of administration of the Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from any DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender; and the Debtor shall irrevocably waive and shall be prohibited from asserting any claim described in this paragraph, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender upon the DIP Collateral. |
| **No Marshaling:** | The Final Order shall provide that the DIP Lender may exercise all remedies available under this DIP Term Sheet, and the DIP |

14

| | |
|---|---|
| | Documents, as applicable, without any requirement first to look to exercise any of its or their rights against any particular collateral or party or to exhaust any remedies available to it or them against any particular collateral or party or to resort to any other source or means of obtaining payment of any of such obligations or to elect any other remedy. Subject to entry of the Final Order, in no event shall any of the DIP Lender be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the collateral securing the DIP Facility. |
| **Section 552(b):** | The Final Order shall provide that the DIP Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, the "equities of the case" exception under sections 552(b)(i) and (ii) of the Bankruptcy Code shall not apply to such parties with respect to the proceeds, products, rents, issues or profits of any of their collateral, and no expenses of administration of the Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the collateral under section 552(b) of the Bankruptcy Code.<br><br>Furthermore, subject to entry of the Final Order, the Debtor and its estate shall be deemed to have irrevocably waived and have agreed not to assert any claim or right under sections 552 or 726 of the Bankruptcy Code to avoid the imposition of the liens of the DIP Lender on any property acquired by any of the Debtor or any of their estates or to seek to surcharge any costs or expenses incurred in connection with the preservation, protection or enhancement of, or realization by, the DIP Lender upon the DIP Collateral or the Prepetition Collateral (as defined below), as applicable. |
| **Restrictions on Use of DIP Facility and Cash Collateral:** | None of the Carve-Out, any Cash Collateral, the DIP Facility, or the DIP Collateral may be used to challenge the amount, validity, perfection, priority or enforceability of, or assert any defense, counterclaim or offset to, the DIP Facility, this DIP Term Sheet, or the DIP Documents, or the security interests and liens securing any of the DIP Obligations or the Prepetition Debt, or to fund prosecution or assertion of any claims, or to otherwise litigate against the DIP Lender. |
| **Payment of Expenses:** | The reasonable and documented fees and out-of-pocket expenses incurred or accrued by the DIP Lender (the foregoing to include all unpaid reasonable and documented prepetition fees, out-of-pocket costs and expenses incurred by the DIP Lender in connection with the DIP Facility) in connection with any and all aspects of the Debtor's Case shall be paid by the DIP Borrower from a DIP Facility reserve in the total amount of $100,000.00 (the "**DIP Lender Expense Reserve**"). The DIP Lender will provide regular statements of such fees and expenses so that the DIP Borrower can track the reduction of the DIP Lender Expense Reserve. |

15

| | |
|---|---|
| **Indemnification:** | The Debtor shall agree to indemnify and hold harmless the DIP Lender (solely in its capacity as the DIP Lender) and each of its respective affiliates and each of their respective officers, directors, employees, agents, advisors, attorneys and representatives (each, an "**Indemnified Party**") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable and documented fees and out-of-pocket expenses of counsel), that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), arising out of or in connection with or by reason of the DIP Facility, or any of the transactions contemplated hereby, except to the extent arising from an Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the Debtor, any of its directors, security holders or creditors, an Indemnified Party or any other person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. |
| **Miscellaneous:** | This summary of terms and conditions does not purport to summarize all the conditions, covenants, representations, warranties and other provisions that would be contained in definitive credit documentation for the DIP Facility contemplated hereby, all of which shall be acceptable to the DIP Lender. |
| **Governing Law:** | The laws of the State of North Carolina (excluding the laws applicable to conflicts or choice of law), except as governed by the Bankruptcy Code. |

IN WITNESS WHEREOF, this DIP Credit Facility Term Sheet is duly executed as of the date first set forth above.

Charles & Colvard Ltd.

By: _____

Name: _____

Title:

16