**SO ORDERED.**

**SIGNED this 29 day of April, 2026.**



_____
**David M. Warren**
**United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | |
| **CHARLES & COLVARD, LTD.** | ) | **Case No. 26-00969-5-DMW** |
| | ) | |
| **Debtor.** | ) | **Chapter 11** |
| | ) | |

**ORDER ALLOWING DEBTOR'S MOTION FOR ORDER: (I) APPROVING PRIVATE SALE OF PERSONAL PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (II) APPROVING STALKING HORSE BIDDER; (III) APPROVING STALKING HORSE BREAK-UP FEE; (IV) APPROVING OVERBID PROCEDURES AND AUCTION; AND (V) SCHEDULING HEARING FOR FINAL APPROVAL OF SALE OF ASSETS**

**THIS MATTER** came on before the Court upon the Debtor's Motion for Order (I) Approving Private Sale of Personal Property Free and Clear of Liens, Claims, Encumbrances, and Interests; (II) Approving Stalking Horse Bidder; (III) Approving Stalking Horse Break-Up Fee; (IV) Approving Overbid Procedures and Auction; and (V) Scheduling Hearing for Final Approval of Sale of Assets [DE# 71] (the "Sale Motion"). Having considered the Sale Motion, and the Limited Objection thereto filed by SBP Office Owner, LP [DE# 85], the Court finds as follows:

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.     The statutory predicates for the relief requested in the Sale Motion are Bankruptcy Code Sections 105, 363, 503 and 507 and Bankruptcy Rules 2002, 4001, and 6004.

3.     The Debtor filed a voluntary petition seeking relief under Chapter 11 of the Bankruptcy Code on March 2, 2026 (the "Petition Date") and, since that date, has operated as Debtor-in-Possession.

4.     The Debtor is a North Carolina corporation founded in 1995 and headquartered in Morrisville, North Carolina.  The Debtor was founded as C3 Diamante, Inc., and changed its name to C3, Inc. by Articles of Amendment filed on April 10, 1996.  The Debtor subsequently changed its name to Charles & Colvard, Ltd. by Articles of Amendment filed on May 17, 2000.

5.     The Debtor is a globally recognized fine jewelry company specializing in lab-created gemstones.  Its common stock is quoted on the OTC Experts Market under the symbol "CTHR."  The Debtor manufactures, markets, and distributes Charles & Colvard Created Moissanite® including its premium moissanite gemstone brand, Forever One™, as well as Caydia®, its brand of premium lab-grown diamonds.  The Debtor offers gemstones and finished jewelry featuring its proprietary moissanite jewels, premium lab-grown diamonds, created color gemstones, and most recently, lab-grown diamonds in color, for sale in the worldwide fine jewelry market through two operating segments: its Online Channels segment, which encompasses its digital properties components, comprised of its charlesandcolvard.com, moissaniteoutlet.com, charlesandcolvarddirect.com, and madenetwork.com websites; e-commerce outlets, including marketplaces, drop-ship customers, and other pure-play, exclusively

e-commerce customers; and its Traditional segment, which consists of domestic and international distributors and retail customers, including end-consumers through its first Charles & Colvard Signature Showroom, which opened in October 2022. As of the Petition Date, the Debtor had a total of 26 full-time employees and 1 part-time employee.

6. The Debtor owns certain jewelry, precious metals, loose jewels, jewelry production equipment, office furniture and equipment, intangibles, and other personal property as detailed in Schedule A/B of its bankruptcy schedules. The Debtor does not own any real property. The Debtor's personal property as detailed herein is the "Property".

7. The Debtor received an offer submitted by Van Lang Jewelry LLC (the "Purchaser" or "Stalking Horse Bidder") to purchase substantially all of the Debtor's and its affiliates' operating assets pursuant to Section 363(f) of the Bankruptcy Code.

8. The Debtor and Stalking Horse Bidder entered into an Asset Purchase Agreement (the "Purchase Agreement") for the Property and the Debtor's affiliates' operating assets (as defined more particularly herein and in the Purchase Agreement as the "Assets"), which is expressly subject to Bankruptcy Court approval in all respects. A true and accurate copy of the Purchase Agreement (subject to Purchaser's provision of final schedules, as referenced therein) is attached hereto as **Exhibit A** and incorporated herein by reference, and can be summarized as follows:

| Purchase Price | $1,500,000.00 |
|---|---|
| Earnest Money Deposit | N/A |
| Closing | Three (3) business days following the later of (a) entry of the Sale Order, provided that the Sale Order is not subject to a stay, or (b) satisfaction of all of the conditions to closing as set forth in the Asset Purchase Agreement or the Overbid Purchase |

| | |
|---|---|
| | Agreement (as defined herein), as applicable. <u>Provided, however, that in no event shall the Closing take place any later than July 7, 2026.</u> |
| **Financing Contingency** | N/A |
| **Break-Up Fee; Conditional Expense Reimbursement** | Three percent (3%) of the Purchase Price, as well as conditional reimbursement of Purchaser's reasonable, documented, out of pocket fees and expenses incurred in connection with the negotiation, execution, and performance of this Agreement and participation in the sale process, in an amount not to exceed $45,000, payable in cash on or before the date that is thirty (30) days after the termination of the Purchase Agreement upon the occurrence of a termination as set forth in Section 10.1 of the Agreement. |

Any Schedules required to be provided by Purchaser under the Purchase Agreement, including without limitation Schedule 2.7, shall be provided in their final form to the Debtor on or before the expiration of the Overbid Period (as defined below).

9.     Each party is responsible for its own attorneys' fees incurred in connection with the Purchase Agreement, this bankruptcy case and the transactions or other matters contemplated hereby or thereby.

10.     The Debtor, through the Sale Motion, moved to establish a procedure for the orderly sale of the Assets to further maximize the recovery for the estate. The Debtor wished to allow for the sale of the Assets on the terms set forth herein, and according to the bidding procedures set forth on **Exhibit B** attached hereto (the "Bidding Procedures").

11.     The Debtor believes the Bidding Procedures allow maximum flexibility when evaluating potential competing offers or bids for the Assets, thereby providing the greatest potential to further maximize value to the estate.

**THE PROPOSED STALKING HORSE BIDDER AND BREAK-UP FEE ARE APPROPRIATE, REASONABLE AND SHOULD BE APPROVED**

12.     In connection with the proposed Stalking Horse, the Debtor has offered a break-up fee equal to three percent (3%) of the Purchase Price (i.e., $45,000.00) in the event the Stalking Horse is outbid (the "Break-Up Fee").

13.     In addition to the proposed Break-Up Fee, the Debtor has agreed, pursuant to Section 10.1(h) of the Purchase Agreement, to reimburse the Stalking Horse Bidder for its reasonable, documented, out of pocket fees and expenses incurred in connection with the negotiation, execution, and performance of the Purchase Agreement and participation in the sale process, in an amount not to exceed $45,000.00 (the "Expense Reimbursement"), payable in cash on or before the date that is thirty (30) days after the termination of the Purchase Agreement, in the event of a termination pursuant to Section 10.1(c) or Section 10.1(d) of the Purchase Agreement, or in the event the Seller terminates the Purchase Agreement pursuant to Section 10.1(b), Section 10.1(i), or Section 10.1(j) of the Purchase Agreement.

14.     The Debtor believes that the designation of the Stalking Horse Bidder as the stalking horse bidder on the terms set forth herein are beneficial to the sales process and will aid the Debtor in obtaining the maximum purchase price for the Assets. Specifically, such designation: (1) discourages bidding strategies designed to hold back competitive bids until later in the process; (2) aids the Debtor in obtaining bids from other potential bidders that may be higher and/or better than the bidder would have otherwise offered; and (3) creates positive momentum going into the potential auction. The Debtor further asserts that such designation will provide greater certainty of closing and establish a floor price for the bid deadline and process.

15.     Furthermore, the Debtor believes that the proposed break-up fee of three percent

(3%), which would be paid in the event the Stalking Horse Bidder is not the successful bidder, is a reasonable and appropriate amount in relation to the proposed Purchase Price.  Such break-up fee would compensate the Stalking Horse Bidder for its time and professional fees and expenses incurred in negotiating the Purchase Agreement and conducting the necessary due diligence to serve as the stalking horse, as well as for its time and energy expended as a result of the attempted acquisition of the Assets.

16.      The Debtor has requested that the Court approve the Purchase Agreement and the designation of the Stalking Horse Bidder as the stalking horse bidder, for the proposed sale of the Assets on the terms set forth in the Sale Motion.

17.      In the Sale Motion, the Debtor requested approval of overbid protection for the Stalking Horse Bidder in the amount of three percent (3%), resulting in a minimum overbid from other potential bidders in an amount of at least $1,575,000.00, covering the three percent break-up fee, plus an additional two percent.

18.      In the Sale Motion, the Debtor requested approval of the proposed break-up fee of three percent (3%) of the Purchase Price (i.e., $45,000.00) to be paid to the Stalking Horse Bidder from the sales proceeds following closing, in the event Stalking Horse Bidder is not the successful bidder.

19.      The Court finds that the Stalking Horse Bidder, as the lender under that certain Section 364 Financing Loan Agreement dated March 24, 2026 (the "DIP Facility"), approved by prior order of this Court, holds an allowed, secured claim against the Debtor's estate arising from the DIP Obligations (as defined in the Purchase Agreement). As the holder of such an allowed secured claim, the Stalking Horse Bidder is authorized, pursuant to Section 363(k) of the Bankruptcy Code, to credit bid all or any portion of the DIP Obligations as part of its Purchase

Price for the Assets. The credit bid contemplated by Section 2.12(b)-(g) of the Purchase Agreement (the "Credit Bid") is authorized and approved, including without limitation the application waterfall set forth in Section 2.12(c) thereof. The Stalking Horse Bidder's right to credit bid at the auction, if held, up to the full amount of the outstanding DIP Obligations as of the date of such auction, is expressly preserved and shall not be subject to limitation except as expressly provided by Section 363(k) of the Bankruptcy Code.

20.      The Debtor sought approval of an overbid period (the "Overbid Period") following the Court's entry of an Order approving the Stalking Horse Bidder as the stalking horse, to allow Qualified Bidders to submit a qualifying bid, to expire no later than June 6, 2026.

21.      The Debtor requested that the Court require interested bidders to deliver the following items to the Debtor's counsel before the expiration of the Overbid Period to be deemed "Qualified Bidders" and participate in the auction of the Assets:

   a. An executed copy of a standard purchase agreement in the form attached hereto as **Exhibit 2** to the Bidding Procedures (**Exhibit B**) (the "Overbid Purchase Agreement");

   b. Earnest money deposit in an amount equal to five percent (5%) of the bid amount, payable by wire transfer or official bank funds as required under the Overbid Purchase Agreement; and

   c. Financials and/or a loan commitment demonstrating the interested bidder's ability to close on the purchase of the Assets on an all-cash basis with immediately available funds.

22.      The Debtor requested that in the event that a Qualified Bidder is the winning bidder and fails to close on the sale of the Assets, the next highest bidder shall be required to

honor its next highest bid and close on the sale, and so on until a closing takes place.

23.     The Debtor requested that a failure to close on the sale of the Assets shall leave the nonperforming higher bidding parties with liability for breach of contract for the difference between the amount of the high bid and any future net sale proceeds received on the actual sale of the property, plus such other claims and causes of action as may be available under North Carolina and Federal law.

24.     The Debtor requested that the Court establish a Final Hearing Date for June 22, 2026 (or the next available date when the Court is holding session) whereby the Assets will be auctioned if one or more Qualified Bidders submit a qualifying overbid and that, following the auction, the Court conduct a hearing to approve the proposed sale and enter a final sale order ("Sale Order").

25.     Upon completion of the sale approved by the Sale Order, the Debtor's counsel will file a subsequent motion for authority to disburse the closing proceeds, except for the items specifically authorized herein or by prior orders of this Court.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the Debtor's Sale Motion is **GRANTED** as follows:

1.     Van Lang Jewelry LLC (or its assignee) shall serve as the Stalking Horse Bidder for the sale of the Assets on the terms set forth in this Order, including without limitation **Exhibit A** hereto, which are hereby approved;

2.     The Stalking Horse Bidder is authorized, consistent with the terms of the Purchase Agreement and pursuant to Section 363(k) of the Bankruptcy Code, to credit bid all or any portion of the outstanding DIP Obligations under the DIP Facility as part of the Purchase Price, and to increase such Credit Bid at any auction conducted pursuant to the Bidding

Procedures, up to the full amount of the DIP Obligations outstanding as of the closing of the sale transaction. The Credit Bid provisions set forth in Sections 2.12(b) through 2.12(g) of the Purchase Agreement are hereby approved. In the event the Stalking Horse Bidder is the final high bidder for the Assets, the Sale Order entered following the Final Sale Hearing shall expressly authorize and approve the Credit Bid and the application thereof to the DIP Obligations in the manner set forth in the Purchase Agreement;

3.      Pursuant to and consistent with Section 11.1 of the Purchase Agreement, the Stalking Horse Bidder is authorized to assign any or all of its rights under the Purchase Agreement, including without limitation the right to credit bid the DIP Obligations pursuant to Section 363(k) of the Bankruptcy Code and Sections 2.12(b) through 2.12(g) of the Purchase Agreement, to its affiliate, Jewelry Design Partners LLC, without further order of this Court and without the need for additional consent or notice to any party;

4.      The proposed Bidding Procedures attached to this Order as **Exhibit B** are hereby approved;

5.      Payment of a break-up fee in the amount of three percent (3%) of the Purchase Price (i.e., $45,000.00) shall be paid to the Stalking Horse Bidder from the sales proceeds at closing, in the event the Stalking Horse Bidder is not the successful bidder;

6.      The Break-Up Fee in the amount of $45,000.00, as set forth in Section 10.1(g) of the Purchase Agreement, and the Expense Reimbursement in an amount not to exceed $45,000.00, as set forth in Section 10.1(h) of the Purchase Agreement (collectively, the "Bid Protections") are hereby approved;

7.     The minimum overbid shall be in an amount equal to five percent (5%) of the proposed Purchase Price, resulting in a minimum overbid from other potential bidders in an amount of at least $1,575,000.00;

8.     Consistent with Paragraph 4.F. of the Bidding Procedures, the Debtor shall provide to the Stalking Horse Bidder copies of all Bids and all Required Bid Documents and other written or electronic materials submitted by any Bidder in connection with such Bid (collectively, "Bid Packages") within one (1) business day after the Debtor's receipt of the same; provided, however, that the Debtor may redact personally identifiable information, bank account numbers, and other sensitive security identifiers solely to the extent reasonably necessary to protect against identity theft or account compromise, while preserving all material economic and contractual terms of the Bid Packages.  The Stalking Horse Bidder shall maintain as confidential and shall not disclose to any third party the fact that any particular Bidder submitted a Bid, the identity of such Bidder, or the terms and conditions of any Bid or Bid Package, except (a) to the Stalking Horse Bidder's employees, attorneys, and advisors who have a need to know such information for purposes of evaluating, formulating, or improving the Stalking Horse Bidder's Bid; (b) to the Court or as otherwise ordered by the Court; or (c) as required by applicable law, regulation, or court order, in which case the Stalking Horse Bidder shall, to the extent legally permissible, provide the Debtor with prompt written notice to allow the Debtor to seek a protective order or other appropriate remedy. If no Qualified Bids are received by the expiration of the Overbid Period, the Debtor shall promptly proceed to the Final Sale Hearing to seek entry of the Sale Order approving the sale to the Stalking Horse Bidder on the terms set forth in the Purchase Agreement without the necessity of an auction.

9.      The Purchase Agreement shall be subject to an Overbid Period through and including June 6, 2026, to allow Qualified Bidders to submit a qualifying bid to counsel for the Debtor;

10.     The Court hereby approves the proposed qualifications for Qualified Bidders, including without limitation the form of the Overbid Purchase Agreement attached as **Exhibit 2** to the Bidding Procedures, which are attached hereto as **Exhibit B**;

11.     If one or more Qualified Bidders submit a qualifying overbid, the Assets will be auctioned at 10:00a.m EST on June 22, 2026 in the United States Bankruptcy Court, 3rd Floor Courtroom in Raleigh, North Carolina;

12.     Regardless of whether any qualifying overbids are submitted, a Final Sale Hearing shall be held before this Court at 11:00a.m. EST on June 22, 2026 in the United States Bankruptcy Court, 3rd Floor Courtroom in Raleigh, North Carolina.

**END OF DOCUMENT**

EXHIBIT A

---

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**CHARLES & COLVARD, LTD.**

(AS SELLER)

**AND**

**VAN LANG JEWELRY LLC**

**or JEWELRY DESIGN PARTNERS LLC**

(AS PURCHASER)

**Dated as of April 15, 2026**

---

**ASSET PURCHASE AGREEMENT**

This Asset Purchase Agreement (the "Agreement") is made as of the 15th day of April, 2026, by and between Charles & Colvard, Ltd. ("Seller") and Van Lang Jewelry LLC or its affiliate Jewelry Design Partners LLC ("Purchaser").

**WITNESSETH:**

WHEREAS, on March 2, 2026 (the "Petition Date"), Seller filed a voluntary petition seeking relief under chapter 11 of the Bankruptcy Code.

WHEREAS, Seller is a North Carolina corporation founded in 1995 and headquartered in Morrisville, North Carolina. Seller was founded as C3 Diamante, Inc. and changed its name to C3, Inc. by Articles of Amendment filed on April 10, 1996. Seller subsequently changed its name to Charles & Colvard, Ltd. by Articles of Amendment filed on May 17, 2000.

WHEREAS, Seller is a globally recognized fine jewelry company specializing in lab-created gemstones. Its common stock is quoted on the OTC Experts Market under the symbol "CTHR." Seller manufactures, markets, and distributes Charles & Colvard Created Moissanite® including its premium moissanite gemstone brand, Forever One™, as well as Caydia®, its brand of premium lab-grown diamonds. Seller offers gemstones and finished jewelry featuring its proprietary moissanite jewels, premium lab-grown diamonds, created color gemstones, and most recently, lab-grown diamonds in color, for sale in the worldwide fine jewelry market through two operating segments: its Online Channels segment, which encompasses its digital properties components, comprised of its charlesandcolvard.com, moissaniteoutlet.com, charlesandcolvarddirect.com, and madenetwork.com websites; e-commerce outlets, including marketplaces, drop-ship customers, and other pure-play, exclusively e-commerce customers; and its Traditional segment, which consists of domestic and international distributors and retail customers, including end-consumers through its first Charles & Colvard Signature Showroom, which opened in October 2022.

WHEREAS, as of the Petition Date, Seller had a total of 26 full-time employees and 1 part-time employee.

WHEREAS, Seller desires to sell to Purchaser all right, title, and interest of Seller and its bankruptcy estate in, to, and under the Assets and to assign to Purchaser the Assumed Contracts, on the terms and conditions set forth in this Agreement, pursuant to Sections 363 and 365 of the Bankruptcy Code;

WHEREAS, Purchaser desires to purchase from Seller all right, title, and interest of Seller and its bankruptcy estate in, to, and under the Assets and to assume the Assumed Contracts, on the terms and conditions set forth in this Agreement, pursuant to Sections 363 and 365 of the Bankruptcy Code; and

WHEREAS, the execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject to entry of the Sale Order.

1

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1     **Certain Definitions**.  For purposes of this Agreement, defined terms used herein have the meanings specified in this Section 1.1.

"Action" means any suit, action, Claim, hearing, administrative action, demand, demand letter, Governmental investigation, notice of violation, or proceeding arising out of any violation or alleged violation of any Law or any breach or alleged breach of any Contract or Order.

"Affiliate" means a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the Person referred to. In this definition, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of securities, by contract, or otherwise.

"Agreement" means this Agreement, as hereafter amended, supplemented, or otherwise modified.

"Assets" has the meaning ascribed to it in Section 2.1 herein, provided that (whether or not expressly stated) for all purposes of this Agreement, Assets always exclude Excluded Assets.

"Assignment of Lease" has the meaning ascribed to it in Section 2.6.

"Assumed Contracts" has the meaning ascribed to in Section 2.7.

"Assumed Liabilities" has the meaning ascribed to it in Section 2.8(a).

"Authorizations" means all Permits, licenses, certificates, grants, or other authorizations of Governmental Authorities.

"Bankruptcy Case" means the case under Chapter 11 of the Bankruptcy Code, styled, *Charles & Colvard, Ltd.*, Case No. 26-00969-5-DMW, pending before the Bankruptcy Court.

"Bankruptcy Code" means title 11 of the United States Code Section 101, et seq. (11 U.S.C. § 101, *et seq.*).

"Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of North Carolina and, to the extent of the withdrawal of any reference made pursuant to 28 U.S.C. § 157, the United States District Court for the Eastern District of North Carolina with jurisdiction over the Bankruptcy Case.

"Bidding Procedures" means the set of rules and guidelines established by Seller, and approved by the Bankruptcy Court, that govern the process by which potential purchasers may submit offers to acquire the Assets. These procedures outline the requirements for submitting bids, the criteria for submitting a Qualified Bid, the timeline for the bidding process, and any other relevant terms and conditions necessary to facilitate a fair and orderly sale process. The Bidding Procedures are designed to ensure that Seller receives the highest or otherwise best offer for the Assets, consistent with its fiduciary duties and applicable law.

"Bill of Sale" has the meaning ascribed to it in Section 2.6.

"Books and Records" includes, without limitation, books, ledgers, files, reports, records, inventory data, accounts receivable records, accounts payable records, vendor lists, financing records, personnel and payroll records and other business books and records (including without limitation documents), regardless of the form of and the medium on which such books and records are maintained.

"Business" means all operations and activities conducted by Seller in connection with its jewelry business, including but not limited to the sale, design, manufacture, and distribution of jewelry products, as well as all related services and functions performed by Seller prior to the Closing Date.

"Business Day" means any day of the year, other than Saturday or Sunday, on which national banking institutions in North Carolina are open to the public for conducting business and are not permitted, required, or authorized to close.

"Business Confidential Information" has the meaning ascribed to it in Section 5.15(b).

"Business Records" has the meaning ascribed to it in Section 5.1(e).

"Casualty" has the meaning ascribed to it in Section 5.10.

"Claims" has the meaning given that term in Section 101(5) of the Bankruptcy Code and includes, *inter alia*, any and all deeds of trust, Liens, mortgages, assessments, security interests, encumbrances, claims, defenses, demands, damages, causes of action, offset rights, setoff rights, recoupment rights, interests, debts, obligations, guaranties, options, commitments, product liability claims (relating to all products sold or produced prior to the Closing), warranty claims, claims of employees or former employees or their beneficiaries or dependents, including but not limited to, severance or termination payments, pension or employee benefit claims, Taxes, all tort or contractual claims and any claims or obligations arising from Environmental Law, whether absolute or contingent, matured or unmatured, accrued or unaccrued, asserted or unasserted, known or unknown, in law or in equity, including, without limitation, any claims predicated upon any theory of successor liability or any similar theory, and all Liabilities or guaranties of any kind or nature, arising from or in any way connected with any action or inaction of Seller, arising prior to the Closing Date but excluding the Permitted Encumbrances.

"Closing" means the consummation of the transactions contemplated by this Agreement.

"Closing Date" means such date following the satisfaction of each Party's conditions to Closing or, where permitted, waiver by each Party of the other Party's conditions to Closing as set forth in Articles VI, VII and VIII to this Agreement, as shall be selected by the Parties, but in no event later than July 7, 2026, or such later date as the Parties may in writing agree.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any contract, agreement, arrangement, understanding, lease, indenture, note, bond, evidence of indebtedness, license, sublicense, undertaking, binding commitment or instrument, or purchase order entered into or made by or on behalf of Seller in connection with the Business.

"Court" means any court, administrative or regulatory body, Government agency, arbitration or mediation panel or similar body.

"Cure Payments" means the amounts necessary to cure defaults, if any, under each Assumed Contract.

"Data Room" has the meaning ascribed to it in Section 1.2(a)(viii) herein.

"Deed" has the meaning ascribed to it in Section 2.6.

"Dispute" has the meaning ascribed to it in Section 11.10(a)

"Effective Time" means the effective time of the Closing, which shall be as of 12:00:01 a.m. prevailing Eastern Time, on the day of the Closing Date.

"Environmental Law" means any federal, state or local statute, law, regulation, code, ordinance, or rule of common law currently in effect relating to the protection or pollution of the environment or natural resources, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 *et seq.*), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801 *et seq.*), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 *et seq.*), the Clean Water Act (33 U.S.C. § 1251 *et seq.*), the Clean Air Act (42 U.S.C. § 7401 *et seq.*) the Toxic Substances Control Act (15 U.S.C. § 2601 *et seq.*), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 *et seq.*), The Medical Waste Tracking Act (42 U.S.C. § 6992 *et seq.*), the Oil Pollution Act (33 U.S.C. § 2701 *et seq.*), the Emergency Planning and Community Right to Know Act (42 U.S.C. § 11001 *et seq.*), the Occupational Safety and Health Act (29 U.S.C. § 651 *et seq.*), and the Occupational Safety Health Act (29 U.S.C. § 651 *et seq.*).

"Excluded Assets" means those assets of Seller that are set forth on Schedule 1 attached hereto.

"Excluded Liabilities" means each and every Liability, obligation, debt, or commitment of the Business or Seller, as principal, or a successor of any kind or nature (provided Seller shall take no action causing or resulting in Purchaser being deemed to be a successor owner or operator of the Business for purposes of any Environmental Law), whether absolute or

4

contingent, accrued or unaccrued, asserted or unasserted, known or unknown, liquidated or unliquidated, due or to become due, or otherwise, other than the Assumed Liabilities.

"Excluded Records" means (a) any materials about employees, disclosure of which would violate Law, (b) any materials that are subject to a Privilege or requirement to maintain confidentiality or (c) any Patient Records but only to the extent access to Patient Records is prohibited by Law.

"Exhibits" means the exhibits provided for and referred to in this Agreement.

"Government" or "Governmental" means or refers to the United States of America, any other nation or sovereign state, any federal, bilateral or multilateral governmental authority, state, possession, territory, county, district, city or other governmental unit or subdivision, and any branch, agency, or judicial body of any of the foregoing.

"Governmental Authority" means (i) any federal, state, county, municipal or other local Government or governmental authority, including, without limitation, any regulatory or administrative agency, commission, department, board, bureau, agency, instrumentality or Court and (ii) any arbitrator or arbitral body of any Government.

"Knowledge" means (a) as to Seller, the actual knowledge of Seller and (b) as to Purchaser, the actual knowledge, after due inquiry, of the senior leadership team members of Purchaser listed on Schedule 2.

"Law" means any statute, law, code, treaty, ordinance, rule, regulation, instrument, directive, decree, agreement, policy, Order, consent decrees and consent orders, or injunction of or with any Government, Governmental Authority, quasi-Governmental Authority, or Court, and includes, without limitation, all judicial and administrative interpretations thereof, and all rules or regulations of any regulatory or self-regulatory authority compliance with which is required by Law.

"Liabilities" means debts and liabilities, whether known or unknown, contingent or absolute, liquidated or unliquidated, and whether or not required to be reflected on the financial statements of a business, whether arising under any Contract, Law, Lien, Order or otherwise.

"Lien" means any lien, security interest, mortgage, deed of trust, option, lease, tenancy, occupancy, covenant, condition, easement, agreement, royalty, pledge, hypothecation, charge, claim or other encumbrance.

"Nonassignable Asset" shall have the meaning set forth in Section 2.5 of this Agreement.

"Order" means any order, judgment, writ, injunction, award or decree of any Court or Governmental Authority.

"Ordinary Course of Business" means with respect to the Business, the ordinary course of commercial operations customarily engaged in by the Business reasonably consistent with past practices.

"Party" or "party" means either Purchaser or Seller, and "Parties" means both Purchaser and Seller together.

"Permits" means any approvals, authorizations, consents, licenses, permits, provider numbers, including, without limitation, certificates of exemption, franchises, accreditations, registrations or certificates of a Governmental Authority.

"Permitted Encumbrances" means (i) the Assumed Liabilities and other obligations assumed by Purchaser under this Agreement, (ii) those Liens or exceptions listed on or described in Schedule 5 attached hereto, and (iii) Liens imposed pursuant to any Assumed Contract.

"Permitted Parties" has the meaning ascribed to it in Section 5.1(e).

"Person" means any natural person, any corporation, partnership, limited liability company, limited liability partnership, joint venture, trust, association, company, or other legal entity, and any Government or Governmental Authority.

"Privilege" means the attorney-client privilege (including the common interest privilege) or the attorney work product doctrine.

"Privileged Materials" means any materials that are protected by or the subject of a Privilege.

"Purchased Intellectual Property Licenses" means those intellectual property licenses of Seller included within the Assets, if any.

"Purchase Price" has the meaning ascribed to it in Section 2.12(a).

"Purchaser" has the meaning set forth in the Preamble to this Agreement.

"Qualified Bid" means an offer submitted to Seller that meets all the criteria and requirements outlined in the Bidding Procedures. A Qualified Bid must comply with the submission requirements, be submitted by an entity that demonstrates the financial capability to complete the transaction, and include any necessary documentation as specified by the Seller.

"Relating to" means arising from, in connection with or otherwise relating to. "Relates to" and "relate to" have corresponding meanings.

"Sale Order" has the meaning ascribed to it in Section 6.1.

"Schedules" means the schedules provided for and referred to in this Agreement.

"Seller" has the meaning set forth in the Preamble to this Agreement.

"Seller's Confidential Information" has the meaning ascribed to it in Section 5.15(a).

"Tax" or "Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value

6

added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, excise taxes under Section 4979 of the Code, unrelated business income taxes, and estimated taxes, whether disputed or not, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i).

"Taxing Authority" means any Government or Governmental Authority responsible for the imposition or collection of any Tax.

"Transferred Business Records" has the meaning ascribed to it in Section 5.1(f).

"Transfer Taxes" means all excise, sales, use, transfer (including Real Property transfer or gains), value added, stamp, documentary, filing, recording and similar Taxes and fees which may be imposed or assessed as a result of the transactions effected pursuant to this Agreement together with any interest, additions, penalties with respect thereto and any interest in respect of such additions or penalties.  Income taxes do not constitute Transfer Taxes.

1.2 **Other Definitional and Interpretive Matters**.

(a) Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i) Calculation of Time Periods.  When calculating the period before which, within which, or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii) Dollars.  Any reference in this Agreement to "$" means United States dollars.

(iii) Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent it is reasonably apparent that it is pertinent to the subject matter of such other Schedule. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv) Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v) Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

7

(vi)     Herein.  The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)    Including.   The word "including" means "including, without limitation," and "includes" and "include" have corresponding meanings, and such words shall not be construed to limit any general statement to the specific or similar items or matters immediately following it.

(viii)   Made Available to Purchaser.   The phrase "made available to Purchaser" means, for all purposes of this Agreement, made available to Purchaser through posting in Seller's electronic data room (the "Data Room"), via email, facsimile or other electronic transfer or through other written means for all purposes of this Agreement.

(b)     No Construction Against Drafter.  No presumption, burden of proof, burden of persuasion or similar method of interpretation or standard shall arise or otherwise apply favoring or disfavoring any Party (including, without limitation, the draftsperson) by virtue of the authorship of any one or more provisions of this Agreement, including in any arbitration or litigation proceeding.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

2.1     **Sale of Assets**.  At the Closing and as of the Effective Time but in all events subject to the approval of the Bankruptcy Court by and through the Sale Order, Seller agrees, upon and subject to the terms and conditions hereinafter set forth, to sell, transfer, convey, assign, and deliver or cause to be sold, transferred, conveyed, assigned, and delivered to Purchaser, all right, title, and interest of Seller and its bankruptcy estate in, to and under all of the assets and properties and associated rights and interests, real, personal, and mixed, tangible and intangible, of whatever kind, owned by Seller or any of its Affiliates (no matter where located, including without limitation, on leased property) including, without limitation, all of the assets and properties used in or related to the Business, but excluding the Excluded Assets (collectively, after excluding the Excluded Assets, the "Assets").  None of the Excluded Assets will be conveyed to Purchaser.

2.2     **Purchase of Assets**.  Purchaser agrees to purchase the Assets upon and subject to the terms, conditions and provisions set forth herein and pursuant to the terms in the Sale Order.

2.3     **Excluded Liabilities**.  Except for the Permitted Encumbrances, the Assets shall be transferred pursuant to the Sale Order and Section 363 of the Bankruptcy Code, to the fullest extent permitted by applicable Law, free and clear of all Liens, Claims, interests, and encumbrances.

(a)     Purchaser shall not assume, satisfy, discharge, or otherwise be responsible for any Excluded Liabilities. Purchaser shall, at the Closing, assume the Assumed Liabilities pursuant to the terms of Section 2.8 of this Agreement.

(b)     Purchaser shall not assume, satisfy, discharge, or otherwise be responsible for any Liabilities of Seller related to any pension or retirement plans or programs.

(c)      The Parties hereto further agree that, as between Purchaser and Seller, all the Excluded Liabilities shall remain the sole, exclusive obligation and responsibility of Seller.

(d)      Notwithstanding the foregoing, Purchaser shall be responsible for all Liabilities applicable to and incurred with respect to the period after the Effective Time that relate to the Business or Purchaser's post-Closing ownership or operation of the Assets; provided, however, that no statement made in this Agreement shall be deemed to allocate or attribute any Liability or obligation to Purchaser that has been released pursuant to the Sale Order.  To the extent this Section 2.3(d) conflicts with any other provision of this Agreement, this Section 2.3(d) controls.

2.4      **Excluded Assets**.  Nothing herein contained shall be deemed to obligate Seller to sell, transfer, assign, or convey any Excluded Asset, as described on Schedule 1, to Purchaser.  The Seller shall retain all right, title, and interest to, in, and under the Excluded Assets. To the extent this Section 2.4 conflicts with any other provision of this Agreement, this Section 2.4 controls.

2.5      **Nonassignable Assets.**  To the extent that the assignment of any Asset shall require the consent of any other party and such consent shall still be required notwithstanding the Sale Order and Sections 363 and 365 of the Bankruptcy Code (each, a "Nonassignable Asset") nothing in this Agreement nor the consummation of the transactions contemplated hereby shall be construed as an attempt or agreement to assign such Nonassignable Asset unless and until such consent shall have been obtained.

2.6      **Method of Conveyance**.  The sale, transfer, conveyance, assignment, and delivery by Seller of the Assets to Purchaser hereunder shall be effected on the Closing Date by delivery by Seller of: (a) assignment(s) and bill(s) of sale and such other instruments of conveyance in the form of Exhibit A (collectively, "Bill of Sale") conveying all right, title, and interest of Seller and its bankruptcy estate in all Assets that comprise tangible or intangible personal property, including separate assignment(s) of any U.S. trademark registrations and applications, if any, included within the Purchased Intellectual Property Licenses in a form suitable for recording with the U.S. Patent and Trademark Office, all to the fullest extent permitted by Law, free and clear of any and all Liens, except for Permitted Encumbrances.

2.7      **Assumed Contracts**.  On and after the Effective Time, Purchaser shall assume and be responsible for, and shall timely pay, perform, and discharge in accordance with their terms, all obligations (i) arising after the Effective Time with respect to executory contracts and unexpired leases identified on Schedule 2.7 (the "Assumed Contracts").  Except for the Assumed Contracts, Purchaser shall not be assigned any contracts or leases of Seller and shall not be responsible for any of Seller's contracts or leases.

2.8      **Assumption of Liabilities**.

(a)      As of the Effective Time, Purchaser shall assume and be responsible for, and shall timely pay, perform, and discharge in accordance with their respective terms all Liabilities of the Business (the "Assumed Liabilities") accruing from and after the Effective Time incurred in connection with or otherwise relating to the Assets or the Business.

(b)     As of the Effective Time, Purchaser shall assume and be responsible for, and shall timely pay, perform, and discharge in accordance with their respective terms the obligations of Seller arising from and after the Effective Time under Assumed Contracts which Seller shall assign and as to which Purchaser shall assume all obligations thereunder, except that Purchaser shall not assume the obligations to pay Cure Payments relating to the Assumed Contracts.

(c)     On the Closing Date, Purchaser shall assume no liability for Seller's accrued payroll, accrued payroll taxes, and accrued paid annual leave.

(d)     Seller shall be responsible for the payment of the Cure Payments, if any, required with respect to the Assumed Contracts with said payments being made to the counterparty to the Assumed Contracts when the Cure Payments become due pursuant to the Sale Order unless the Seller and the counterparty to an Assumed Contract agree otherwise.  Such Cure Payments shall be paid from the Cash Purchase Price.  Seller represents that Schedule 2.8(d) lists all executory contracts necessary to Seller's ongoing operations that require a cure.

(e)     Notwithstanding anything to the contrary in this Agreement, (i) Purchaser shall consult with Seller with respect to the terms of the assumption of the Assumed Contracts provided that Purchaser shall not modify any terms thereof without the prior written consent of Seller if such modification would be or could reasonably be expected to be adverse to Seller in any respect, and (ii) the rights of Seller to object to such terms are expressly preserved and reserved.

(f)     Seller shall be responsible for prosecuting all objections to the Cure Payments.  Seller shall, at Seller's sole cost, (i) negotiate the amount of all Cure Payments and/or (ii) pay all of Purchaser's legal and other fees and expenses, if any, to the extent incurred because of Purchaser being required to intervene or defend) relating to any litigation or other dispute in connection with or otherwise relating to Cure Payments.

2.9     **Taxes and Assessments**.  The Liability for payment of accrued but unbilled or unpaid Taxes (including, but not limited to, real estate taxes, personal property tax, ad valorem tax and similar non-income Taxes) and other assessments relating to, or arising out of the ownership or transfer of, the Assets or the Assumed Contracts (including, but not limited to any water, sewer and other municipal charges owed to any Governmental Authority), imposed on a periodic basis beginning before and ending after the Effective Time or as a result of the consummation of the transactions evidenced by this Agreement or otherwise, shall be paid by Seller at the Closing, provided that Seller has received at Closing the purchase price required to be paid by Purchaser pursuant to this Section.  All Taxes and other assessments shall be listed on Schedule 7, which shall be prepared and delivered at Closing.  If any Taxes or other assessments paid by Seller at any time on or prior to the Closing Date are attributable in whole or in part to any period following the Closing, then the Purchase Price payable at Closing shall be increased to adjust for the prior payment of such Taxes and assessments by Seller attributable to the post-closing period.

2.10   **Intentionally Deleted**.

2.11    **Closing Obligation.**

(a)    Upon entry of the Sale Order, Seller and Purchaser shall have the obligation to consummate the Closing pursuant to and subject to the terms of this Agreement and the Sale Order.  If Purchaser fails to consummate the purchase of the Assets on or before July 7, 2026 (unless such failure arises from Seller's uncured material breach and unless Seller and Purchaser agree to extend such deadline in writing), Seller is authorized but not required to effect the sale of the Assets to one or more third parties as soon as is commercially reasonable subject to further Orders of the Bankruptcy Court.

2.12    **Purchase Price**.

(a)    In consideration of the sale, transfer, conveyance, and assignment of the Assets to Purchaser, Purchaser shall at Closing: (i) assume the Assumed Liabilities, (ii) pay to Seller cash by wire transfer of immediately available funds (the "Cash Purchase Price") in the amount necessary to ensure that the Credit Bid Amount plus the Cash Purchase Price equal $1,500,000.00; (iii) pay to Seller the Credit Bid Amount (as defined below); (iv) assume the liabilities described in Sections 2.7 and 2.8 on the terms contained therein; and (v) pay to Seller the amount required under Section 2.9 (collectively, the "Purchase Price").

(b)    Credit Bid Amount. Purchaser shall pay a portion of the Purchase Price by way of a credit bid (the "Credit Bid") in an amount equal to all outstanding, accrued, and unpaid obligations, liabilities, fees, costs, indemnities, yield maintenance, make-whole amounts, premiums, and other amounts, in each case to the extent payable pursuant to the court-approved debtor-in-possession financing facility provided by Purchaser to Seller under that certain Section 364 Financing Loan Agreement dated March 24, 2026 (as amended, restated, supplemented, or otherwise modified from time to time, the "DIP Facility"), including, without limitation: (a) all principal outstanding under the DIP Facility; (b) all accrued and unpaid interest (including default interest, if any); (c) all accrued and unpaid fees, expenses, and charges (including, without limitation, agency fees, unused fees, closing fees, exit fees, monitoring fees, appraisal fees, and any other contractual fees); (d) all costs and expenses of the Purchaser reimbursable under the DIP Facility (including, without limitation, reasonable and documented attorneys', advisers', consultants', and financial advisors' fees and expenses); and (e) all protective advances and other amounts owing under the DIP Facility or any related loan documents approved by the Bankruptcy Court (collectively, the "DIP Obligations"), in each case as of the Closing (the "Credit Bid Amount"). For the avoidance of doubt, the Credit Bid Amount shall be reduced by any amounts of the DIP Obligations that have been indefeasibly paid in cash prior to the Closing.

(c)    Application of Credit Bid. Effective upon the Closing, the Credit Bid Amount shall be irrevocably applied, dollar-for-dollar, as a credit against the Purchase Price and, correspondingly, as a satisfaction, to the extent of the Credit Bid Amount, of the DIP Obligations in the following order of priority (to the extent applicable and outstanding): (a) first, to accrued and unpaid fees, costs, expenses, and indemnities owing under the DIP Facility; (b) second, to accrued and unpaid interest (including default interest, if any); (c) third, to outstanding principal; and (d) fourth, to any other DIP Obligations then due and payable under the DIP Facility and approved by the Bankruptcy Court. The parties acknowledge and agree that the Credit Bid is made pursuant to, and conditioned upon, entry of the Sale Order authorizing Purchaser, as a holder of

11

claims arising under the DIP Facility, to credit bid the DIP Obligations up to the full amount thereof.

(d)　　Evidence of Amounts; Statements. No later than two (2) Business Days prior to the Closing Date, Purchaser shall deliver to Seller a payoff statement (for informational purposes) setting forth a good-faith itemization of the then-outstanding DIP Obligations proposed to be satisfied by the Credit Bid, including the calculation of the Credit Bid Amount and the application thereof in accordance with Section 3. Any disputes regarding the amounts set forth in such payoff statement shall not delay Closing and shall be resolved post-Closing, with appropriate true-up payments in cash within five (5) Business Days following resolution.

(e)　　No Cash Payment for Credit Bid. Except as expressly provided in this Agreement, no cash shall be paid by Purchaser to Seller or any other Person on account of the portion of the Purchase Price satisfied by the Credit Bid, it being the intent of the parties that the Credit Bid Amount constitutes non-cash consideration credited against the Purchase Price as and to the extent permitted by the Sale Order.

(f)　　Conditions; Sale Order. The effectiveness of the Credit Bid and the application thereof to the DIP Obligations are expressly conditioned upon entry by the Bankruptcy Court of an order approving the sale of the Assets to Purchaser free and clear of liens, claims, and interests and authorizing Purchaser to credit bid the DIP Obligations as contemplated herein (the Sale Order). If the Sale Order does not authorize the Credit Bid in the manner contemplated by this Section, the parties shall cooperate in good faith to implement an alternative structure that achieves, to the maximum extent permitted, the economic effect of the Credit Bid, including by adjusting the Cash Purchase Price and applying the proceeds to repay the DIP Obligations at Closing, subject in all respects to further order of the Bankruptcy Court.

(g)　　No Merger; Reservation of Rights. The satisfaction of the DIP Obligations by application of the Credit Bid Amount shall not affect, impair, or limit any rights, remedies, claims, defenses, or priorities of Purchaser with respect to any obligations not satisfied by the Credit Bid, including, without limitation, with respect to any Excluded Assets, Excluded Liabilities, or obligations expressly surviving Closing under the DIP Facility, except to the extent expressly provided in this Agreement or required by the Sale Order.

(h)　　The Parties agree to report this transaction for federal, state, and local Tax purposes consistently and in accordance with this Section 2.12.

2.13　**Intentionally Deleted.**

2.14　**Closing**.  The Closing shall take place at 10:00 a.m., prevailing Eastern Time, on the Closing Date at the offices of Seller's bankruptcy counsel, or at such other time and place as the Parties may agree in writing.  The Closing shall be deemed to have occurred and to be effective as between the parties as of the Effective Time.  Seller will operate the Business until immediately prior to the Effective Time.

2.15　**Intentionally Deleted.**

2.16   **Closing Deliveries of Seller**.  At the Closing, in addition to any other documents, assignments, certificates, letters, orders, or agreements described in Section 2.6 or otherwise required to be delivered pursuant to the terms of this Agreement, and the satisfaction of all the conditions set forth in Articles VI and VIII, Seller shall deliver to Purchaser the following:

(a)   the execution and delivery of this Agreement by Seller; and

(b)   a certified copy of the final, non-appealable Sale Order authorizing and ratifying the execution and delivery of this Agreement by Seller and the consummation of the transactions contemplated hereby; and

2.17   **Closing Deliveries of Purchaser**.   At the Closing, in addition to any other documents otherwise required to be delivered by Purchaser pursuant to the terms of this Agreement and the satisfaction of all other conditions set forth in Articles VI and VII, Purchaser shall deliver to Seller the following:

(a)   the payment of the Cash Purchase Price, by wire transfer of immediately available funds, pursuant to Section 2.12 herein;

(b)   a certificate of an officer of Purchaser certifying to Seller (a) compliance in all material respects with Purchaser's covenants set forth in this Agreement, (b) that all of the conditions contained in Articles VI and VII have been satisfied except those, if any, waived in writing by Purchaser, and (c) that all of the representations and warranties set forth in Article IV are true and correct in all material respects as of the Closing Date; and

(c)   copies of the resolutions of all corporate bodies of Purchaser necessary to authorize the transactions contemplated hereby, authorizing the purchase of the Assets and the execution and delivery by Purchaser of this Agreement and the consummation by Purchaser of the transactions contemplated hereby, certified by an authorized signatory of Purchaser.

2.18   **Intentionally Deleted.**

2.19   **Further Conveyances and Assumptions**.  From time to time following Closing, each Party shall, and shall cause their respective Affiliates to execute, acknowledge, and deliver all such further conveyances, notices, assumptions, releases, and other instruments, and shall take such further actions, as may be reasonably necessary or appropriate (i) to assure fully to Purchaser and its successors and permitted assigns, all of the properties, rights, titles, interests, estates, remedies, powers, and privileges intended to be conveyed to Purchaser under this Agreement and (ii) to assure fully to Seller and its successors and permitted assigns, the assumption of the Assumed Liabilities and other obligations intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the transactions contemplated herein.  Without limiting the generality of the foregoing, if Seller receives any Assets or payments related to the Assets after the Closing Date, it will promptly turn over same to Purchaser.

2.20   **Intentionally Deleted.**

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

13

Seller hereby makes the following representations and warranties, subject to any exceptions included in Seller's Disclosure Schedule:

3.1     **Power of Seller**.  Seller has the power to enter into this Agreement, to perform its obligations hereunder, and to consummate the transactions contemplated hereby.  Seller has all necessary power and authority to enter into this Agreement and all other documents that the Seller is required to execute and deliver hereunder, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.

3.2     **Validity and Enforceability of Agreement**.  Upon the entry of the Sale Order approving the sale of the Assets to the Purchaser, this Agreement constitutes a legal, valid, and binding obligation of Seller, this Agreement constitutes, and all documents required to be executed and delivered at Closing by Seller hereunder or in connection herewith will each constitute, the legal, valid, and binding obligations of Seller, enforceable against it in accordance with their respective terms, subject to general principles of equity.

3.3     **Consents; Waivers and Approvals**.  Except for the approval of the Bankruptcy Court as required by Section 363 of the Bankruptcy Code, no consent, waiver, approval, authorization, license or order of, registration or filing with, or notice to, any Governmental Authority or any other Person is necessary to be obtained, made or given by Seller in connection with the execution and delivery of this Agreement, the performance by Seller of its obligations hereunder or the consummation by Seller of the transactions contemplated hereby.

3.4     **No Conflict**.  Subject to the issuance of the Sale Order, the execution and delivery by Seller of this Agreement and the other agreements, documents and instruments required to be executed and delivered by Seller pursuant to this Agreement and the consummation by Seller of the transactions contemplated hereby or thereby, and compliance by Seller with any of the provisions hereof or thereof, will not:

(a)     violate (with or without the giving of notice or the lapse of time or both) any Law or any Order to which Seller, the Assets, or the Business is subject.

3.5     **Rights to Acquire Assets**.  Except for Ordinary Course of Business transactions involving the disposition of personal property that are not, individually or in the aggregate, material to the Seller, there are no agreements, options, or other rights to which Seller is a party pursuant to which a Claim exists that Seller is, or may become, obligated to sell or grant any Lien in any of the Assets.  Notwithstanding the foregoing, Seller acknowledges and agrees that the Assets shall be transferred pursuant to the Sale Order and Section 363 of the Bankruptcy Code, to the fullest extent permitted by applicable Law, free and clear of all Liens, Claims, interests, and encumbrances other than the Permitted Encumbrances.

3.6     **Title to and Adequacy of the Assets**.  Seller owns each of the Assets.  Subject to the approval of this Agreement by the Bankruptcy Court, Seller's right, title, and interest in the Assets will be transferred free and clear of any Liens by Order of the Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code, except for the Permitted Encumbrances.  The Assets comprise all items used in the operation of the Business.

14

3.7     **Intentionally Deleted.**

3.8     **Intentionally Deleted.**

3.9     **Intentionally Deleted.**

3.10    **Intentionally Deleted.**

3.11    **Intentionally Deleted.**

3.12    **Intentionally Deleted.**

3.13    **Intentionally Deleted**.

3.14    **Compliance with Laws; Permits**.

(a)     To Seller's Knowledge, Seller has all permits that are necessary to enable it to own, lease, or otherwise hold the Assets and to enable it to operate the Business as currently conducted.  All such permits are in full force and effect.  To the Knowledge of Seller, no proceedings are pending or threatened where the remedy sought is to revoke or materially modify any such permit, materially restrict any renewal of any such permit or deny the right to transfer any such permit that is permitted to be transferred with consent.

(b)     To Seller's Knowledge, Seller is in compliance in all material respects with all applicable Laws respecting the Business.  There are no charges of a material violation of a Law pending or to the Knowledge of Seller threatened against Seller.

(c)     There is not now pending or, to Seller's Knowledge, threatened, any claim, investigation or enforcement action by any governmental authority (whether judicial, executive or administrative) concerning Seller's potential liability under Environmental Laws in connection with the ownership or operation of the Business or the Assets.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser hereby makes the following representations and warranties:

4.1     **Corporate Existence of Purchaser**.  Purchaser has all necessary power and authority to enter into this Agreement and all other documents that the Purchaser is required to execute and deliver hereunder, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.

4.2     **Validity and Enforceability of Agreement**.  Upon the entry of the Sale Order approving the sale of the Assets to the Purchaser, this Agreement constitutes, and all documents executed and delivered by Purchaser at Closing hereunder or in connection herewith will each constitute, the legal, valid, and binding obligations of Purchaser, enforceable against it in accordance with their respective terms, except as enforcement hereof may be limited by general principles of equity.

15

4.3      **Authorization and Authority**.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized, approved and ratified by all necessary action on the part of Purchaser.  Purchaser has full authority to enter into and deliver this Agreement, to perform its obligations hereunder, and to consummate the transactions contemplated hereby.

4.4      **No Conflict**.  Neither the execution and delivery by Purchaser of this Agreement nor the performance by Purchaser of its obligations hereunder, (a) (i) violates or breaches the terms of or causes a default under any legal requirement applicable to Purchaser, (ii) contravenes the certificate of incorporation or bylaws or the certificate of formation and operating agreement or other organizational documents of Purchaser, or (iii) violates or breaches the terms or causes a default under any contract, indenture, evidence of indebtedness or other commitment to which Purchaser is a party or by which it or its properties is bound, or (b) will, with or without the passage of time, the giving of notice or the taking of any action by a third person, have any of the effects set forth in this subsection, except to the extent that any such matter would reasonably be expected to have a material adverse change with regard to Purchaser.

4.5      **Ability to Consummate Transaction**.  Purchaser has or will have sufficient immediately available funds and/or access to credit facilities necessary to consummate the purchase of the Assets and perform of its obligations under this Agreement.

4.6      **Solvency.**  Purchaser is solvent.  The consummation of the transactions provided for in this Agreement will not render Purchaser insolvent.  There are no conditions, obligations or commitments of Purchaser, or Claims against Purchaser, which will or could be reasonably expected to render Purchaser insolvent.

4.7      **Litigation and Arbitration**.

(a)      There is no Action pending or, to the Knowledge of Purchaser, threatened against Purchaser, including any before any Governmental Authority or any arbitration panel, that is not resolved herein seeking to prevent the consummation of the transactions contemplated by this Agreement.

(b)      There is no Action pending or, to the Knowledge of Purchaser, threatened against Purchaser or any of its Affiliates, or any of their respective members, owners, managers, officers, directors, or other senior executives or to which Purchaser is otherwise a party before any Governmental Authority, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the transactions contemplated hereby.  Purchaser or any of its Affiliates, or any of their respective members, owners, managers, officers, or senior executives are not subject to any Order of any Governmental Authority except to the extent the same would not reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the transactions contemplated hereby.

4.8      **Brokers and Intermediaries**.  Neither Purchaser nor any of its Affiliates has employed any broker, finder, advisor or intermediary that is entitled, in connection with the

16

consummation of the transactions contemplated hereby, to a broker's, finder's, or similar fee or commission.

## ARTICLE V
## CERTAIN COVENANTS AND AGREEMENTS OF SELLER AND PURCHASER

5.1     **Access and Information**.

(a)     Before the Closing and to the extent permitted by Law, and except as required to preserve any Privilege, Seller will provide Purchaser and its representatives with reasonable access during normal business hours, to all of the assets, properties, facilities, employees, agents, accountants, and books and records of Seller and will furnish or make available to Purchaser and its representatives during such period all such information and data concerning Seller in its possession or control as Purchaser reasonably may request; *provided, however*, such access shall be coordinated through such persons as may be designated in writing by Seller for such purpose.  Purchaser's access shall include IT access to allow Purchaser to prepare to transition/preserve any electronic data as may be customary or required.

(b)     Before the Closing, Seller shall permit Purchaser to engage in discussions and negotiations with Seller's vendors for the purpose of negotiating the terms of contracts between Purchaser and such vendors in connection with Purchaser's purchase of the Assets.

(c)     Before the Closing, Seller shall grant Purchaser and its representatives reasonable access to the employees within the Business for the purpose of administering the hiring process as to such employees.  Thus, by way of example and without limitation, except to the extent prohibited by applicable Law, Seller will grant reasonable access to enable Purchaser and its representatives to disseminate documents and information to such employees; collect documents and information from such employees; interview such employees and their supervisors and managers; investigate the backgrounds, experience, education, qualifications and work records of such employees; offer employment to such employees; and hire such employees.  Purchaser agrees to conduct all such activities in compliance with applicable Law.

(d)     Seller shall provide to Purchaser at the Closing or as soon thereafter as is reasonably possible all appropriate books and records and other documents in the possession or control of Seller, its representatives or its agents relating to the Assets being sold pursuant to this Agreement and the transactions contemplated hereby.  Such books, records, and documents shall include, but are not limited to, all paper and electronic financial, operational, administrative, research, regulatory reporting, maintenance, and HR records, but shall expressly exclude all Excluded Assets.

5.2     **Intentionally Deleted**.

5.3     **Conduct of Business**.

(a)     Prior to the Closing, except as otherwise contemplated by this Agreement or required by applicable Law or with the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed), Seller shall (subject to Purchaser's continued provision of financing under the DIP Facility):

17

(i)    operate the Business in the Ordinary Course of Business in all material respects;

(ii)    use commercially reasonable efforts to (A) maintain the Assets in good working order and condition consistent with past practices and (B) maintain the insurance coverage currently in place with respect to the Assets or obtain comparable replacement coverage;

(iii)    perform when due all undisputed post-petition obligations under its contracts, including leases of Real Property or personal property to the extent of available funds;

(iv)    comply in all material respects with all Laws and Orders pertaining to the Business and the Assets;

(v)    without being obligated to make any payment to any Person to preserve any goodwill or relationship, and subject to changes incident to Seller's bankruptcy filing and related intention to sell its assets, use commercially reasonable efforts reasonably consistent with past practices to preserve the goodwill thereof and Seller's relationships with the employees, suppliers, and others with whom it deals; and

(vi)    perform all undisputed post-petition obligations under Excluded Contracts and timely pay, perform, and discharge in accordance with their respective terms the undisputed post-petition Excluded Liabilities to the extent of available funds.

(b)    Prior to the Closing, except as otherwise contemplated by this Agreement or required by applicable Law or with the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed), Seller shall not:

(i)    make or enter into any Contract that would be required to be assumed by Purchaser;

(ii)    other than in the Ordinary Course of Business, (A) increase the annual level of compensation of any employee or other Person who works in the Business, (B) grant any bonus, similar benefit, or increase in other direct or indirect compensation to any employee or other Person who works in the Business, (C) with respect to any employee or other Person who works in the Business, increase the coverage or benefits available under any (or create any new) employee benefits plan, or (D) enter into any employment, deferred compensation, severance, consulting, non-competition, or similar agreement (or amend any such agreement) with any employee or other Person who works in the Business, except, as to each of clauses (A) through (D), as required by applicable Law from time to time in effect, by any employee benefits plan maintained or sponsored by Seller or by any existing Contract made available to Purchaser that the Seller is a party to or bound by;

(iii)    subject any of the Assets to any Lien, other than (A) any Permitted Encumbrances or (B) as approved by Order of the Bankruptcy Court;

(iv)    other than pursuant to an existing Contract made available to Purchaser, acquire or lease any material assets that would be Assets or sell, assign, license, transfer, convey, lease, or otherwise dispose of any of the Assets, provided that any other removal shall be

18

permitted if the assets removed, taken as a whole, are replaced with reasonably equivalent or better assets;

(v)     cancel or compromise any material debt or claim or waive or release any material right of Seller that constitutes an Asset except in the Ordinary Course of Business;

(vi)     permit or allow relocation of any services or programs of the Business; or

(vii)     other than in the Ordinary Course of Business or pursuant to an existing Contract made available to Purchaser, remove any furniture, equipment, or other tangible personal property used in the Ordinary Course of Business provided further that any other removal shall be permitted if the assets removed, taken as a whole, are replaced with reasonably equivalent or better assets.

5.4     **Commercially Reasonable Efforts**.   Each Party shall use its commercially reasonable efforts to fulfill or cause the fulfillment of the conditions of the Closing, including, without limitation, the execution and delivery of all agreements contemplated hereunder to be so executed and delivered provided that it shall be the responsibility of Purchaser to obtain the Authorizations and any required consents with respect to the assumption of the Assumed Contracts.

5.5     **Adequacy of Purchaser's Review**.   Purchaser agrees that it (a) had a full and complete opportunity to conduct due diligence regarding the Assets prior to making its offer and does not require further due diligence, (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its bid and executing and delivering this Agreement, and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties of any kind or nature, including, without limitation, any that are express, are implied, arise by operation of law, or that may otherwise be deemed to apply, regarding the Assets, or the completeness of any information provided in connection therewith except, as to clauses (b) and (c), solely for Seller's representations and warranties that are contained in Article 3 of this Agreement.

5.6     **Intentionally Deleted**.

5.7     **Tax Matters**.

(a)     The Parties agree to request that the Bankruptcy Court find that the sale of the Assets constitutes a sale in furtherance of effectuating a plan of reorganization, and, in accordance with section 1146(a) of the Bankruptcy Code, all transfers in connection therewith shall be exempt from any and all Transfer Taxes.  To the extent that the Bankruptcy Court does not so order, Seller shall be responsible for the payment of all Transfer Taxes from the Cash Purchase Price. Purchaser and Seller will cooperate in the timely preparation and filing of any Tax return that must be filed in connection with any Transfer Taxes.  Any such Taxes or fees resulting from any subsequent transfer of the acquired Assets or Assumed Contracts shall be borne by Seller from the Cash Purchase Price.

19

(b)      After the Closing Date, Seller and Purchaser shall, and shall cause their respective Affiliates to:

(i)      assist the other Party and its Affiliates in preparing any tax returns that such Party is responsible for preparing and filing relating to the Assets, the Excluded Assets or the Business;

(ii)      cooperate fully in preparing for any tax audit relating to or arising out of the ownership or use of the Assets or the Business;

(iii)      make available to the other Party and its Affiliates and to any Taxing Authority as reasonably requested all information, Books and Records, and documents relating to Taxes arising out of the conduct of the Business or the ownership or use of the Assets; and

(iv)      furnish the other Party with copies of all correspondence received from any Taxing Authority in connection with any tax audit relating to the conduct of the Business or the ownership or use of the Assets with respect to any such taxable period.

5.8      **Intentionally Deleted.**

5.9      **Intentionally Deleted.**

5.10      **Risk of Loss; Casualty Loss**.  All risk of loss or damage to or destruction of the Assets, in whole or in part, shall be and remain with Seller until the Effective Time and from and after the Effective Time, the risk of loss or damages to or destruction of the Assets in whole or in part shall be and remain with Purchaser.  If, between the date of this Agreement and the Closing, any of the Assets having a value in excess of $100,000, individually or in the aggregate, shall be destroyed or damaged in whole or in part by fire, earthquake, flood, other casualty or any other cause (the "Casualty"), individually or in the aggregate, then, with respect to a loss in value in excess of $100,000 (a) Purchaser shall have the option to acquire such Assets on an "as is" basis and take an assignment, without representation, warranty or recourse, from Seller of any insurance proceeds payable to Seller in respect of the Casualty (excluding proceeds under any directors or officers insurance policies) or (b) Seller shall have the option exercisable on or before the Closing Date by the delivery of written notice thereof to Purchaser (i) to fix such Casualty within sixty (60) days after the Closing Date, or (ii) pay Purchaser the loss in value arising from such Casualty, and if Seller does not elect within thirty (30) days of the occurrence of the Casualty an option set forth in (b)(i) or (b)(ii) above, then Seller shall be deemed to have elected the option in clause (b)(ii).

5.11      **Bankruptcy Actions**.

(a)      Seller and Purchaser acknowledge that this Agreement and the sale of the Assets are subject to Bankruptcy Court approval and entry of the Sale Order.

(b)      If an appeal is taken or a stay pending appeal is requested, with respect to the Sale Order, Seller shall promptly notify Purchaser of such appeal or stay request.  Seller shall promptly provide to Purchaser a copy of the related notice of appeal or order of stay.  Seller shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from such order. In the event of an appeal of the Sale Order, Seller shall, at its own

expense, be primarily responsible for drafting pleadings and attending hearings as necessary to defend against the appeal.

(c) From and after the date hereof, Seller shall not take any action that is intended to reverse, void, materially modify, or stay the Sale Order.

(d) Seller will provide Purchaser with a reasonable opportunity to review and comment upon all motions, applications, and supporting papers prepared by Seller (including forms of orders and notices to interested parties) related to the transaction contemplated by this Agreement.

5.12 **Intentionally Deleted.**

5.13 **DISCLAIMERS**. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES IN ARTICLE 3, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE TO PURCHASER, EXPRESS OR IMPLIED, WITH RESPECT TO THE TRANSACTIONS CONTEMPLATED HEREBY. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES IN ARTICLE 3, OR EXCEPT AS EXPRESSLY SET FORTH IN THE SALE ORDER, THE ASSETS TO BE SOLD AND TRANSFERRED HEREUNDER SHALL BE SOLD (A) IN THEIR THEN EXISTING PHYSICAL CONDITION, WITH ALL DEFECTS, IF ANY, AND SUBJECT TO WEAR AND TEAR FROM THE DATE HEREOF TO THE CLOSING DATE AND (B) ON AN "AS IS, WHERE IS" BASIS

5.14 **Further Assurances**. Each party shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated herein and (ii) cause the fulfillment at the earliest practicable date of all the conditions to their respective obligations to consummate same. Without limiting the generality of the foregoing, promptly after the discovery by Seller of any item included within the definition of Assets but not transferred, conveyed, or assigned to Purchaser, (x) Seller will deliver written notice to Purchaser of the existence and non-transfer, non-conveyance, or non-assumption of such item and provide Purchaser with all the information in Seller's possession about, and with access to such item in Seller's possession as Purchaser may reasonably request, and (y) if requested by Purchaser, Seller shall use commercially reasonable efforts to transfer, convey, or assign to Purchaser such item in the manner and on the terms and conditions as applicable to an Asset.

5.15 **Intentionally Deleted.**

5.16 **Acceptance and Discharge**. Except to the extent, if at all, Liabilities of Seller to Purchaser are specifically stated herein to survive the Closing, (i) Seller shall cease to have any Liability of any kind or nature relating to its representations and warranties hereunder and/or covenants and agreements to be performed prior to the Effective Time, and (ii) Seller will, without any further writing or other act by Purchaser, at such time be fully and forever, irrevocably and unconditionally, released and discharged from all such Liabilities.

5.17 **Cooperation**. Seller and Purchaser agree to reasonably cooperate with each other in good faith from the date hereof up through and following the Closing Date, in any effort to

21

satisfy all further conditions, undertakings and agreements contemplated by this Agreement to be effected after the Closing.

5.18   **Surrender of Certificates.  Following the Closing and in accordance with the timing and other requirements of applicable Law, Seller shall surrender all licenses and operating certificates issued to it relating to the Business, except for the licenses and operating certificates transferred to Purchaser pursuant to this Agreement.**

5.19   **Intentionally Deleted.**

5.20   **Insurance**.  Neither Purchaser nor Seller shall have an obligation to purchase tail director and officer insurance coverage or tail professional liability insurance coverage.

5.21   **Intentionally Deleted.**

**ARTICLE VI**
**CONDITIONS TO PURCHASER'S AND SELLER'S OBLIGATIONS**

The obligations of the Parties to consummate the transaction provided for in this Agreement shall be subject to the satisfaction of the following conditions on or before the Closing Date:

6.1   **Filing of the Sale Motion and Entry of the Sale Order**.  Seller shall have filed a sale motion in form and substance reasonably satisfactory to the Parties requesting the Bankruptcy Court to enter a sale order in form and substance reasonably satisfactory to the Parties (the "Sale Order"), which approves this Agreement and the consummation of the transactions contemplated hereby in their entirety; and which provides for the following rulings and/or findings: (a) Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code; (b) timely, adequate, and sufficient notice of the sale was provided; (c) the Assets to be transferred to the Purchaser are property of the bankruptcy estate and Seller has all requisite authority and approval to transfer the Assets; (d) the total consideration to be realized by Seller represents fair consideration and reasonably equivalent value in the context of any state or federal law governing the rights of creditors; (e) the conveyance and assignment of the Assets pursuant to this Agreement is a legal, valid, and effective transfer of the Assets to the Purchaser, and will vest the Purchaser with all right, title, and interest of Seller in and to the Assets free and clear of all Liens, Claims, interests except as provided herein and encumbrances except for those (i) liabilities to be assumed by Purchaser pursuant to this Agreement and (ii) Permitted Encumbrances, and (f) neither Seller nor Purchaser has engaged in any conduct that would cause or permit the Agreement, or the transfers contemplated thereby, to be avoided under Section 363(n) of the Bankruptcy Code.  In addition, the Bankruptcy Court shall have entered the Sale Order, and, unless waived by Purchaser in writing in its sole discretion, the Sale Order shall have become a final, non-appealable order.

6.2   **No Injunctions**.   No injunction or restraining Order (whether temporary, preliminary or permanent) of any Governmental Authority shall exist against Purchaser or Seller that prevents the transactions contemplated hereby and approved in the Sale Order.  No other Governmental Authority shall have enacted, issued, promulgated, enforced, or entered any statute, rule, regulation, or non-appealable judgment which prohibits or renders illegal the consummation of the Closing or the transactions provided for herein and approved in the Sale Order.

22

6.3     **Intentionally Deleted.**

6.4     **Intentionally Deleted.**

6.5     **Intentionally Deleted**.

## ARTICLE VII
## CONDITIONS TO PURCHASER'S OBLIGATIONS

The obligations of Purchaser to consummate the transactions provided for in this Agreement shall be subject to the satisfaction of each of the following conditions on or before the Closing Date, subject to the right of Purchaser, in its sole discretion, to waive any one or more of the conditions set forth below:

7.1     **Representations and Warranties of Seller**.  The representations and warranties of Seller contained in this Agreement, taken as a whole, shall be true and correct in all material respects on the Closing Date, except to the extent that any representation or warranty is made only as of a specified date, in which case the accuracy of such representation or warranty shall be measured as of such date, and except to the extent of changes permitted by the terms of this Agreement.

7.2     **Schedules**.  The matters set forth on the Schedules shall be true and correct in all material respects on the Closing Date, except to the extent of changes permitted by the terms of this Agreement.

7.3     **Documents**.  Purchaser shall have received a signed copy of this Agreement with all Schedules and Exhibits attached, as updated through and including the Closing, together with copies of all other documents and certificates to be executed and delivered by Seller at Closing.

7.4     **Performance of Obligations**.  Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date.

7.5     **No Changes to Business**.  Since the date of this Agreement, there shall have been no material changes to the Business or Assets that, in the aggregate, have had a material adverse effect on the Business, excluding adverse changes that were projected to occur in any forecast or budget provided by Seller.

7.6     **Intentionally Deleted**.

7.7     **Release of Liens**.  All Liens on the Assets shall have been released, satisfied or otherwise removed or discharged pursuant to Bankruptcy Court order or otherwise, except for the Permitted Encumbrances.

7.8     **Time is of the Essence**. The Sale Order shall have been entered by the Bankruptcy Court by July 2, 2026, and the Closing shall have occurred by July 7, 2026.

7.9     **Intentionally Deleted.**

23

7.10   **Intentionally Deleted**.

7.11   **Intentionally Deleted.**

### ARTICLE VIII
### CONDITIONS TO SELLER'S OBLIGATIONS

The obligations of Seller to consummate the transactions provided for in this Agreement shall be subject to the satisfaction of each of the following conditions on or before the Closing Date, subject to the right of Seller, in its sole discretion to waive any one or more of the conditions set forth below:

8.1   **Representations and Warranties of Purchaser**.   The representations and warranties of Purchaser contained in this Agreement, taken as a whole, shall be true and correct in all material respects on the Closing Date, except to the extent that any representation or warranty is made as of a specified date, in which case such representation or warranty shall be true in all material respects as of such date, and except to the extent of changes permitted by the terms of this Agreement.

8.2   **Performance of this Agreement**.  Purchaser shall have materially performed or complied with all of the obligations to be performed or complied with by it under the terms of this Agreement on or prior to the Closing Date.

8.3   **Payment of Purchase Price and Assumption of Liabilities and Assumed Contracts**.  Seller shall receive from Purchaser on the Closing Date the Purchase Price pursuant to Section 2.12 of this Agreement and Purchaser shall have assumed the Assumed Liabilities pursuant to a document that is reasonably satisfactory to Seller.

8.4   **Documents**.  Seller shall have received a signed copy of this Agreement with all Schedules and Exhibits attached, as updated through and including the Closing and copies of all such other documents and certificates executed and delivered hereunder.

### ARTICLE IX
### SURVIVAL

9.1   **Survival**.  Sections 2.7, 2.8, 2.9, 5.1(d), 5.7, 5.8, 5.10, 5.13, 5.14, 5.16, 5.17, 5.18, 5.19, and 5.20, this Section 9.1 and Article 11, and all defined terms used therein, shall survive the Closing, except to the extent (if at all) that such survival is expressly limited herein.  The representations and warranties of the Parties shall expire upon the consummation of the Closing.

### ARTICLE X
### LIMITED AGREEMENT TERMINATION RIGHTS

10.1   **Termination of Agreement**.  This Agreement and the transactions contemplated hereby may be terminated prior to the Closing Date only as follows:

(a)   by mutual written consent of Purchaser and Seller;

24

(b)      except as otherwise provided in this Agreement, by either Party if the Closing shall not have occurred on or before the Closing Date;

(c)      by Purchaser if any of the conditions to the obligations of Purchaser to close set forth in Article VII shall have become incapable of fulfillment other than because of a breach by Purchaser of any covenant or agreement contained in this Agreement and such condition is not waived by Purchaser;

(d)      by Purchaser if there shall be a material breach by Seller, as determined by the Bankruptcy Court, of the representations and warranties, taken as a whole, or of any material covenant or agreement contained in this Agreement which breach cannot be or has not been cured within ten (10) Business Days after the giving of written notice by Purchaser to Seller of such breach;

(e)      by Seller if any of the conditions to the obligations of Seller to close set forth in Article VIII shall have become incapable of fulfillment other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement and such condition is not waived by Seller;

(f)      by Seller if there is a material breach by Purchaser, as determined by the Bankruptcy Court, of the representations and warranties, taken as a whole, or of any material covenant or agreement contained in this Agreement which breach cannot be or has not been cured within ten (10) Business Days after the giving of written notice by Seller to Purchaser of such breach; or

(g)      by Seller, at any time prior to the entry of the Sale Order, if Seller determines in good faith, consistent with its fiduciary duties and the Bidding Procedures approved by the Bankruptcy Court, that it has received a bona fide Qualified Bid that constitutes, in Seller's reasonable judgment, a higher or otherwise better offer for the Assets (a "Higher or Better Bid"), and Seller intends to accept such Higher or Better Bid, subject to Bankruptcy Court approval if required. Upon such termination, this Agreement shall be of no further force or effect, except as expressly provided in this subsection and in those provisions that by their terms survive termination. In the event this Agreement is terminated pursuant to this subsection and Seller consummates, or obtains Bankruptcy Court approval to consummate, a sale of all or substantially all of the Assets to another entity, Seller shall pay to Purchaser, as Purchaser's sole and exclusive monetary remedy, a break-up fee in an amount equal to $45,000 (the "Break-Up Fee"), which Break-Up Fee shall be payable in cash from the proceeds of such alternative transaction at or promptly following the closing thereof, subject to Bankruptcy Court approval.

(h)      If this Agreement is terminated pursuant to Section 10.1(c) or (d) or if Seller terminates this Agreement pursuant to Section 10.1(b), (i), or (j), Seller shall reimburse Purchaser for Purchaser's reasonable, documented, out of pocket fees and expenses incurred in connection with the negotiation, execution, and performance of this Agreement and participation in the sale process, in an amount not to exceed $45,000, payable in cash on or before the date that is thirty (30) days after the termination of this Agreement.

25

(i) by Seller or Purchaser if the Bankruptcy Court fails to enter the Sale Order by July 2, 2026.

(j) by Seller or Purchaser if the Closing shall not have occurred by July 7, 2026.

10.2 **Procedure for Termination**. If this Agreement is terminated by Purchaser or Seller, or both, pursuant to Section 10.1, written notice thereof shall forthwith be given to the other party, and upon the giving of such notice (or at such time as specified in the particular termination right set forth in Section 10.1) the transactions contemplated hereunder shall be abandoned and this Agreement shall terminate to the extent and with the effect provided in Section 10.3, without further action by the parties.

10.3 **Effects of Termination**. If this Agreement is validly terminated as provided herein, then each party shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without Liability to any party; provided, however, that (i) the obligations of the parties set forth in Article XI of this Agreement, and to the extent necessary to effectuate the foregoing enumerated provisions, Article I of this Agreement, shall survive any such termination and shall be enforceable in accordance with their terms, and (ii) if this Agreement is terminated as provided herein, each party shall upon request redeliver or destroy as soon as practicable any or all documents, work papers and other material of the other party relating to its business or affairs or the transactions contemplated hereunder, whether obtained before or after the execution hereof, to the party furnishing the same, other than any material which is of public record. Nothing in this Section 10.3 shall relieve the parties of any Liability for a breach of this Agreement prior to the date of termination.

**ARTICLE XI**
**MISCELLANEOUS**

11.1 **Assignment; Binding Agreement**.

(a) Except as set forth in Section 11.1(c), neither this Agreement nor any rights or obligations of a Party hereunder may be assigned or delegated without the other Party's prior written consent. Any purported assignment or delegation without such consent shall be void. Provided, however, Purchaser may assign any or all its rights under this Agreement to Jewelry Design Partners LLC. Such approved assignment may be accomplished prior to the entry of the Sale Order such that the Sale Order would authorize the sale of the Assets as well as the assignment of the Assumed Contracts directly to Jewelry Design Partners LLC without further consent or notice.

(b) This Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the Parties hereto and to their respective successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights, remedies, obligations, or Liabilities.

11.2 **Post-Closing Cooperation**. From time to time after the Closing, Seller will execute and deliver, or cause to be executed and delivered, such documents to Purchaser as Purchaser shall reasonably request in order to consummate more effectively the transactions contemplated by this Agreement, including, without limitation, the transfer of the Assets to

26

Purchaser.  From time to time after the Closing, Purchaser will execute and deliver, or cause to be executed and delivered, such documents to Seller as Seller shall reasonably request in order to consummate more effectively the transactions contemplated by this Agreement, including, without limitation, Purchaser's assumption of the Assumed Liabilities.  From and after the Closing, Seller shall use its commercially reasonable efforts to deliver to Purchaser all such books, reports and other documents that constitute or relate to Assets (which may be redacted to the extent not relevant to the Assets) as may be requested by Purchaser which were not delivered on or before the Closing Date, and to assist the Purchaser in obtaining any Authorizations not obtained by Purchaser prior to the Closing.

11.3    **Expenses**.  Except as set forth in this Agreement, each Party shall pay the fees and expenses of its respective counsel, accountants, and other experts and shall pay all other expenses incurred by it in connection with the negotiation, preparation, and execution of this Agreement and the consummation of the transactions contemplated hereby.

11.4    **Entire Agreement and Modification**.  This Agreement, including any Exhibits and Schedules attached hereto and thereto and any other documents hereby required to be delivered at the Closing, and any confidentiality agreement previously executed by Seller and Purchaser or Purchaser's Affiliate, constitute the entire agreement between the Parties and supersede all prior discussions, negotiations, or agreements relating to the subject matter of this Agreement.  No changes of, additions to, or other modifications of this Agreement shall be valid unless the same is in writing and signed by the Parties.

11.5    **Severability**.  If any provision of this Agreement shall be determined to be contrary to Law and unenforceable by any Court, the remaining provisions shall be severable and enforceable in accordance with their terms.  To the extent any provision of this Agreement is enforceable in part but not in whole, such provision shall be enforced to the maximum extent permitted by applicable Law.

11.6    **Waiver**.  Any of the conditions to Closing set forth in this Agreement, except for those set forth in Article VI, may be waived at any time prior to or at the Closing hereunder by the Party entitled to the benefit thereof.  Any such waiver shall only be effective if it is in writing and signed by the Party to be charged with such waiver.  The failure of any Party hereto to enforce at any time any of the provisions of this Agreement shall in no way be construed to be a waiver of any other breach of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of such Party thereafter to enforce each and every such provision.  No waiver of any breach of or non-compliance with this Agreement shall be held to be a waiver of any other or subsequent breach or non-compliance.

11.7    **Counterparts**.  This Agreement may be executed in multiple counterparts, by the Parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.  All signatures of the Parties to this Agreement may be transmitted by email or facsimile, and such email or facsimile of signature will, for all purposes, be deemed to be the original signature of such Party whose signature it reproduces and will be binding upon such Party.

27

11.8    **Headings; Interpretation**.  The table of contents and article and section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

11.9    **Governing Law**.  This Agreement shall be construed and interpreted according to the Laws of the State of North Carolina, without regard to the application of the choice of law principles thereof.  All of the conveyance documents executed and delivered pursuant to the terms hereof shall be governed by and continued and interpreted according to the Laws of the State of North Carolina, without regard to the application of the choice of law principles thereof.

11.10   **Bankruptcy Court Jurisdiction**.

(a)     Purchaser and Seller agree that the Bankruptcy Court shall have exclusive jurisdiction over all disputes, Claims, and other controversies (collectively, "Disputes") and other matters relating to (a) the interpretation and enforcement of this Agreement or any document executed pursuant hereto; (b) the Assets; (c) the Assumed Liabilities and other obligations assumed by the Purchaser under this Agreement; and (d) any obligations surviving Closing, as long as the Bankruptcy Court reserves such jurisdiction, and Purchaser expressly consents to and agrees not to contest such exclusive jurisdiction.

(b)     The parties shall jointly request that the Bankruptcy Court reserve jurisdiction to consider Disputes arising under this Agreement even after the closing of the Bankruptcy Case.  To the extent allowed under existing and controlling law in the Fourth Circuit as of the Closing Date, the parties consent to the jurisdiction of the Bankruptcy Court to hear all such Disputes and to enter final orders with respect to all matters and issues raised therein.

11.11   **Notices**.  All notices, requests, demands and other communications hereunder shall be deemed to have been duly given if the same shall be in writing and shall be delivered or sent (a) by personal delivery against a receipted copy, (b) by certified mail, return receipt requested, or (c) by e-mail if the addressee confirms receipt of the e-mail, and addressed as set forth below:

If to Purchaser to:                          If to Seller, to:

Van Lang Jewelry LLC                         Charles & Colvard, Ltd.
or Jewelry Design Partners LLC
c/o Jennifer B. Lyday                        c/o Rebecca Redwine Grow
Waldrep Wall Babcock & Bailey PLLC           Hendren, Redwine & Malone, PLLC
370 Knollwood Rd., Suite 600                 4600 Marriott Drive, Suite 150
Winston-Salem, North Carolina 27028          Raleigh, North Carolina 27612
E-Mail: jlyday@waldrepwall.com               E-Mail: rredwine@hendrenmalone.com

A Party may change the address to which notices hereunder are to be sent to it by giving notice of such change of address in the manner provided above.  Any notice delivered personally shall be deemed to have been given on the date it is so delivered, or upon attempted delivery if acceptance of delivery is refused.

28

11.12  **Effectiveness**. This Agreement shall be effective only when duly signed by Seller and approved by the Bankruptcy Court.

11.13  **No Third-Party Beneficiaries.** Nothing expressed or referred to in this Agreement will be construed to give any person other than the Parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement, except as such rights as shall inure to a successor or permitted assignee pursuant to this Agreement.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

SELLER: Charles & Colvard, Ltd.

By:_____
Print Name:
Title:

PURCHASER: Van Lang Jewelry LLC or
Jewelry Design Partners LLC

By:_____
Print Name: Duc Pham
Title: Manager, Jewelry Design Partners

29

**Schedules and Exhibits**

Schedule 1             List of Excluded Assets
Schedule 2             Selected Senior Managers of Purchaser
Schedule 5             List of Permitted Encumbrances
Schedule 7             List of Taxes and Assessments
Schedule 2.7           Assumed Contracts
Schedule 2.8(d)        List of Assumed Contracts with Cure

Exhibit A              Form of Bill of Sale and Assignments

**SCHEDULE 1**

**Excluded Assets**

"Excluded Assets" means the following assets, properties, interests, and rights of Seller or its Affiliates:

(a)     all cash and cash equivalents (excluding Accounts Receivable) on hand as of the Closing;

(b)     any rights, Claims, counterclaims, third party Claims or causes of action of Seller against any Person and any actions under Chapter 5 of the Bankruptcy Code, including, without limitation, under Sections 542, 544, 545, 547, 548, 549, 550, 551, 553 and 724(a) of the Bankruptcy Code;

(c)     all Actions and/or causes of actions that Seller has brought and/or may bring against any Person relating to any Excluded Asset and/or Excluded Liabilities, including, without limitation, all Actions and/or causes of action that Seller may bring against any current or former director, officer, employee, or consultant;

(d)     all insurance policies and all rights to proceeds thereunder, including, without limitation, any director or officer insurance policies relating to any matter, event or circumstance occurring on or prior to the Closing Date, except as otherwise provided for in Section 5.10;

(e)     the residual rights in and proceeds of any employee benefits plans that are not transferred to Seller;

(f)     all Contracts, Permits, and other assets that require a consent (taking into consideration the provisions of the Bankruptcy Code), to transfer same unless (i) such written consent is obtained and (ii) Purchaser assumes all post-assignment liabilities arising thereunder, excluding all Cure Payments, if applicable (it being understood that Seller shall not be required to obtain or attempt to obtain any such consent);

(g)     all executory contracts and unexpired leases of the Debtor that are not identified on Schedule 2.7;

(h)     all rights or documents relating to any Excluded Liability or other Excluded Asset;

(i)     any rights or remedies provided to Seller under this Agreement and applicable Law and each other document executed in connection with the Closing;

(j)     any (i) personnel files for employees of Seller who are not hired by Purchaser; (ii) other books and records that Seller is required by Law to retain; provided, however, that except as prohibited by Law and subject to Article 5, Purchaser shall have the right, at Purchaser's sole expense, to receive or make copies of any portions of such retained books and records that relate to the Business as conducted before the Closing or that relate to any of the Assets; (iii) documents which Seller is not permitted to transfer pursuant to any contractual obligation owed to any third party; (iv) documents primarily related to any Excluded

31

Assets; and (v) documents necessary to prepare tax returns (Purchaser shall be entitled to a copy of such documents referred to in this clause (v));

(k)     all of Seller's deposits and other prepaid charges and expenses paid in connection with or relating to any Excluded Assets;

(l)     any assets disposed of or consumed in the ordinary course of business (except any disposed of or consumed in breach of the provisions of this Agreement) during the period between the date hereof and the Closing Date;

(m)     Seller's minute book and similar corporate records; and

(n)     any Privilege that relates to any Excluded Asset or any Excluded Liability.

## SCHEDULE 2

**Selected Senior Managers of Purchaser**

- Duc Pham

## SCHEDULE 5

### Permitted Encumbrances

NONE

# SCHEDULE 7

## Taxes and Assessments

[To Be Provided]

**SCHEDULE 2.7**

**Assumed Contracts**

[To Be Provided]

## SCHEDULE 2.8(d)

### Assumed Contracts with Cure

Malca Amit CHB Inc.

EXHIBIT A

[To Be Provided]

**Exhibit B**

**<u>BIDDING PROCEDURES</u>**

1. <u>Definitions</u>:

A.    AUCTION: Debtor (also referred to as "Seller") will conduct (pursuant to the terms and conditions of these Bidding Procedures) an auction of the Property if a party or parties provide a qualifying overbid over and above the Stalking Horse Bidder proposal.

B.    AUCTION DATE:  June 22, 2026 at 10:00a.m. prevailing eastern time.

C.    AUCTION VENUE:  United States Bankruptcy Court, 300 Fayetteville Street, 3rd Floor, Raleigh, North Carolina 27602.

D.    BACK-UP BID:  The Qualified Bid selected by Seller at the conclusion of the Auction as the second best Bid.

E.    BACK-UP BIDDER:  The Bidder who submitted the Back-up Bid.  The Back-up Bidder's Deposit is held pursuant to the provisions below and, in the event that the Successful Bidder fails to close, the Back-up Bidder is obligated to close.

F.    BID:  A binding offer to purchase the Property.  All Bids are irrevocable pursuant to the terms set forth below.

G.    BIDDER:  A person or entity that submits a Bid.

H.    COURT:  United States Bankruptcy Court for the Eastern District of North Carolina, Raleigh Division.

I.    DATA: Information provided by Seller to Bidders or prospective Bidders subject to the conditions and limitations set forth in these Bidding Procedures.  This information may include financial information and other data relevant to the Property in Seller's possession.

J.    DEPOSIT:  Five percent (5%) of the purchase price, payable via cashier's check, certified check, or wire transfer (if wire information is needed please contact Rebecca Redwine Grow at rredwine@hendrenmalone.com).

K.    ESCROW AGENT:  Hendren, Redwine & Malone, PLLC

L.    IRREVOCABILITY PERIOD:  That period of time which commences upon each Bidder's submission of a Bid and which concludes at the earlier of (i) the Closing, or (ii) 30 days after the conclusion of the Auction (as adjourned), but in no event later than July 7, 2026.

M.    OFFER & BIDDER REGISTRATION FORM:  The form of document attached hereto as **Exhibit 1.**

N.    OVERBID DEADLINE:  June 6, 2026.

O.    OVERBID PURCHASE AGREEMENT:  The form of document attached hereto as **Exhibit 2**.

1

P. PROPERTY: The Debtor's and its affiliates' personal property as more fully described in the Asset Purchase Agreement between the Debtor and Stalking Horse Bidder and defined therein as the "Assets".

Q. QUALIFIED BID: A Bid that satisfies the requirements, as specifically described in Paragraph 4 below.

R. QUALIFIED BIDDER: A Bidder that submits a Qualified Bid.

S. REQUIRED BID DOCUMENTS: The Required Bid Documents are those documents that a Bidder is required to submit by the Overbid Deadline, as specifically described in Paragraph 3 below.

T. SALE HEARING: A hearing on June 22, 2026 at 11:00a.m. at the United States Bankruptcy Court, 300 Fayetteville Street, 3rd Floor courtroom, Raleigh, North Carolina 27602 at which Seller will seek an Order approving the final sale.

U. SALE ORDER: An Order of the Court authorizing a sale of the Property to the Successful Bidder.

V. SELLER: Charles & Colvard, Ltd. and its affiliates Charles & Colvard Direct, LLC; charlesandcolvard.com, LLC; moissaniteoutlet.com, LLC; and Charles & Colvard (HK) Ltd.

W. SELLER'S COUNSEL: Hendren, Redwine & Malone, PLLC. Seller's Counsel can be contacted at:

> Hendren, Redwine & Malone, PLLC
> Attn: Rebecca Redwine Grow
> 4600 Marriott Drive, Suite 150
> Raleigh, North Carolina 27612
> Telephone: 919-573-1422
> Email: rredwine@hendrenmalone.com

X. STALKING HORSE BIDDER: Van Lang Jewelry LLC or its assigns.

Y. SUCCESSFUL BID: At the conclusion of the Auction, the Qualified Bid selected by Seller as the winning bid based upon price, financial condition, experience, and such other factors as Seller may deem relevant, as further detailed below.

Z. SUCCESSFUL BIDDER: The Bidder that submitted the Successful Bid.

2. <u>STEP ONE</u>: Overbid Deadline: June 6, 2026.

A. Seller seeks to solicit Bids for the sale of the Property. In order to solicit the highest and best offers, Seller is conducting the Auction herein described. The first step is the submission of binding Bids in the form of the Required Bid Documents on or before the Overbid Deadline. Seller will review the Required Bid Documents and will identify those Bidders who have submitted Qualified Bids. Only those Bidders who have submitted timely Qualified Bids, if any, will be authorized to participate in the Auction.

2

You must submit the Required Bid Documents (including the Deposit) to Seller's Counsel so as to be actually received by no later than 4:00 p.m. prevailing Eastern time on the Overbid Deadline.

Due diligence information can be obtained by contacting Seller's Counsel. Seller shall not be obligated to furnish any Data after the Overbid Deadline or otherwise to any party that Seller determines, in its sole discretion, is not reasonably likely to be a Qualified Bidder. Seller may require any potential Bidders to sign a Confidentiality & Nondisclosure Agreement before furnishing any Data.

3.    Required Bid Documents:

A.    In order for a Bidder to become a Qualified Bidder, a Bidder must submit to Seller's Counsel the following documents which, taken together, constitute the "Required Bid Documents":

1.    Offer: A written and executed "Offer and Bidder Registration Form" in the form attached hereto as **Exhibit 1**. Pursuant to the terms of such form, the offer must expressly state that the Bidder's offer is all cash, on an as-is, where-is basis and irrevocable during the Irrevocability Period.

2.    Contract: An executed "Overbid Purchase Agreement" in the form attached hereto as **Exhibit 2** (an "Overbid Purchase Agreement"). The Overbid Purchase Agreement may not contain any contingencies including, but not limited to, due diligence and/or financing contingencies. Without limiting the foregoing, the executed Overbid Purchase Agreement shall include a final Schedule 2.7 (Assumed Contracts) as referenced therein.

3.    Financials: Financial statements, a non-contingent financing commitment from an accredited financial institution, copies of current account statements or correspondence from a bank or other accredited financial institution, or other evidence satisfactory to Seller in its discretion showing sufficient liquid assets to close by paying the Closing Payment (as defined in the Overbid Purchase Agreement) and establishing that the Bidder is ready, willing, authorized, capable, and qualified, financially, legally, and otherwise, of consummating a purchase of the Property and unconditionally performing all obligations under its proposed Overbid Purchase Agreement in the event that it is the high bidder at the sale, with no contingencies whatsoever other than Court approval.

4.    Other Information: Any other information that Seller may reasonably request which would enable Seller to evaluate, among other things, the Bidder's ability to consummate a transaction, the Bidder's legal authority to Bid, and/or the Bidder's ability to fulfill its obligations in connection therewith.

5.    Deposit: Five percent (5%) of the purchase price, payable via cashier's check, certified check, or wire transfer to the Escrow Agent.

3

B.  Confidentiality: By submitting a Bid, each Bidder agrees to maintain as confidential and to not disclose to third parties both the fact that Bidder submitted a Bid and the terms and conditions of such Bid. Failure to do so may result in a determination that collusion has occurred, which is a federal offense.

4.  <u>Qualified Bids</u>:

A.  ONLY BIDDERS THAT HAVE SUBMITTED QUALIFIED BIDS SHALL BE ELIGIBLE TO PARTICIPATE IN THE AUCTION; and

B.  In order for a Bid to be a "Qualified Bid," a Bid must:

1.  Include the Deposit and each of the Required Bid Documents, executed and acceptable to Seller in form and substance;

2.  Be a good faith, bona fide, offer to purchase the Property;

3.  Not be contingent;

4.  Be actually received by the Overbid Deadline;

5.  Demonstrate to Seller the Bidder's ability to consummate promptly the purchase of the Property and to perform all terms and conditions set forth in the Overbid Purchase Agreement; and

6.  Be irrevocable during the Irrevocability Period.

C.  Failure of a Bidder to fully, accurately and promptly respond to Seller's requests for additional information may result in a Bid no longer being considered a Qualified Bid.

D.  Following the receipt of Bids, Seller will ascertain, in the exercise of its reasonable business judgment and in consultation with the Debtor's Board, whether a Bid is a Qualified Bid, taking into account, among other things, the quality of the Required Bid Documents.

E.  By 4 p.m. prevailing Eastern time on June 8, 2026, Seller's Counsel will notify each Bidder at the email address set forth on the Offer and Bidder Registration Form if it is a Qualified Bidder.

F.  Seller shall provide to the Stalking Horse Bidder copies of all Bids and all Required Bid Documents and other written or electronic materials submitted by any Bidder in connection with such Bid (collectively, "Bid Packages") within one (1) business day after Seller's receipt of the same; provided, however, that Seller may redact personally identifiable information, bank account numbers, and other sensitive security identifiers solely to the extent reasonably necessary to protect against identity theft or account compromise, while preserving all material economic and contractual terms of the Bid Packages. The Stalking Horse Bidder shall maintain as confidential and shall not disclose to any third party the fact that any particular Bidder submitted a Bid, the identity of such Bidder, or the terms and conditions of any Bid or Bid Package, except (a) to the Stalking Horse Bidder's employees,

4

attorneys, and advisors who have a need to know such information for purposes of evaluating, formulating, or improving the Stalking Horse Bidder's Bid; (b) to the Court or as otherwise ordered by the Court; or (c) as required by applicable law, regulation, or court order, in which case the Stalking Horse Bidder shall, to the extent legally permissible, provide Seller with prompt written notice to allow Seller to seek a protective order or other appropriate remedy.

5.   Deposit Requirement:

A.   Each Bidder shall tender a Deposit with the Required Bid Documents to Seller's Counsel. The Successful Bidder and Back-Up Bidder will be required to tender additional Deposits, as set forth below.

B.   The Deposit shall be by cashier's check, certified check or wire transfer to Escrow Agent. Escrow Agent shall have no liability to any party in connection with its services with respect to Deposits except for willful misconduct, gross negligence or bad faith. Escrow Agent, at its discretion, may either immediately deposit Deposits into its escrow account or may hold Deposits pending the outcome of the Auction.

C.   Except as set forth in the Stalking Horse Bidder's Asset Purchase Agreement with Seller, in the event that Seller does not consummate a sale of the Property, for any reason (other than the Bidder's failure to consummate a sale), Seller's sole obligation and liability shall be to refund the Deposit to the Bidder.

D.   No Bid shall be deemed to be "accepted" by Seller unless and until the Court has entered the Sale Order.

6.   Seller's Pre-Auction Discretion:

A.   Seller, in its sole and absolute discretion, reserves the right to extend the Overbid Deadline, the date by which Bidders will be notified whether or not they are Qualified Bidders, and the Auction Date.

B.   Designation of Stalking Horse Bidder and Negotiation of Break-up Fee:

1.   On April 15, 2026 the Debtor filed a Motion for Order: (i) Approving Private Sale of Personal Property Free and Clear of Liens, Claims, Encumbrances, and Interests; (ii) Approving Stalking Horse Bidder; (iii) Approving Stalking Horse Break-up Fee; (iv) Approving Overbid Procedures; and (v) Scheduling Hearing for Final Approval of Sale of Assets [DE# 71] (the "Motion"). In the Motion, the Debtor requested approval of a Stalking Horse Bidder with a bid of $1,500,000.00 (the "Purchase Price").

2.   Seller negotiated a break-up fee of three percent (3%) of the Purchase Price (as defined above) with the Stalking Horse Bidder in the event the Stalking Horse Bidder is not the Successful Bidder.

5

7.  STEP TWO:  The Auction:  June 22, 2026 at 10:00a.m. prevailing Eastern time.

A.  Provided that one or more Qualifying Bidders submit a timely Qualifying Bid, Seller shall Auction the Property on the Auction Date at the Auction Venue.  Seller reserves the right to change the location and time of the Auction.  Only the Bids of Qualified Bidders and the Stalking Horse will be considered at the Auction.

B.  Based upon the terms of the Qualified Bids, the level of interest expressed in the Property, and such other information as Seller may determine to be relevant, Seller, after consultation with the Stalking Horse Bidder, shall have the right to amend the procedures set forth herein and to adopt, at any time, in its reasonable discretion, such rules for the bidding process which it determines will better promote the goals of the bidding process.  Among other things, Seller shall determine, after consultation with the Stalking Horse Bidder, in the exercise of its reasonable discretion, acceptable bidding increments, which may be modified by Seller during the Auction. Seller may offer the Property for bidding in successive rounds or may otherwise conduct the Auction in the manner that it deems most appropriate for soliciting the highest and best Bids; provided however, the Auction shall be conducted as an open Auction, with all Bids communicated openly in the presence of all participating parties.

C.  At the commencement of the Auction, Seller's Counsel shall announce the procedures for bidding at the Auction, including the increments for bidding, time between rounds of bidding, and any other procedures necessary to the efficient conduct of the Auction.  All procedures announced at the Auction shall control over anything set forth in these Bidding Procedures to the contrary.

D.  Seller shall receive Bids at the Auction for the Property with the intention of selling the Property to the Successful Bidder.  At the conclusion of the Auction or a later point to be determined by Seller, Seller will determine which Bid is the highest and best Bid and which Bid is the next highest and best Bid.  Based upon the foregoing determinations, Seller will announce the Successful Bid and the Back-up Bid, respectively.

E.  Seller's determination as to what constitutes the Successful Bid and the Back-up Bid will be based upon the exercise of Seller's discretion and may take into consideration price, modifications to the Overbid Purchase Agreement, closing risk, risk of delay, financial condition, and such other factors as Seller may deem relevant.

F.  At the conclusion of the Auction, both the Successful Bidder and the Back-up Bidder shall update and re-execute their respective Overbid Purchase Agreements and any other agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid and the Back-up Bid were made, and shall pay any additional Deposit as may be required to bring the total Deposit amount to equal five percent (5%) of the final purchase price as set forth in their final Overbid Purchase Agreement.

G.  Formal rejection of a Bid by Seller will not occur unless and until (a) Seller expressly rejects a Bid in writing; or (ii) the Irrevocability Period lapses. The establishment of

6

a Successful Bid and a Back-up Bid does not release any Bidder from its obligations and all Bids remain open and irrevocable for the duration of the Irrevocability Period.

H.   Return of Deposits:

1.   Seller reserves the right to hold the Deposit of the Back-up Bidder until Closing or expiration of the Irrevocability Period, whichever occurs sooner.

2.   Seller shall return the Deposits of all Bidders other than the Successful Bidder and the Backup Bidder within five (5) business days of the conclusion of the Auction.

8.   STEP THREE:  Court Approval: June 22, 2026 at 11:00a.m.  The Sale Hearing will be held in the Court following the conclusion of the Auction.

9.   STEP FOUR:  The Closing

A.   The Closing shall occur in accordance with the terms of (i) either the Asset Purchase Agreement executed by the Stalking Horse Bidder or the Overbid Purchase Agreement (depending on whether the Stalking Horse Bidder is the Successful Bidder), and (ii) the Sale Order.  Unless Seller agrees otherwise, the Closing shall take place on or about the date that is three (3) business days following the later of (a) entry of the Sale Order, provided that the Sale Order is not subject to a stay, or (b) satisfaction of all of the conditions to closing as set forth in the Asset Purchase Agreement or the Overbid Purchase Agreement, as applicable.  In no event shall the Closing take place any later than July 7, 2026.  WITH RESPECT TO THE CLOSING, TIME OF PERFORMANCE BY THE SUCCESSFUL BIDDER IS OF THE ESSENCE.

B.   In the event of the failure by the Successful Bidder to consummate a sale of the Property, the Back-up Bidder for such Property shall be deemed the Successful Bidder without further Order of the Court, and shall proceed to Closing no later than three (3) business days following Seller's tender of a notice to the Back-up Bidder at the address set forth on the Overbid Purchase Agreement.  In no event shall the Closing take place any later than July 7, 2026.

C.   Seller shall be entitled to retain the Deposit of any Successful Bidder who fails to close because of a breach or failure by such Successful Bidder and such Deposit shall be deemed forfeited by such defaulting Successful Bidder, shall not be credited against the purchase price for the benefit of a Back-up Bidder, and Seller specifically reserves the right to seek all available damages from the defaulting Bidder.

D.   The balance of the purchase price shall be paid by the Successful Bidder by cashiers' check, certified check, or wire transfer at the Closing.

10.   Other Provisions

7

A.    Disclaimer

1.    Any sale or other disposition of all or a portion of the Property shall be without representations or warranties of any kind, nature or description by Seller, its agents or representatives, except as expressly set forth in the Asset Purchase Agreement or the Overbid Purchase Agreement, as applicable. The Property shall be transferred on an "as is" and "where is" basis.

2.    Any and all Data provided to prospective Bidders:

a)  has been prepared for informational purposes only;

b)  has been prepared from materials supplied to Seller by third parties; and

c)  is being furnished (i) solely for use by Bidders in considering their interest in acquiring the Property, and (ii) subject to the terms of any Confidentiality & Nondisclosure Agreement.

3.    By accepting Data from Seller and/or Seller's Counsel, the recipient acknowledges and agrees that the Data has been prepared to assist the recipient in making its own evaluation of the Property and the Data does not purport to be all-inclusive or to contain all of the information that a Bidder may desire. In all cases, Bidders should conduct their own investigation and analysis of the Property, conduct site inspections, and scrutinize all of the Data. Seller's Counsel has assumed no responsibility for independent verification of any of the Data and has not in fact in any way audited such information. Seller and Seller's Counsel are not making nor will they make and expressly disclaim making any written or oral statements, representations, warranties, promises or guarantees, whether express, implied or by operation of law or otherwise, with respect to the Property and with respect to the accuracy, reliability or completeness of any Data, except as expressly stated in a contract executed by Seller. Seller and Seller's Counsel and their respective partners, officers, directors and employees, affiliates and representatives, expressly disclaim any and all liability based on or relating or pertaining to any written or oral statements, financial information, projections, representations, warranties, promises or guarantees, whether express, implied or by operation of law or otherwise.

4.    Each Bidder, by submitting a Bid for the Property, shall be deemed to acknowledge and represent:

a)    that it is bound by these Bidding Procedures;

b)    that it had an opportunity to inspect and examine the Property and to review all pertinent documents and information with respect to the Property prior to making its offer and that it relied solely on that review and upon its own investigation and inspection of the Property in making its Bid; and

c)    that it is not relying upon any written or oral statements, representations, or warranties of Seller or Seller's agents or

8

representatives.

B.     All of Seller's right, title, and interest in and to the Property shall be assigned and sold, free and clear of all liens, claims, encumbrances and interests, which shall attach to the net proceeds received by Seller as a result of the sale with the same force and effect that they now have, subject to further Order of the Court.

C.     Seller, at or before the Auction, may impose such other and additional terms and conditions as it may determine to be in the best interests of the Debtor, the estate, the creditors, and other parties in interest.

D.     Seller may reject any Bid that, in its sole discretion, it deems to be: (i) inadequate or insufficient; or (ii) contrary to the best interest of Seller's estate, creditors, and parties in interest.  Such rejection may be made at any time prior to Court Approval.

E.     Any and all disputes related or pertaining to or resulting or arising from the marketing process, the Auction, the sale of the Property, and/or the conduct of Seller, Seller's Counsel and/or any of Seller's other professional advisors shall be adjudicated solely by the Court.  The submission of a Bid shall constitute an express consent by the Bidder to the exclusive jurisdiction of the Court for all such matters.

F.     Enforcement: If any party shall seek to enforce or protect its rights under this document or under any document or instrument executed and delivered in connection herewith in any action, suit, or other proceeding, including all bankruptcy cases and proceedings, the prevailing party shall be entitled to receive from the other party payment of its costs and expenses, including reasonable attorneys' fees incurred (whether such costs or fees are incurred before or after the commencement of the proceeding), including any and all appeals or petitions there from.

G.     Severability:  The provisions hereof are severable and the invalidity of any provision hereof will not invalidate any other provision.

H.     Entire Agreement: This document, combined with the Offer and Bidder Registration Form and Overbid Purchase Agreement, shall constitute the entire agreement between the parties, and any prior understanding or representation of any kind shall not be binding upon either party except to the extent it has been expressly incorporated into this document.

I.     Captions: The captions to sections and subsections of this document are solely for the convenience of the parties, are not a part of this document, and shall not be used for the interpretation or determination of the validity of this document or any provision hereof.

J.     Notice: Any correspondence or required notice shall be addressed as follows and shall be sent by Certified Mail, Return Receipt Requested, or by FedEx, either of which notices shall be supplemented by facsimile and/or email transmission, and shall be effective as of the date of actual receipt of the Certified Mail or FedEx.  Such notice shall be addressed as follows:

1.     If to a Bidder, to the Bidder and its attorney (if disclosed on the Overbid Purchase Agreement) using the contact information set forth on the Overbid

9

Purchase Agreement.

2.      If to Seller and/or Seller's Counsel, then to all such parties at the addresses set forth in the Definitions section above.

**EXHIBIT 1**

**OFFER & BIDDER REGISTRATION FORM**

Bidder, _____, hereby:

- Offers to buy the Property as described in the Overbid Purchase Agreement for the price set forth below, pursuant to this Offer & Bidder Registration Form and the terms and conditions of the accompanying Overbid Purchase Agreement, and

- Seeks to become a Qualified Bidder pursuant to the terms and conditions of the Bidding Procedures approved by the United States Bankruptcy Court for the Eastern District of North Carolina ("Bidding Procedures").

Bidder's offer is for the Property as described in the Overbid Purchase Agreement at the following price (must be a minimum of $1,575,000.00 in cash in order to qualify):

$_____

Bidder hereby warrants and represents as follows:

(a) Bidder has received, reviewed, understands and agrees to abide by the terms and conditions of the Bidding Procedures, which terms and conditions are incorporated herein by reference.

(b) Bidder has received, reviewed and understands the terms and conditions of the standard form "Overbid Purchase Agreement", which terms and conditions are incorporated herein by reference.

(c) Bidder warrants and represents that it has sufficient funds readily available to pay the cash due at Closing.

(d) To the extent that the words and phrases which are capitalized in this Offer & Bidder Registration Form have been defined in the Bidding Procedures or in the Overbid Purchase Agreement, those definitions are incorporated herein by reference.

(e) Each Bid made at the Auction shall constitute a binding, irrevocable "Bid" pursuant to the Bidding Procedures.

(f) Each Bid along with any subsequent Bids is irrevocable pursuant to the terms of the Bidding Procedures.

(g) Each Bid is and shall be a good faith, bona fide, irrevocable offer to purchase the Property on an all-cash, as-is, where-is basis, with no contingencies.

(h) Bidder had an opportunity to inspect and examine the Property and to review all other pertinent documents with respect to the Property prior to making its Bid and Bidder relied solely on that review and upon its own investigation and inspection of the Property in

1

making its Bid.  Bidder is not relying upon any written or oral statements, representations, or warranties of Seller and/or Seller's Counsel or any of Seller's other agents or representatives.

(i)    Both the Successful Bidder and the Back-up Bidder shall modify and re-execute the Overbid Purchase Agreement, as appropriate, without varying its terms other than to reflect the terms of the Successful Bid as publicly announced at the Auction.

(j)    Bidder acknowledges that, pursuant to, inter alia, 18 U.S.C. Section 371, it is a federal crime to engage in collusive bidding or to chill the bidding.

AGREED & ACCEPTED this _____ day of _____, 2026

_____
[Bidder Name]

By:    _____
Name:  _____
Its:    _____

*BIDDER I.D.*
Bidder's Address: _____
Bidder's Contact: _____
Bidder's Phone: _____
Bidder's Email Address: _____
Bidder's Tax ID Number: _____

*ATTORNEY I.D.*
Bidder's Attorney: _____
Bidder's Attorney's Address: _____
Bidder's Attorney's Phone: _____
Bidder's Attorney's Email Address: _____

*BANK REFERENCE*
Bank Name: _____
Bank Contact: _____
Bank Address: _____
Bank Contact's Phone Number: _____
Bank Contact's Email Address: _____

EXHIBIT 2

---

**OVERBID PURCHASE AGREEMENT**

**BY AND BETWEEN**

**CHARLES & COLVARD, LTD.**

(AS SELLER)

**AND**

_____

(AS PURCHASER)

**Dated as of _____, 2026**

---

**OVERBID PURCHASE AGREEMENT**

This Overbid Purchase Agreement (the "Agreement") is made as of the _____ day of _____, 2026, by and between Charles & Colvard, Ltd. ("Seller") and _____ ("Purchaser").

**WITNESSETH:**

WHEREAS, on March 2, 2026 (the "Petition Date"), Seller filed a voluntary petition seeking relief under chapter 11 of the Bankruptcy Code.

WHEREAS, Seller is a North Carolina corporation founded in 1995 and headquartered in Morrisville, North Carolina. Seller was founded as C3 Diamante, Inc. and changed its name to C3, Inc. by Articles of Amendment filed on April 10, 1996. Seller subsequently changed its name to Charles & Colvard, Ltd. by Articles of Amendment filed on May 17, 2000.

WHEREAS, Seller is a globally recognized fine jewelry company specializing in lab-created gemstones. Its common stock is quoted on the OTC Experts Market under the symbol "CTHR." Seller manufactures, markets, and distributes Charles & Colvard Created Moissanite® including its premium moissanite gemstone brand, Forever One™, as well as Caydia®, its brand of premium lab-grown diamonds. Seller offers gemstones and finished jewelry featuring its proprietary moissanite jewels, premium lab-grown diamonds, created color gemstones, and most recently, lab-grown diamonds in color, for sale in the worldwide fine jewelry market through two operating segments: its Online Channels segment, which encompasses its digital properties components, comprised of its charlesandcolvard.com, moissaniteoutlet.com, charlesandcolvarddirect.com, and madenetwork.com websites; e-commerce outlets, including marketplaces, drop-ship customers, and other pure-play, exclusively e-commerce customers; and its Traditional segment, which consists of domestic and international distributors and retail customers, including end-consumers through its first Charles & Colvard Signature Showroom, which opened in October 2022.

WHEREAS, as of the Petition Date, Seller had a total of 26 full-time employees and 1 part-time employee.

WHEREAS, Seller desires to sell to Purchaser all right, title, and interest of Seller and its bankruptcy estate in, to, and under the Assets and to assign to Purchaser the Assumed Contracts, on the terms and conditions set forth in this Agreement, pursuant to Sections 363 and 365 of the Bankruptcy Code;

WHEREAS, Purchaser desires to purchase from Seller all right, title, and interest of Seller and its bankruptcy estate in, to, and under the Assets and to assume the Assumed Contracts, on the terms and conditions set forth in this Agreement, pursuant to Sections 363 and 365 of the Bankruptcy Code; and

WHEREAS, the execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject to entry of the Sale Order.

1

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1    **Certain Definitions**.  For purposes of this Agreement, defined terms used herein have the meanings specified in this Section 1.1.

"Action" means any suit, action, Claim, hearing, administrative action, demand, demand letter, Governmental investigation, notice of violation, or proceeding arising out of any violation or alleged violation of any Law or any breach or alleged breach of any Contract or Order.

"Affiliate" means a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the Person referred to. In this definition, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of securities, by contract, or otherwise.

"Agreement" means this Agreement, as hereafter amended, supplemented, or otherwise modified.

"Assets" has the meaning ascribed to it in Section 2.1 herein, provided that (whether or not expressly stated) for all purposes of this Agreement, Assets always exclude Excluded Assets.

"Assignment of Lease" has the meaning ascribed to it in Section 2.6.

"Assumed Contracts" has the meaning ascribed to in Section 2.7.

"Assumed Liabilities" has the meaning ascribed to it in Section 2.8(a).

"Authorizations" means all Permits, licenses, certificates, grants, or other authorizations of Governmental Authorities.

"Bankruptcy Case" means the case under Chapter 11 of the Bankruptcy Code, styled, *Charles & Colvard, Ltd.*, Case No. 26-00969-5-DMW, pending before the Bankruptcy Court.

"Bankruptcy Code" means title 11 of the United States Code Section 101, et seq. (11 U.S.C. § 101, *et seq.*).

"Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of North Carolina and, to the extent of the withdrawal of any reference made pursuant to 28 U.S.C. § 157, the United States District Court for the Eastern District of North Carolina with jurisdiction over the Bankruptcy Case.

2

"Bidding Procedures" means the set of rules and guidelines established by Seller, and approved by the Bankruptcy Court, that govern the process by which potential purchasers may submit offers to acquire the Assets. These procedures outline the requirements for submitting bids, the criteria for submitting a Qualified Bid, the timeline for the bidding process, and any other relevant terms and conditions necessary to facilitate a fair and orderly sale process. The Bidding Procedures are designed to ensure that Seller receives the highest or otherwise best offer for the Assets, consistent with its fiduciary duties and applicable law.

"Bill of Sale" has the meaning ascribed to it in Section 2.6.

"Books and Records" includes, without limitation, books, ledgers, files, reports, records, inventory data, accounts receivable records, accounts payable records, vendor lists, financing records, personnel and payroll records and other business books and records (including without limitation documents), regardless of the form of and the medium on which such books and records are maintained.

"Business" means all operations and activities conducted by Seller in connection with its jewelry business, including but not limited to the sale, design, manufacture, and distribution of jewelry products, as well as all related services and functions performed by Seller prior to the Closing Date.

"Business Day" means any day of the year, other than Saturday or Sunday, on which national banking institutions in North Carolina are open to the public for conducting business and are not permitted, required, or authorized to close.

"Business Confidential Information" has the meaning ascribed to it in Section 5.15(b).

"Business Records" has the meaning ascribed to it in Section 5.1(e).

"Casualty" has the meaning ascribed to it in Section 5.10.

"Claims" has the meaning given that term in Section 101(5) of the Bankruptcy Code and includes, *inter alia*, any and all deeds of trust, Liens, mortgages, assessments, security interests, encumbrances, claims, defenses, demands, damages, causes of action, offset rights, setoff rights, recoupment rights, interests, debts, obligations, guaranties, options, commitments, product liability claims (relating to all products sold or produced prior to the Closing), warranty claims, claims of employees or former employees or their beneficiaries or dependents, including but not limited to, severance or termination payments, pension or employee benefit claims, Taxes, all tort or contractual claims and any claims or obligations arising from Environmental Law, whether absolute or contingent, matured or unmatured, accrued or unaccrued, asserted or unasserted, known or unknown, in law or in equity, including, without limitation, any claims predicated upon any theory of successor liability or any similar theory, and all Liabilities or guaranties of any kind or nature, arising from or in any way connected with any action or inaction of Seller, arising prior to the Closing Date but excluding the Permitted Encumbrances.

"Closing" means the consummation of the transactions contemplated by this Agreement.

3

"Closing Date" means such date following the satisfaction of each Party's conditions to Closing or, where permitted, waiver by each Party of the other Party's conditions to Closing as set forth in Articles VI, VII and VIII to this Agreement, as shall be selected by the Parties, but in no event later than July 7, 2026, or such later date as the Parties may in writing agree.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any contract, agreement, arrangement, understanding, lease, indenture, note, bond, evidence of indebtedness, license, sublicense, undertaking, binding commitment or instrument, or purchase order entered into or made by or on behalf of Seller in connection with the Business.

"Court" means any court, administrative or regulatory body, Government agency, arbitration or mediation panel or similar body.

"Cure Payments" means the amounts necessary to cure defaults, if any, under each Assumed Contract.

"Data Room" has the meaning ascribed to it in Section 1.2(a)(viii) herein.

"Deed" has the meaning ascribed to it in Section 2.6.

"Dispute" has the meaning ascribed to it in Section 11.10(a)

"Effective Time" means the effective time of the Closing, which shall be as of 12:00:01 a.m. prevailing Eastern Time, on the day of the Closing Date.

"Environmental Law" means any federal, state or local statute, law, regulation, code, ordinance, or rule of common law currently in effect relating to the protection or pollution of the environment or natural resources, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 *et seq.*), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801 *et seq.*), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 *et seq.*), the Clean Water Act (33 U.S.C. § 1251 *et seq.*), the Clean Air Act (42 U.S.C. § 7401 *et seq.*) the Toxic Substances Control Act (15 U.S.C. § 2601 *et seq.*), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 *et seq.*), The Medical Waste Tracking Act (42 U.S.C. § 6992 *et seq.*), the Oil Pollution Act (33 U.S.C. § 2701 *et seq.*), the Emergency Planning and Community Right to Know Act (42 U.S.C. § 11001 *et seq.*), the Occupational Safety and Health Act (29 U.S.C. § 651 *et seq.*), and the Occupational Safety Health Act (29 U.S.C. § 651 *et seq.*).

"Excluded Assets" means those assets of Seller that are set forth on Schedule 1 attached hereto.

"Excluded Liabilities" means each and every Liability, obligation, debt, or commitment of the Business or Seller, as principal, or a successor of any kind or nature (provided Seller shall take no action causing or resulting in Purchaser being deemed to be a successor owner or operator of the Business for purposes of any Environmental Law), whether absolute or

4

contingent, accrued or unaccrued, asserted or unasserted, known or unknown, liquidated or unliquidated, due or to become due, or otherwise, other than the Assumed Liabilities.

"Excluded Records" means (a) any materials about employees, disclosure of which would violate Law, (b) any materials that are subject to a Privilege or requirement to maintain confidentiality or (c) any Patient Records but only to the extent access to Patient Records is prohibited by Law.

"Exhibits" means the exhibits provided for and referred to in this Agreement.

"Government" or "Governmental" means or refers to the United States of America, any other nation or sovereign state, any federal, bilateral or multilateral governmental authority, state, possession, territory, county, district, city or other governmental unit or subdivision, and any branch, agency, or judicial body of any of the foregoing.

"Governmental Authority" means (i) any federal, state, county, municipal or other local Government or governmental authority, including, without limitation, any regulatory or administrative agency, commission, department, board, bureau, agency, instrumentality or Court and (ii) any arbitrator or arbitral body of any Government.

"Knowledge" means (a) as to Seller, the actual knowledge of Seller and (b) as to Purchaser, the actual knowledge, after due inquiry.

"Law" means any statute, law, code, treaty, ordinance, rule, regulation, instrument, directive, decree, agreement, policy, Order, consent decrees and consent orders, or injunction of or with any Government, Governmental Authority, quasi-Governmental Authority, or Court, and includes, without limitation, all judicial and administrative interpretations thereof, and all rules or regulations of any regulatory or self-regulatory authority compliance with which is required by Law.

"Liabilities" means debts and liabilities, whether known or unknown, contingent or absolute, liquidated or unliquidated, and whether or not required to be reflected on the financial statements of a business, whether arising under any Contract, Law, Lien, Order or otherwise.

"Lien" means any lien, security interest, mortgage, deed of trust, option, lease, tenancy, occupancy, covenant, condition, easement, agreement, royalty, pledge, hypothecation, charge, claim or other encumbrance.

"Nonassignable Asset" shall have the meaning set forth in Section 2.5 of this Agreement.

"Order" means any order, judgment, writ, injunction, award or decree of any Court or Governmental Authority.

"Ordinary Course of Business" means with respect to the Business, the ordinary course of commercial operations customarily engaged in by the Business reasonably consistent with past practices.

5

"Party" or "party" means either Purchaser or Seller, and "Parties" means both Purchaser and Seller together.

"Permits" means any approvals, authorizations, consents, licenses, permits, provider numbers, including, without limitation, certificates of exemption, franchises, accreditations, registrations or certificates of a Governmental Authority.

"Permitted Encumbrances" means (i) the Assumed Liabilities and other obligations assumed by Purchaser under this Agreement, (ii) those Liens or exceptions listed on or described in Schedule 5 attached hereto, and (iii) Liens imposed pursuant to any Assumed Contract.

"Permitted Parties" has the meaning ascribed to it in Section 5.1(e).

"Person" means any natural person, any corporation, partnership, limited liability company, limited liability partnership, joint venture, trust, association, company, or other legal entity, and any Government or Governmental Authority.

"Privilege" means the attorney-client privilege (including the common interest privilege) or the attorney work product doctrine.

"Privileged Materials" means any materials that are protected by or the subject of a Privilege.

"Purchased Intellectual Property Licenses" means those intellectual property licenses of Seller included within the Assets, if any.

"Purchase Price" has the meaning ascribed to it in Section 2.12(a).

"Purchaser" has the meaning set forth in the Preamble to this Agreement.

"Qualified Bid" means an offer submitted to Seller that meets all the criteria and requirements outlined in the Bidding Procedures. A Qualified Bid must comply with the submission requirements, be submitted by an entity that demonstrates the financial capability to complete the transaction, and include any necessary documentation as specified by the Seller.

"Relating to" means arising from, in connection with or otherwise relating to. "Relates to" and "relate to" have corresponding meanings.

"Sale Order" has the meaning ascribed to it in Section 6.1.

"Schedules" means the schedules provided for and referred to in this Agreement.

"Seller" has the meaning set forth in the Preamble to this Agreement.

"Seller's Confidential Information" has the meaning ascribed to it in Section 5.15(a).

"Tax" or "Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value

6

added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, excise taxes under Section 4979 of the Code, unrelated business income taxes, and estimated taxes, whether disputed or not, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i).

"Taxing Authority" means any Government or Governmental Authority responsible for the imposition or collection of any Tax.

"Transferred Business Records" has the meaning ascribed to it in Section 5.1(f).

"Transfer Taxes" means all excise, sales, use, transfer (including Real Property transfer or gains), value added, stamp, documentary, filing, recording and similar Taxes and fees which may be imposed or assessed as a result of the transactions effected pursuant to this Agreement together with any interest, additions, penalties with respect thereto and any interest in respect of such additions or penalties. Income taxes do not constitute Transfer Taxes.

1.2     **Other Definitional and Interpretive Matters**.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)     Calculation of Time Periods. When calculating the period before which, within which, or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)     Dollars. Any reference in this Agreement to "$" means United States dollars.

(iii)     Exhibits/Schedules. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent it is reasonably apparent that it is pertinent to the subject matter of such other Schedule. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)     Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)     Headings. The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

7

(vi)     Herein.  The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)    Including.   The word "including" means "including, without limitation," and "includes" and "include" have corresponding meanings, and such words shall not be construed to limit any general statement to the specific or similar items or matters immediately following it.

(viii)   Made Available to Purchaser.   The phrase "made available to Purchaser" means, for all purposes of this Agreement, made available to Purchaser through posting in Seller's electronic data room (the "Data Room"), via email, facsimile or other electronic transfer or through other written means for all purposes of this Agreement.

(b)      No Construction Against Drafter.  No presumption, burden of proof, burden of persuasion or similar method of interpretation or standard shall arise or otherwise apply favoring or disfavoring any Party (including, without limitation, the draftsperson) by virtue of the authorship of any one or more provisions of this Agreement, including in any arbitration or litigation proceeding.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

2.1     **Sale of Assets**.  At the Closing and as of the Effective Time but in all events subject to the approval of the Bankruptcy Court by and through the Sale Order, Seller agrees, upon and subject to the terms and conditions hereinafter set forth, to sell, transfer, convey, assign, and deliver or cause to be sold, transferred, conveyed, assigned, and delivered to Purchaser, all right, title, and interest of Seller and its bankruptcy estate in, to and under all of the assets and properties and associated rights and interests, real, personal, and mixed, tangible and intangible, of whatever kind, owned by Seller or any of its Affiliates (no matter where located, including without limitation, on leased property) including, without limitation, all of the assets and properties used in or related to the Business, but excluding the Excluded Assets (collectively, after excluding the Excluded Assets, the "Assets").  None of the Excluded Assets will be conveyed to Purchaser.

2.2     **Purchase of Assets**.  Purchaser agrees to purchase the Assets upon and subject to the terms, conditions and provisions set forth herein and pursuant to the terms in the Sale Order.

2.3     **Excluded Liabilities**.  Except for the Permitted Encumbrances, the Assets shall be transferred pursuant to the Sale Order and Section 363 of the Bankruptcy Code, to the fullest extent permitted by applicable Law, free and clear of all Liens, Claims, interests, and encumbrances.

(a)      Purchaser shall not assume, satisfy, discharge, or otherwise be responsible for any Excluded Liabilities. Purchaser shall, at the Closing, assume the Assumed Liabilities pursuant to the terms of Section 2.8 of this Agreement.

(b)      Purchaser shall not assume, satisfy, discharge, or otherwise be responsible for any Liabilities of Seller related to any pension or retirement plans or programs.

8

(c)     The Parties hereto further agree that, as between Purchaser and Seller, all the Excluded Liabilities shall remain the sole, exclusive obligation and responsibility of Seller.

(d)     Notwithstanding the foregoing, Purchaser shall be responsible for all Liabilities applicable to and incurred with respect to the period after the Effective Time that relate to the Business or Purchaser's post-Closing ownership or operation of the Assets; provided, however, that no statement made in this Agreement shall be deemed to allocate or attribute any Liability or obligation to Purchaser that has been released pursuant to the Sale Order.  To the extent this Section 2.3(d) conflicts with any other provision of this Agreement, this Section 2.3(d) controls.

2.4     **Excluded Assets**.  Nothing herein contained shall be deemed to obligate Seller to sell, transfer, assign, or convey any Excluded Asset, as described on Schedule 1, to Purchaser.  The Seller shall retain all right, title, and interest to, in, and under the Excluded Assets. To the extent this Section 2.4 conflicts with any other provision of this Agreement, this Section 2.4 controls.

2.5     **Nonassignable Assets.**  To the extent that the assignment of any Asset shall require the consent of any other party and such consent shall still be required notwithstanding the Sale Order and Sections 363 and 365 of the Bankruptcy Code (each, a "Nonassignable Asset") nothing in this Agreement nor the consummation of the transactions contemplated hereby shall be construed as an attempt or agreement to assign such Nonassignable Asset unless and until such consent shall have been obtained.

2.6     **Method of Conveyance**.  The sale, transfer, conveyance, assignment, and delivery by Seller of the Assets to Purchaser hereunder shall be effected on the Closing Date by delivery by Seller of: (a) assignment(s) and bill(s) of sale and such other instruments of conveyance in the form of Exhibit A (collectively, "Bill of Sale") conveying all right, title, and interest of Seller and its bankruptcy estate in all Assets that comprise tangible or intangible personal property, including separate assignment(s) of any U.S. trademark registrations and applications, if any, included within the Purchased Intellectual Property Licenses in a form suitable for recording with the U.S. Patent and Trademark Office, all to the fullest extent permitted by Law, free and clear of any and all Liens, except for Permitted Encumbrances.

2.7     **Assumed Contracts**.  On and after the Effective Time, Purchaser shall assume and be responsible for, and shall timely pay, perform, and discharge in accordance with their terms, all obligations (i) arising after the Effective Time with respect to executory contracts and unexpired leases identified on Schedule 2.7 (the "Assumed Contracts").  Except for the Assumed Contracts, Purchaser shall not be assigned any contracts or leases of Seller and shall not be responsible for any of Seller's contracts or leases.

2.8     **Assumption of Liabilities**.

(a)     As of the Effective Time, Purchaser shall assume and be responsible for, and shall timely pay, perform, and discharge in accordance with their respective terms all Liabilities of the Business (the "Assumed Liabilities") accruing from and after the Effective Time incurred in connection with or otherwise relating to the Assets or the Business.

9

(b)      As of the Effective Time, Purchaser shall assume and be responsible for, and shall timely pay, perform, and discharge in accordance with their respective terms the obligations of Seller arising from and after the Effective Time under Assumed Contracts which Seller shall assign and as to which Purchaser shall assume all obligations thereunder, except that Purchaser shall not assume the obligations to pay Cure Payments relating to the Assumed Contracts.

(c)      On the Closing Date, Purchaser shall assume no liability for Seller's accrued payroll, accrued payroll taxes, and accrued paid annual leave.

(d)      Seller shall be responsible for the payment of the Cure Payments, if any, required with respect to the Assumed Contracts with said payments being made to the counterparty to the Assumed Contracts when the Cure Payments become due pursuant to the Sale Order unless the Seller and the counterparty to an Assumed Contract agree otherwise.  Such Cure Payments shall be paid from the Cash Purchase Price.  Seller represents that Schedule 2.8(d) lists all executory contracts necessary to Seller's ongoing operations that require a cure.

(e)      Notwithstanding anything to the contrary in this Agreement, (i) Purchaser shall consult with Seller with respect to the terms of the assumption of the Assumed Contracts provided that Purchaser shall not modify any terms thereof without the prior written consent of Seller if such modification would be or could reasonably be expected to be adverse to Seller in any respect, and (ii) the rights of Seller to object to such terms are expressly preserved and reserved.

(f)      Seller shall be responsible for prosecuting all objections to the Cure Payments.  Seller shall, at Seller's sole cost, (i) negotiate the amount of all Cure Payments and/or (ii) pay all of Purchaser's legal and other fees and expenses, if any, to the extent incurred because of Purchaser being required to intervene or defend) relating to any litigation or other dispute in connection with or otherwise relating to Cure Payments.

2.9      **Taxes and Assessments**.  The Liability for payment of accrued but unbilled or unpaid Taxes (including, but not limited to, real estate taxes, personal property tax, ad valorem tax and similar non-income Taxes) and other assessments relating to, or arising out of the ownership or transfer of, the Assets or the Assumed Contracts (including, but not limited to any water, sewer and other municipal charges owed to any Governmental Authority), imposed on a periodic basis beginning before and ending after the Effective Time or as a result of the consummation of the transactions evidenced by this Agreement or otherwise, shall be paid by Seller at the Closing, provided that Seller has received at Closing the purchase price required to be paid by Purchaser pursuant to this Section.  All Taxes and other assessments shall be listed on Schedule 7, which shall be prepared and delivered at Closing.  If any Taxes or other assessments paid by Seller at any time on or prior to the Closing Date are attributable in whole or in part to any period following the Closing, then the Purchase Price payable at Closing shall be increased to adjust for the prior payment of such Taxes and assessments by Seller attributable to the post-closing period.

2.10   **Intentionally Deleted**.

2.11 **Closing Obligation.**

(a) Upon entry of the Sale Order, Seller and Purchaser shall have the obligation to consummate the Closing pursuant to and subject to the terms of this Agreement and the Sale Order. If Purchaser fails to consummate the purchase of the Assets on or before July 7, 2026 (unless such failure arises from Seller's uncured material breach and unless Seller and Purchaser agree to extend such deadline in writing), Seller is authorized but not required to effect the sale of the Assets to one or more third parties as soon as is commercially reasonable subject to further Orders of the Bankruptcy Court.

2.12 **Purchase Price**.

(a) In consideration of the sale, transfer, conveyance, and assignment of the Assets to Purchaser, Purchaser shall at Closing: (i) assume the Assumed Liabilities, (ii) pay to Seller cash by wire transfer of immediately available funds (the "Cash Purchase Price") in the amount of $_____, less any deposit previously paid; (iii) [intentionally deleted]; (iv) assume the liabilities described in Sections 2.7 and 2.8 on the terms contained therein; and (v) pay to Seller the amount required under Section 2.9 (collectively, the "Purchase Price"). Upon execution of this Agreement, Purchaser shall deposit five percent (5%) of the Cash Purchase Price (the "Deposit") in immediately available funds with Seller's counsel, to be held by Seller's counsel in trust and disbursed pursuant to the terms of this Agreement.

(b) Intentionally Deleted.

(c) Intentionally Deleted.

(d) Intentionally Deleted.

(e) Intentionally Deleted.

(f) Intentionally Deleted.

(g) Intentionally Deleted.

(h) The Parties agree to report this transaction for federal, state, and local Tax purposes consistently and in accordance with this Section 2.12.

2.13 **Intentionally Deleted.**

2.14 **Closing**. The Closing shall take place at 10:00 a.m., prevailing Eastern Time, on the Closing Date at the offices of Seller's bankruptcy counsel, or at such other time and place as the Parties may agree in writing. The Closing shall be deemed to have occurred and to be effective as between the parties as of the Effective Time. Seller will operate the Business until immediately prior to the Effective Time.

2.15 **Intentionally Deleted.**

2.16   **Closing Deliveries of Seller**.  At the Closing, in addition to any other documents, assignments, certificates, letters, orders, or agreements described in Section 2.6 or otherwise required to be delivered pursuant to the terms of this Agreement, and the satisfaction of all the conditions set forth in Articles VI and VIII, Seller shall deliver to Purchaser the following:

      (a)   the execution and delivery of this Agreement by Seller; and

      (b)   a certified copy of the final, non-appealable Sale Order authorizing and ratifying the execution and delivery of this Agreement by Seller and the consummation of the transactions contemplated hereby; and

2.17   **Closing Deliveries of Purchaser**.  At the Closing, in addition to any other documents otherwise required to be delivered by Purchaser pursuant to the terms of this Agreement and the satisfaction of all other conditions set forth in Articles VI and VII, Purchaser shall deliver to Seller the following:

      (a)   the payment of the Cash Purchase Price, by wire transfer of immediately available funds, pursuant to Section 2.12 herein, less the Deposit previously paid;

      (b)   a certificate of an officer of Purchaser certifying to Seller (a) compliance in all material respects with Purchaser's covenants set forth in this Agreement, (b) that all of the conditions contained in Articles VI and VII have been satisfied except those, if any, waived in writing by Seller, and (c) that all of the representations and warranties set forth in Article IV are true and correct in all material respects as of the Closing Date; and

      (c)   copies of the resolutions of all corporate bodies of Purchaser necessary to authorize the transactions contemplated hereby, authorizing the purchase of the Assets and the execution and delivery by Purchaser of this Agreement and the consummation by Purchaser of the transactions contemplated hereby, certified by an authorized signatory of Purchaser.

2.18   **Intentionally Deleted.**

2.20   **Further Conveyances and Assumptions**.  From time to time following Closing, each Party shall, and shall cause their respective Affiliates to execute, acknowledge, and deliver all such further conveyances, notices, assumptions, releases, and other instruments, and shall take such further actions, as may be reasonably necessary or appropriate (i) to assure fully to Purchaser and its successors and permitted assigns, all of the properties, rights, titles, interests, estates, remedies, powers, and privileges intended to be conveyed to Purchaser under this Agreement and (ii) to assure fully to Seller and its successors and permitted assigns, the assumption of the Assumed Liabilities and other obligations intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the transactions contemplated herein.  Without limiting the generality of the foregoing, if Seller receives any Assets or payments related to the Assets after the Closing Date, it will promptly turn over same to Purchaser.

2.21   **Intentionally Deleted.**

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

12

Seller hereby makes the following representations and warranties, subject to any exceptions included in Seller's Disclosure Schedule:

3.1     **Power of Seller**.  Seller has the power to enter into this Agreement, to perform its obligations hereunder, and to consummate the transactions contemplated hereby.  Seller has all necessary power and authority to enter into this Agreement and all other documents that the Seller is required to execute and deliver hereunder, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.

3.2     **Validity and Enforceability of Agreement**.  Upon the entry of the Sale Order approving the sale of the Assets to the Purchaser, this Agreement constitutes a legal, valid, and binding obligation of Seller, this Agreement constitutes, and all documents required to be executed and delivered at Closing by Seller hereunder or in connection herewith will each constitute, the legal, valid, and binding obligations of Seller, enforceable against it in accordance with their respective terms, subject to general principles of equity.

3.3     **Consents; Waivers and Approvals**.  Except for the approval of the Bankruptcy Court as required by Section 363 of the Bankruptcy Code, no consent, waiver, approval, authorization, license or order of, registration or filing with, or notice to, any Governmental Authority or any other Person is necessary to be obtained, made or given by Seller in connection with the execution and delivery of this Agreement, the performance by Seller of its obligations hereunder or the consummation by Seller of the transactions contemplated hereby.

3.4     **No Conflict**.  Subject to the issuance of the Sale Order, the execution and delivery by Seller of this Agreement and the other agreements, documents and instruments required to be executed and delivered by Seller pursuant to this Agreement and the consummation by Seller of the transactions contemplated hereby or thereby, and compliance by Seller with any of the provisions hereof or thereof, will not:

(a)     violate (with or without the giving of notice or the lapse of time or both) any Law or any Order to which Seller, the Assets, or the Business is subject.

3.5     **Rights to Acquire Assets**.  Except for Ordinary Course of Business transactions involving the disposition of personal property that are not, individually or in the aggregate, material to the Seller, there are no agreements, options, or other rights to which Seller is a party pursuant to which a Claim exists that Seller is, or may become, obligated to sell or grant any Lien in any of the Assets.  Notwithstanding the foregoing, Seller acknowledges and agrees that the Assets shall be transferred pursuant to the Sale Order and Section 363 of the Bankruptcy Code, to the fullest extent permitted by applicable Law, free and clear of all Liens, Claims, interests, and encumbrances other than the Permitted Encumbrances.

3.6     **Title to and Adequacy of the Assets**.  Seller owns each of the Assets.  Subject to the approval of this Agreement by the Bankruptcy Court, Seller's right, title, and interest in the Assets will be transferred free and clear of any Liens by Order of the Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code, except for the Permitted Encumbrances.  The Assets comprise all items used in the operation of the Business.

13

3.7     **Intentionally Deleted.**

3.8     **Intentionally Deleted.**

3.9     **Intentionally Deleted.**

3.10    **Intentionally Deleted.**

3.11    **Intentionally Deleted.**

3.12    **Intentionally Deleted.**

3.13    **Intentionally Deleted**.

3.14    **Compliance with Laws; Permits**.

(a)     To Seller's Knowledge, Seller has all permits that are necessary to enable it to own, lease, or otherwise hold the Assets and to enable it to operate the Business as currently conducted.  All such permits are in full force and effect.  To the Knowledge of Seller, no proceedings are pending or threatened where the remedy sought is to revoke or materially modify any such permit, materially restrict any renewal of any such permit or deny the right to transfer any such permit that is permitted to be transferred with consent.

(b)     To Seller's Knowledge, Seller is in compliance in all material respects with all applicable Laws respecting the Business.  There are no charges of a material violation of a Law pending or to the Knowledge of Seller threatened against Seller.

(c)     There is not now pending or, to Seller's Knowledge, threatened, any claim, investigation or enforcement action by any governmental authority (whether judicial, executive or administrative) concerning Seller's potential liability under Environmental Laws in connection with the ownership or operation of the Business or the Assets.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby makes the following representations and warranties:

4.1     **Corporate Existence of Purchaser**.  Purchaser has all necessary power and authority to enter into this Agreement and all other documents that the Purchaser is required to execute and deliver hereunder, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.

4.2     **Validity and Enforceability of Agreement**.  Upon the entry of the Sale Order approving the sale of the Assets to the Purchaser, this Agreement constitutes, and all documents executed and delivered by Purchaser at Closing hereunder or in connection herewith will each constitute, the legal, valid, and binding obligations of Purchaser, enforceable against it in accordance with their respective terms, except as enforcement hereof may be limited by general principles of equity.

14

4.3     **Authorization and Authority**.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized, approved and ratified by all necessary action on the part of Purchaser.  Purchaser has full authority to enter into and deliver this Agreement, to perform its obligations hereunder, and to consummate the transactions contemplated hereby.

4.4     **No Conflict**.  Neither the execution and delivery by Purchaser of this Agreement nor the performance by Purchaser of its obligations hereunder, (a) (i) violates or breaches the terms of or causes a default under any legal requirement applicable to Purchaser, (ii) contravenes the certificate of incorporation or bylaws or the certificate of formation and operating agreement or other organizational documents of Purchaser, or (iii) violates or breaches the terms or causes a default under any contract, indenture, evidence of indebtedness or other commitment to which Purchaser is a party or by which it or its properties is bound, or (b) will, with or without the passage of time, the giving of notice or the taking of any action by a third person, have any of the effects set forth in this subsection, except to the extent that any such matter would reasonably be expected to have a material adverse change with regard to Purchaser.

4.5     **Ability to Consummate Transaction**.  Purchaser has or will have sufficient immediately available funds and/or access to credit facilities necessary to consummate the purchase of the Assets and perform of its obligations under this Agreement.

4.6     **Solvency.**  Purchaser is solvent.  The consummation of the transactions provided for in this Agreement will not render Purchaser insolvent.  There are no conditions, obligations or commitments of Purchaser, or Claims against Purchaser, which will or could be reasonably expected to render Purchaser insolvent.

4.7     **Litigation and Arbitration**.

(a)     There is no Action pending or, to the Knowledge of Purchaser, threatened against Purchaser, including any before any Governmental Authority or any arbitration panel, that is not resolved herein seeking to prevent the consummation of the transactions contemplated by this Agreement.

(b)     There is no Action pending or, to the Knowledge of Purchaser, threatened against Purchaser or any of its Affiliates, or any of their respective members, owners, managers, officers, directors, or other senior executives or to which Purchaser is otherwise a party before any Governmental Authority, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the transactions contemplated hereby.  Purchaser or any of its Affiliates, or any of their respective members, owners, managers, officers, or senior executives are not subject to any Order of any Governmental Authority except to the extent the same would not reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the transactions contemplated hereby.

4.8     **Brokers and Intermediaries**.  Neither Purchaser nor any of its Affiliates has employed any broker, finder, advisor or intermediary that is entitled, in connection with the

15

consummation of the transactions contemplated hereby, to a broker's, finder's, or similar fee or commission.

**ARTICLE V**
**CERTAIN COVENANTS AND AGREEMENTS OF SELLER AND PURCHASER**

5.1     **Access and Information**.

(a)     Before the Closing and to the extent permitted by Law, and except as required to preserve any Privilege, Seller will provide Purchaser and its representatives with reasonable access during normal business hours, to all of the assets, properties, facilities, employees, agents, accountants, and books and records of Seller and will furnish or make available to Purchaser and its representatives during such period all such information and data concerning Seller in its possession or control as Purchaser reasonably may request; *provided, however*, such access shall be coordinated through such persons as may be designated in writing by Seller for such purpose.  Purchaser's access shall include IT access to allow Purchaser to prepare to transition/preserve any electronic data as may be customary or required.

(b)     Before the Closing, Seller shall permit Purchaser to engage in discussions and negotiations with Seller's vendors for the purpose of negotiating the terms of contracts between Purchaser and such vendors in connection with Purchaser's purchase of the Assets.

(c)     Before the Closing, Seller shall grant Purchaser and its representatives reasonable access to the employees within the Business for the purpose of administering the hiring process as to such employees.  Thus, by way of example and without limitation, except to the extent prohibited by applicable Law, Seller will grant reasonable access to enable Purchaser and its representatives to disseminate documents and information to such employees; collect documents and information from such employees; interview such employees and their supervisors and managers; investigate the backgrounds, experience, education, qualifications and work records of such employees; offer employment to such employees; and hire such employees.  Purchaser agrees to conduct all such activities in compliance with applicable Law.

(d)     Seller shall provide to Purchaser at the Closing or as soon thereafter as is reasonably possible all appropriate books and records and other documents in the possession or control of Seller, its representatives or its agents relating to the Assets being sold pursuant to this Agreement and the transactions contemplated hereby.  Such books, records, and documents shall include, but are not limited to, all paper and electronic financial, operational, administrative, research, regulatory reporting, maintenance, and HR records, but shall expressly exclude all Excluded Assets.

5.2     **Intentionally Deleted**.

5.3     **Conduct of Business**.

(a)     Prior to the Closing, except as otherwise contemplated by this Agreement or required by applicable Law or with the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed), Seller shall (subject to Seller's ability to continue

16

receiving adequate debtor-in-possession financing under its existing debtor-in-possession financing facility):

(i)     operate the Business in the Ordinary Course of Business in all material respects;

(ii)     use commercially reasonable efforts to (A) maintain the Assets in good working order and condition consistent with past practices and (B) maintain the insurance coverage currently in place with respect to the Assets or obtain comparable replacement coverage;

(iii)     perform when due all undisputed post-petition obligations under its contracts, including leases of Real Property or personal property to the extent of available funds;

(iv)     comply in all material respects with all Laws and Orders pertaining to the Business and the Assets;

(v)     without being obligated to make any payment to any Person to preserve any goodwill or relationship, and subject to changes incident to Seller's bankruptcy filing and related intention to sell its assets, use commercially reasonable efforts reasonably consistent with past practices to preserve the goodwill thereof and Seller's relationships with the employees, suppliers, and others with whom it deals; and

(vi)     perform all undisputed post-petition obligations under Excluded Contracts and timely pay, perform, and discharge in accordance with their respective terms the undisputed post-petition Excluded Liabilities to the extent of available funds.

(b)     Prior to the Closing, except as otherwise contemplated by this Agreement or required by applicable Law or with the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed), Seller shall not:

(i)     make or enter into any Contract that would be required to be assumed by Purchaser;

(ii)     other than in the Ordinary Course of Business, (A) increase the annual level of compensation of any employee or other Person who works in the Business, (B) grant any bonus, similar benefit, or increase in other direct or indirect compensation to any employee or other Person who works in the Business, (C) with respect to any employee or other Person who works in the Business, increase the coverage or benefits available under any (or create any new) employee benefits plan, or (D) enter into any employment, deferred compensation, severance, consulting, non-competition, or similar agreement (or amend any such agreement) with any employee or other Person who works in the Business, except, as to each of clauses (A) through (D), as required by applicable Law from time to time in effect, by any employee benefits plan maintained or sponsored by Seller or by any existing Contract made available to Purchaser that the Seller is a party to or bound by;

(iii)     subject any of the Assets to any Lien, other than (A) any Permitted Encumbrances or (B) as approved by Order of the Bankruptcy Court;

17

(iv)    other than pursuant to an existing Contract made available to Purchaser, acquire or lease any material assets that would be Assets or sell, assign, license, transfer, convey, lease, or otherwise dispose of any of the Assets, provided that any other removal shall be permitted if the assets removed, taken as a whole, are replaced with reasonably equivalent or better assets;

(v)    cancel or compromise any material debt or claim or waive or release any material right of Seller that constitutes an Asset except in the Ordinary Course of Business;

(vi)    permit or allow relocation of any services or programs of the Business; or

(vii)    other than in the Ordinary Course of Business or pursuant to an existing Contract made available to Purchaser, remove any furniture, equipment, or other tangible personal property used in the Ordinary Course of Business provided further that any other removal shall be permitted if the assets removed, taken as a whole, are replaced with reasonably equivalent or better assets.

5.4    **Commercially Reasonable Efforts**.   Each Party shall use its commercially reasonable efforts to fulfill or cause the fulfillment of the conditions of the Closing, including, without limitation, the execution and delivery of all agreements contemplated hereunder to be so executed and delivered provided that it shall be the responsibility of Purchaser to obtain the Authorizations and any required consents with respect to the assumption of the Assumed Contracts.

5.5    **Adequacy of Purchaser's Review**.   Purchaser agrees that it (a) had a full and complete opportunity to conduct due diligence regarding the Assets prior to making its offer and does not require further due diligence, (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its bid and executing and delivering this Agreement, and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties of any kind or nature, including, without limitation, any that are express, are implied, arise by operation of law, or that may otherwise be deemed to apply, regarding the Assets, or the completeness of any information provided in connection therewith except, as to clauses (b) and (c), solely for Seller's representations and warranties that are contained in Article 3 of this Agreement.

5.6    **Intentionally Deleted**.

5.7    **Tax Matters**.

(a)    The Parties agree to request that the Bankruptcy Court find that the sale of the Assets constitutes a sale in furtherance of effectuating a plan of reorganization, and, in accordance with section 1146(a) of the Bankruptcy Code, all transfers in connection therewith shall be exempt from any and all Transfer Taxes.  To the extent that the Bankruptcy Court does not so order, Seller shall be responsible for the payment of all Transfer Taxes from the Cash Purchase Price.  Purchaser and Seller will cooperate in the timely preparation and filing of any Tax return that must be filed in connection with any Transfer Taxes.  Any such Taxes or fees resulting

18

from any subsequent transfer of the acquired Assets or Assumed Contracts shall be borne by Seller from the Cash Purchase Price.

(b)     After the Closing Date, Seller and Purchaser shall, and shall cause their respective Affiliates to:

(i)     assist the other Party and its Affiliates in preparing any tax returns that such Party is responsible for preparing and filing relating to the Assets, the Excluded Assets or the Business;

(ii)     cooperate fully in preparing for any tax audit relating to or arising out of the ownership or use of the Assets or the Business;

(iii)     make available to the other Party and its Affiliates and to any Taxing Authority as reasonably requested all information, Books and Records, and documents relating to Taxes arising out of the conduct of the Business or the ownership or use of the Assets; and

(iv)     furnish the other Party with copies of all correspondence received from any Taxing Authority in connection with any tax audit relating to the conduct of the Business or the ownership or use of the Assets with respect to any such taxable period.

5.8     **Intentionally Deleted.**.

5.9     **Intentionally Deleted.**

5.10     **Risk of Loss; Casualty Loss**.  All risk of loss or damage to or destruction of the Assets, in whole or in part, shall be and remain with Seller until the Effective Time and from and after the Effective Time, the risk of loss or damages to or destruction of the Assets in whole or in part shall be and remain with Purchaser.  If, between the date of this Agreement and the Closing, any of the Assets having a value in excess of $100,000, individually or in the aggregate, shall be destroyed or damaged in whole or in part by fire, earthquake, flood, other casualty or any other cause (the "Casualty"), individually or in the aggregate, then, with respect to a loss in value in excess of $100,000 (a) Purchaser shall have the option to acquire such Assets on an "as is" basis and take an assignment, without representation, warranty or recourse, from Seller of any insurance proceeds payable to Seller in respect of the Casualty (excluding proceeds under any directors or officers insurance policies) or (b) Seller shall have the option exercisable on or before the Closing Date by the delivery of written notice thereof to Purchaser (i) to fix such Casualty within sixty (60) days after the Closing Date, or (ii) pay Purchaser the loss in value arising from such Casualty, and if Seller does not elect within thirty (30) days of the occurrence of the Casualty an option set forth in (b)(i) or (b)(ii) above, then Seller shall be deemed to have elected the option in clause (b)(ii).

5.11     **Bankruptcy Actions**.

(a)     Seller and Purchaser acknowledge that this Agreement and the sale of the Assets are subject to Bankruptcy Court approval and entry of the Sale Order.

(b)     If an appeal is taken or a stay pending appeal is requested, with respect to the Sale Order, Seller shall promptly notify Purchaser of such appeal or stay request.  Seller shall

19

promptly provide to Purchaser a copy of the related notice of appeal or order of stay. Seller shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from such order. In the event of an appeal of the Sale Order, Seller shall, at its own expense, be primarily responsible for drafting pleadings and attending hearings as necessary to defend against the appeal.

(c)     From and after the date hereof, Seller shall not take any action that is intended to reverse, void, materially modify, or stay the Sale Order.

(d)     Seller will provide Purchaser with a reasonable opportunity to review and comment upon all motions, applications, and supporting papers prepared by Seller (including forms of orders and notices to interested parties) related to the transaction contemplated by this Agreement.

5.12     **Intentionally Deleted.**

5.13     **DISCLAIMERS**.     EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES IN ARTICLE 3, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE TO PURCHASER, EXPRESS OR IMPLIED, WITH RESPECT TO THE TRANSACTIONS CONTEMPLATED HEREBY.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES IN ARTICLE 3, OR EXCEPT AS EXPRESSLY SET FORTH IN THE SALE ORDER, THE ASSETS TO BE SOLD AND TRANSFERRED HEREUNDER SHALL BE SOLD (A) IN THEIR THEN EXISTING PHYSICAL CONDITION, WITH ALL DEFECTS, IF ANY, AND SUBJECT TO WEAR AND TEAR FROM THE DATE HEREOF TO THE CLOSING DATE AND (B) ON AN "AS IS, WHERE IS" BASIS

5.14     **Further Assurances**.  Each party shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated herein and (ii) cause the fulfillment at the earliest practicable date of all the conditions to their respective obligations to consummate same.  Without limiting the generality of the foregoing, promptly after the discovery by Seller of any item included within the definition of Assets but not transferred, conveyed, or assigned to Purchaser, (x) Seller will deliver written notice to Purchaser of the existence and non-transfer, non-conveyance, or non-assumption of such item and provide Purchaser with all the information in Seller's possession about, and with access to such item in Seller's possession as Purchaser may reasonably request, and (y) if requested by Purchaser, Seller shall use commercially reasonable efforts to transfer, convey, or assign to Purchaser such item in the manner and on the terms and conditions as applicable to an Asset.

5.15     **Intentionally Deleted.**

5.16     **Acceptance and Discharge**.  Except to the extent, if at all, Liabilities of Seller to Purchaser are specifically stated herein to survive the Closing, (i) Seller shall cease to have any Liability of any kind or nature relating to its representations and warranties hereunder and/or covenants and agreements to be performed prior to the Effective Time, and (ii) Seller will, without any further writing or other act by Purchaser, at such time be fully and forever, irrevocably and unconditionally, released and discharged from all such Liabilities.

20

5.17    **Cooperation**.  Seller and Purchaser agree to reasonably cooperate with each other in good faith from the date hereof up through and following the Closing Date, in any effort to satisfy all further conditions, undertakings and agreements contemplated by this Agreement to be effected after the Closing.

5.18    **Surrender of Certificates.  Following the Closing and in accordance with the timing and other requirements of applicable Law, Seller shall surrender all licenses and operating certificates issued to it relating to the Business, except for the licenses and operating certificates transferred to Purchaser pursuant to this Agreement.**

5.19    **Intentionally Deleted.**

5.20    **Insurance**.  Neither Purchaser nor Seller shall have an obligation to purchase tail director and officer insurance coverage or tail professional liability insurance coverage.

5.21    **Intentionally Deleted.**

**ARTICLE VI**
**CONDITIONS TO PURCHASER'S AND SELLER'S OBLIGATIONS**

The obligations of the Parties to consummate the transaction provided for in this Agreement shall be subject to the satisfaction of the following conditions on or before the Closing Date:

6.1    **Entry of the Sale Order**.  The Bankruptcy Court shall have entered a sale order in form and substance reasonably satisfactory to the Parties (the "Sale Order"), which approves this Agreement and the consummation of the transactions contemplated hereby in their entirety; and which provides for the following rulings and/or findings: (a) Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code; (b) timely, adequate, and sufficient notice of the sale was provided; (c) the Assets to be transferred to the Purchaser are property of the bankruptcy estate and Seller has all requisite authority and approval to transfer the Assets; (d) the total consideration to be realized by Seller represents fair consideration and reasonably equivalent value in the context of any state or federal law governing the rights of creditors; (e) the conveyance and assignment of the Assets pursuant to this Agreement is a legal, valid, and effective transfer of the Assets to the Purchaser, and will vest the Purchaser with all right, title, and interest of Seller in and to the Assets free and clear of all Liens, Claims, interests except as provided herein and encumbrances except for those (i) liabilities to be assumed by Purchaser pursuant to this Agreement and (ii) Permitted Encumbrances, and (f) neither Seller nor Purchaser has engaged in any conduct that would cause or permit the Agreement, or the transfers contemplated thereby, to be avoided under Section 363(n) of the Bankruptcy Code.  In addition, unless waived by Purchaser in writing in its sole discretion, the Sale Order shall have become a final, non-appealable order.

6.2    **No Injunctions**.  No injunction or restraining Order (whether temporary, preliminary or permanent) of any Governmental Authority shall exist against Purchaser or Seller that prevents the transactions contemplated hereby and approved in the Sale Order.  No other Governmental Authority shall have enacted, issued, promulgated, enforced, or entered any statute, rule, regulation, or non-appealable judgment which prohibits or renders illegal the consummation of the Closing or the transactions provided for herein and approved in the Sale Order.

21

6.3 **Intentionally Deleted.**

6.4 **Intentionally Deleted.**

6.5 **Intentionally Deleted**.

**ARTICLE VII**
**CONDITIONS TO PURCHASER'S OBLIGATIONS**

The obligations of Purchaser to consummate the transactions provided for in this Agreement shall be subject to the satisfaction of each of the following conditions on or before the Closing Date, subject to the right of Purchaser, in its sole discretion, to waive any one or more of the conditions set forth below:

7.1 **Representations and Warranties of Seller**.  The representations and warranties of Seller contained in this Agreement, taken as a whole, shall be true and correct in all material respects on the Closing Date, except to the extent that any representation or warranty is made only as of a specified date, in which case the accuracy of such representation or warranty shall be measured as of such date, and except to the extent of changes permitted by the terms of this Agreement.

7.2 **Schedules**.  The matters set forth on the Schedules shall be true and correct in all material respects on the Closing Date, except to the extent of changes permitted by the terms of this Agreement.

7.3 **Documents**.  Purchaser shall have received a signed copy of this Agreement with all Schedules and Exhibits attached, as updated through and including the Closing, together with copies of all other documents and certificates to be executed and delivered by Seller at Closing.

7.4 **Performance of Obligations**.  Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date.

7.5 **No Changes to Business**.  Since the date of this Agreement, there shall have been no material changes to the Business or Assets that, in the aggregate, have had a material adverse effect on the Business, excluding adverse changes that were projected to occur in any forecast or budget provided by Seller.

7.6 **Intentionally Deleted**.

7.7 **Release of Liens**.  All Liens on the Assets shall have been released, satisfied or otherwise removed or discharged pursuant to Bankruptcy Court order or otherwise, except for the Permitted Encumbrances.

7.8 **Time is of the Essence**. The Sale Order shall have been entered by the Bankruptcy Court by July 2, 2026, and the Closing shall have occurred by July 7, 2026.

7.9 **Intentionally Deleted**.

22

7.10    **Intentionally Deleted.**

# ARTICLE VIII
## CONDITIONS TO SELLER'S OBLIGATIONS

The obligations of Seller to consummate the transactions provided for in this Agreement shall be subject to the satisfaction of each of the following conditions on or before the Closing Date, subject to the right of Seller, in its sole discretion to waive any one or more of the conditions set forth below:

8.1    **Representations and Warranties of Purchaser**.   The representations and warranties of Purchaser contained in this Agreement, taken as a whole, shall be true and correct in all material respects on the Closing Date, except to the extent that any representation or warranty is made as of a specified date, in which case such representation or warranty shall be true in all material respects as of such date, and except to the extent of changes permitted by the terms of this Agreement.

8.2    **Performance of this Agreement**.  Purchaser shall have materially performed or complied with all of the obligations to be performed or complied with by it under the terms of this Agreement on or prior to the Closing Date.

8.3    **Payment of Purchase Price and Assumption of Liabilities and Assumed Contracts**.  Seller shall receive from Purchaser on the Closing Date the Purchase Price pursuant to Section 2.12 of this Agreement and Purchaser shall have assumed the Assumed Liabilities pursuant to a document that is reasonably satisfactory to Seller.

8.4    **Documents**.  Seller shall have received a signed copy of this Agreement with all Schedules and Exhibits attached, as updated through and including the Closing and copies of all such other documents and certificates executed and delivered hereunder.

# ARTICLE IX
## SURVIVAL

9.1    **Survival**.  Sections 2.7, 2.8, 2.9, 5.1(d), 5.7, 5.8, 5.10, 5.13, 5.14, 5.16, 5.17, 5.18, 5.19, and 5.20, this Section 9.1 and Article 11, and all defined terms used therein, shall survive the Closing, except to the extent (if at all) that such survival is expressly limited herein.  The representations and warranties of the Parties shall expire upon the consummation of the Closing.

# ARTICLE X
## LIMITED AGREEMENT TERMINATION RIGHTS

10.1    **Termination of Agreement**.  This Agreement and the transactions contemplated hereby may be terminated prior to the Closing Date only as follows:

(a)    by mutual written consent of Purchaser and Seller;

(b)    except as otherwise provided in this Agreement, by either Party if the Closing shall not have occurred on or before the Closing Date;

23

(c)   by Purchaser if any of the conditions to the obligations of Purchaser to close set forth in Article VII shall have become incapable of fulfillment other than because of a breach by Purchaser of any covenant or agreement contained in this Agreement and such condition is not waived by Purchaser;

(d)   by Purchaser if there shall be a material breach by Seller, as determined by the Bankruptcy Court, of the representations and warranties, taken as a whole, or of any material covenant or agreement contained in this Agreement which breach cannot be or has not been cured within ten (10) Business Days after the giving of written notice by Purchaser to Seller of such breach;

(e)   by Seller if any of the conditions to the obligations of Seller to close set forth in Article VIII shall have become incapable of fulfillment other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement and such condition is not waived by Seller;

(f)   by Seller if there is a material breach by Purchaser, as determined by the Bankruptcy Court, of the representations and warranties, taken as a whole, or of any material covenant or agreement contained in this Agreement which breach cannot be or has not been cured within ten (10) Business Days after the giving of written notice by Seller to Purchaser of such breach; or

(g)   Intentionally deleted.

(h)   Intentionally deleted.

(i)   by Seller or Purchaser if the Bankruptcy Court fails to enter the Sale Order by July 2, 2026.

(j)   by Seller or Purchaser if the Closing shall not have occurred by July 7, 2026.

(k)   Intentionally deleted.

10.2   **Procedure for Termination**.  If this Agreement is terminated by Purchaser or Seller, or both, pursuant to Section 10.1, written notice thereof shall forthwith be given to the other party, and upon the giving of such notice (or at such time as specified in the particular termination right set forth in Section 10.1) the transactions contemplated hereunder shall be abandoned and this Agreement shall terminate to the extent and with the effect provided in Section 10.3, without further action by the parties.

10.3   **Effects of Termination**.  If this Agreement is validly terminated as provided herein, then each party shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without Liability to any party; provided, however, that (i) the obligations of the parties set forth in Article XI of this Agreement, and to the extent necessary to effectuate the foregoing enumerated provisions, Article I of this Agreement, shall survive any such termination and shall be enforceable in accordance with their terms, and (ii) if this Agreement is terminated as provided herein, each party shall upon request redeliver or destroy as soon as practicable any or all documents, work papers and other material

24

of the other party relating to its business or affairs or the transactions contemplated hereunder, whether obtained before or after the execution hereof, to the party furnishing the same, other than any material which is of public record.  Nothing in this Section 10.3 shall relieve the parties of any Liability for a breach of this Agreement prior to the date of termination.  Notwithstanding the foregoing, if this Agreement is terminated pursuant to Section 10.1(c) or (d) or if Seller terminates this Agreement pursuant to Section 10.1(b), (i), or (j), Seller's counsel shall promptly return the Deposit to Purchaser by wire transfer of immediately available funds and this Agreement shall forthwith become void and have no further force or effect, without any liability or obligation on the part of Seller or Purchaser (except for a pre-termination breach of this Agreement).  If this Agreement is terminated pursuant to Section 10.1(e) or (f) or if Purchaser terminates this Agreement pursuant to Section 10.1(b), (i), or (j), the Deposit shall be released for the benefit of Seller as liquidated damages and not as a penalty and this Agreement shall forthwith become void and have no further force or effect, without any liability or obligation on the part of Seller or Purchaser (except for a pre-termination breach of this Agreement).

## ARTICLE XI
## MISCELLANEOUS

11.1   **Assignment; Binding Agreement**.

(a)   Except as set forth in Section 11.1(c), neither this Agreement nor any rights or obligations of a Party hereunder may be assigned or delegated without the other Party's prior written consent.  Any purported assignment or delegation without such consent shall be void.

(b)   This Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the Parties hereto and to their respective successors and permitted assigns.  Nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights, remedies, obligations, or Liabilities.

11.2   **Post-Closing Cooperation**.  From time to time after the Closing, Seller will execute and deliver, or cause to be executed and delivered, such documents to Purchaser as Purchaser shall reasonably request in order to consummate more effectively the transactions contemplated by this Agreement, including, without limitation, the transfer of the Assets to Purchaser.  From time to time after the Closing, Purchaser will execute and deliver, or cause to be executed and delivered, such documents to Seller as Seller shall reasonably request in order to consummate more effectively the transactions contemplated by this Agreement, including, without limitation, Purchaser's assumption of the Assumed Liabilities.  From and after the Closing, Seller shall use its commercially reasonable efforts to deliver to Purchaser all such books, reports and other documents that constitute or relate to Assets (which may be redacted to the extent not relevant to the Assets) as may be requested by Purchaser which were not delivered on or before the Closing Date, and to assist the Purchaser in obtaining any Authorizations not obtained by Purchaser prior to the Closing.

11.3   **Expenses**.  Except as set forth in this Agreement, each Party shall pay the fees and expenses of its respective counsel, accountants, and other experts and shall pay all other expenses incurred by it in connection with the negotiation, preparation, and execution of this Agreement and the consummation of the transactions contemplated hereby.

11.4    **Entire Agreement and Modification**.  This Agreement, including any Exhibits and Schedules attached hereto and thereto and any other documents hereby required to be delivered at the Closing, and any confidentiality agreement previously executed by Seller and Purchaser or Purchaser's Affiliate, constitute the entire agreement between the Parties and supersede all prior discussions, negotiations, or agreements relating to the subject matter of this Agreement.  No changes of, additions to, or other modifications of this Agreement shall be valid unless the same is in writing and signed by the Parties.

11.5    **Severability**.  If any provision of this Agreement shall be determined to be contrary to Law and unenforceable by any Court, the remaining provisions shall be severable and enforceable in accordance with their terms.  To the extent any provision of this Agreement is enforceable in part but not in whole, such provision shall be enforced to the maximum extent permitted by applicable Law.

11.6    **Waiver**.  Any of the conditions to Closing set forth in this Agreement, except for those set forth in Article VI, may be waived at any time prior to or at the Closing hereunder by the Party entitled to the benefit thereof.  Any such waiver shall only be effective if it is in writing and signed by the Party to be charged with such waiver.  The failure of any Party hereto to enforce at any time any of the provisions of this Agreement shall in no way be construed to be a waiver of any other breach of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of such Party thereafter to enforce each and every such provision.  No waiver of any breach of or non-compliance with this Agreement shall be held to be a waiver of any other or subsequent breach or non-compliance.

11.7    **Counterparts**.  This Agreement may be executed in multiple counterparts, by the Parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.  All signatures of the Parties to this Agreement may be transmitted by email or facsimile, and such email or facsimile of signature will, for all purposes, be deemed to be the original signature of such Party whose signature it reproduces and will be binding upon such Party.

11.8    **Headings; Interpretation**.  The table of contents and article and section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

11.9    **Governing Law**.  This Agreement shall be construed and interpreted according to the Laws of the State of North Carolina, without regard to the application of the choice of law principles thereof.  All of the conveyance documents executed and delivered pursuant to the terms hereof shall be governed by and continued and interpreted according to the Laws of the State of North Carolina, without regard to the application of the choice of law principles thereof.

11.10   **Bankruptcy Court Jurisdiction**.

(a)      Purchaser and Seller agree that the Bankruptcy Court shall have exclusive jurisdiction over all disputes, Claims, and other controversies (collectively, "Disputes") and other matters relating to (a) the interpretation and enforcement of this Agreement or any document executed pursuant hereto; (b) the Assets; (c) the Assumed Liabilities and other obligations assumed

26

by the Purchaser under this Agreement; and (d) any obligations surviving Closing, as long as the Bankruptcy Court reserves such jurisdiction, and Purchaser expressly consents to and agrees not to contest such exclusive jurisdiction.

(b)      The parties shall jointly request that the Bankruptcy Court reserve jurisdiction to consider Disputes arising under this Agreement even after the closing of the Bankruptcy Case.  To the extent allowed under existing and controlling law in the Fourth Circuit as of the Closing Date, the parties consent to the jurisdiction of the Bankruptcy Court to hear all such Disputes and to enter final orders with respect to all matters and issues raised therein.

11.11   **Notices**.  All notices, requests, demands and other communications hereunder shall be deemed to have been duly given if the same shall be in writing and shall be delivered or sent (a) by personal delivery against a receipted copy, (b) by certified mail, return receipt requested, or (c) by e-mail if the addressee confirms receipt of the e-mail, and addressed as set forth below:

If to Purchaser to:                         If to Seller, to:

_____         Charles & Colvard, Ltd.
c/o _____         c/o Rebecca Redwine Grow
_____         Hendren, Redwine & Malone, PLLC
_____         4600 Marriott Drive, Suite 150
_____         Raleigh, North Carolina 27612
E-Mail: _____         E-Mail: rredwine@hendrenmalone.com

A Party may change the address to which notices hereunder are to be sent to it by giving notice of such change of address in the manner provided above.  Any notice delivered personally shall be deemed to have been given on the date it is so delivered, or upon attempted delivery if acceptance of delivery is refused.

11.12   **Effectiveness**.  This Agreement shall be effective only when duly signed by Seller and approved by the Bankruptcy Court.

11.13   **No Third-Party Beneficiaries.**  Nothing expressed or referred to in this Agreement will be construed to give any person other than the  Parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement, except as such rights as shall inure to a successor or permitted assignee pursuant to this Agreement.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

SELLER: Charles & Colvard, Ltd.

27

By:_____
Print Name:
Title:


PURCHASER: _____


By:_____
Print Name:
Title:

**Schedules and Exhibits**

| | |
|---|---|
| Schedule 1 | List of Excluded Assets |
| Schedule 5 | List of Permitted Encumbrances |
| Schedule 7 | List of Taxes and Assessments |
| Schedule 2.7 | Assumed Contracts |
| Schedule 2.8(d) | List of Assumed Contracts with Cure |
| | |
| Exhibit A | Form of Bill of Sale and Assignment |

29

## SCHEDULE 1

### Excluded Assets

"Excluded Assets" means the following assets, properties, interests, and rights of Seller or its Affiliates:

(a)     all cash and cash equivalents (excluding Accounts Receivable) on hand as of the Closing;

(b)     any rights, Claims, counterclaims, third party Claims or causes of action of Seller against any Person and any actions under Chapter 5 of the Bankruptcy Code, including, without limitation, under Sections 542, 544, 545, 547, 548, 549, 550, 551, 553 and 724(a) of the Bankruptcy Code;

(c)     all Actions and/or causes of actions that Seller has brought and/or may bring against any Person relating to any Excluded Asset and/or Excluded Liabilities, including, without limitation, all Actions and/or causes of action that Seller may bring against any current or former director, officer, employee, or consultant;

(d)     all insurance policies and all rights to proceeds thereunder, including, without limitation, any director or officer insurance policies relating to any matter, event or circumstance occurring on or prior to the Closing Date, except as otherwise provided for in Section 5.10;

(e)     the residual rights in and proceeds of any employee benefits plans that are not transferred to Seller;

(f)     all Contracts, Permits, and other assets that require a consent (taking into consideration the provisions of the Bankruptcy Code), to transfer same unless (i) such written consent is obtained and (ii) Purchaser assumes all post-assignment liabilities arising thereunder, excluding all Cure Payments, if applicable (it being understood that Seller shall not be required to obtain or attempt to obtain any such consent);

(g)     all executory contracts and unexpired leases of the Debtor that are not identified on Schedule 2.7;

(h)     all rights or documents relating to any Excluded Liability or other Excluded Asset;

(i)     any rights or remedies provided to Seller under this Agreement and applicable Law and each other document executed in connection with the Closing;

(j)     any (i) personnel files for employees of Seller who are not hired by Purchaser; (ii) other books and records that Seller is required by Law to retain; provided, however, that except as prohibited by Law and subject to Article 5, Purchaser shall have the right, at Purchaser's sole expense, to receive or make copies of any portions of such retained books and records that relate to the Business as conducted before the Closing or that relate to any of the Assets; (iii) documents which Seller is not permitted to transfer pursuant to any contractual obligation owed to any third party; (iv) documents primarily related to any Excluded

30

Assets; and (v) documents necessary to prepare tax returns (Purchaser shall be entitled to a copy of such documents referred to in this clause (v));

(k)     all of Seller's deposits and other prepaid charges and expenses paid in connection with or relating to any Excluded Assets;

(l)     any assets disposed of or consumed in the ordinary course of business (except any disposed of or consumed in breach of the provisions of this Agreement) during the period between the date hereof and the Closing Date;

(m)     Seller's minute book and similar corporate records; and

(n)     any Privilege that relates to any Excluded Asset or any Excluded Liability.

## SCHEDULE 5

### Permitted Encumbrances

NONE

**SCHEDULE 7**

**Taxes and Assessments**

[To Be Provided]

**SCHEDULE 2.7**

**Assumed Contracts**

[To Be Provided]

EXHIBIT A

[To Be Provided]