**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | |
| **CHARLES & COLVARD, LTD.** | ) | **Case No. 26-00969-5-DMW** |
| | ) | |
| **Debtor.** | ) | **Chapter 11** |
| | ) | |

# DISCLOSURE STATEMENT
**August 31, 2026**

**HENDREN, REDWINE & MALONE, PLLC**

s/ Rebecca Redwine Grow
Jason L. Hendren (NC State Bar No. 26869)
Rebecca Redwine Grow (NC State Bar No. 37012)
Benjamin E.F.B. Waller (NC State Bar No. 27680)
Lydia C. Carpenter (NC State Bar No. 56697)
4600 Marriott Drive, Suite 150
Raleigh, NC 27612
Telephone: (919) 573-1422
Facsimile: (919) 420-0475
Email: jhendren@hendrenmalone.com
rredwine@hendrenmalone.com
bwaller@hendrenmalone.com
lcarpenter@hendrenmalone.com
COUNSEL FOR THE DEBTOR

TABLE OF CONTENTS


I. Introduction ... 3
A. Purpose of This Document ... 3
B. Deadlines for Voting and Objecting
Date of Plan Confirmation Hearing ... 4

II. Classification and Treatment of Classes of Claims and Interests ... 4

A. What is the Purpose of the Plan of Reorganization ... 4
B. Administrative Expenses and Tax Claims ... 4
1. Administrative Costs ... 5
2. Priority Tax Claims ... 5
C. Classes of Claims and Equity Interests ... 5
1. Class of Priority Unsecured Claims ... 5
2. Classes of Secured Claims ... 5
3. Class of General Unsecured Claims ... 5
4. Class of Equity Interest Holders ... 5

III. History and Post-Petition Operations ... 6

IV. Treatment of Executory Contracts and Unexpired Leases ... 6

V. Means of Implementation and Execution of the Plan ... 7

VI. Acceptance or Rejection of Plan; Effect of Rejection by an Impaired Class ... 13

VII. "Cramdown" for Impaired Creditors Not Accepting the Plan ... 14

VIII. Disclaimer ... 15

IX. Payments Under Plan are in Full and Final Satisfaction of Debt ... 15

X. Potential Material Federal Tax Consequences ... 16
A. Tax Consequences to the Debtor ... 16
B. Tax Consequences to Creditors ... 17

XI. Provisions for Voting on a Plan ... 17

XII. Acceptance and Confirmation ... 18

XIII. Effect of Confirmation ... 20

XIV. Recommendation and Conclusion ... 21

XV. Other Sources of Information Available to Creditors and Parties in Interest ... 21

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | |
| **CHARLES & COLVARD, LTD.** | ) | **Case No. 26-00969-5-DMW** |
| | ) | |
| **Debtor.** | ) | **Chapter 11** |
| | ) | |

**DISCLOSURE STATEMENT**

Pursuant to the provisions of Section 1125(b) of the Bankruptcy Code, the Debtor hereby submits the following information:

## I. INTRODUCTION

### A. Purpose of This Document

The purpose of this Disclosure Statement ("Disclosure Statement") is to provide each holder of a claim against the Debtor with adequate information about the Debtor and the Debtor's Plan of Reorganization so that each holder of a claim may make an informed decision about whether to accept or reject the Plan. Attached hereto as **Exhibits "A"** and **"B"** are summaries of the Debtor's assets and liabilities. **Exhibit "C"** is the Liquidation Analysis of the Debtor.

This Disclosure Statement describes:

1. The Debtor and significant events during the bankruptcy case;
2. Who can vote on or object to the Plan;
3. What factors the Bankruptcy Court (the "Court") will consider when deciding whether to confirm the Plan;
4. Why the Debtor believes the Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation; and
5. The effect of confirmation of the Plan.

The Plan describes:

1. How the Debtor proposes to treat claims or equity interest of the type you hold (*i.e.,* what you will receive on your claim or equity interest if the Plan is confirmed); and
2. The classification of claims and interests and the treatments of the classes of claims and interests, including a description of whether each class is impaired or unimpaired.

### B. Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing

The Court has not yet confirmed the Plan. This section describes the procedures pursuant to which the Plan will or will not be confirmed.

1. *Time and Place of the Hearing to Confirm the Plan*

The hearing at which the Court will determine whether to confirm the Plan will be scheduled by the Court and you will receive an Order setting forth the date, time and place.

2. *Deadline for Voting to Accept or Reject the Plan*

If you are entitled to vote to accept or reject the Plan, vote on the enclosed ballot and return the ballot in the enclosed envelope to Hendren, Redwine & Malone, PLLC, 4600 Marriott Drive, Suite 150, Raleigh, NC 27612 by 5:00 p.m. on the ballot deadline. See information below for a discussion of voting eligibility requirements.

Your ballot must be received by the date set by the Court or it will not be counted.

3. *Deadline For Objecting to the Adequacy of Disclosure and Confirmation of the Plan*

Objections to this Disclosure Statement or to the confirmation of the Plan must be filed with the Court and served upon the Debtor's attorney by the date set by the Court.

## II. CLASSIFICATION AND TREATMENT OF CLASSES OF CLAIMS AND INTERESTS

**The Debtor's Plan of Reorganization ("Plan"), which accompanies this Disclosure Statement, is incorporated herein by reference. Section IV of the Plan describes the classification of claims and interests and the treatment of the classes of claims and interests, including a description of whether each class is impaired or unimpaired.**

### A. What is the Purpose of the Plan of Reorganization?

As required by the Code, the Plan places claims and equity interests in various classes and describes the treatment that each class will receive. The Plan also states whether each class of claims or equity interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

### B. Administrative Expenses and Tax Claims

The following types of claims are addressed in the Plan:

1. *Administrative Costs*

Administrative costs are costs or expenses of administering the Debtor's Chapter 11 case which are allowed under Section 507(a)(2) of the Code. Administrative expenses may also include the value of any goods sold to the Debtor in the ordinary course of business and received within twenty (20) days before the date of the bankruptcy.

2. *Priority Tax Claims*

Priority tax claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code. Unless the holder of a priority tax claim agrees otherwise, it must receive the present value of such claim, in regular installments paid over a period not exceeding five years.

**C. Classes of Claims and Equity Interests**

The following classes are also addressed in the Plan. The Plan describes the proposed treatment that they will receive under the Plan:

1. *Class of Priority Unsecured Claims*

Certain priority claims that are referred to in Sections 507(a)(1), (4), (5), (6) and (7) of the Code are required to be placed in classes. The Code requires that each holder of such a claim receives cash on the effective date of the Plan equal to the allowed amount of such claim. However, a class of holders of such claims may vote to accept different treatment.

2. *Class of Secured Claims*

Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code. The specific classes are described in Section IV of the Plan.

3. *Class of General Unsecured Claims*

General unsecured claims are not secured by property of the estate and are not entitled to priority under Section 507(a) of the Code.

4. *Class of Equity Interest Holders*

Equity interest holders are parties who hold an ownership interest (*i.e.* equity interest) in the Debtor. In a corporation, entities holding preferred or common stock are equity interest holders. In a partnership, equity interest holders include both general and limited partners. In a limited liability company ("LLC"), the equity interest holders are the members.

## III. HISTORY AND POST-PETITION OPERATIONS

The Debtor is a North Carolina corporation founded in 1995 and headquartered in Morrisville, North Carolina. The Debtor was founded as C3 Diamante, Inc., and changed its name to C3, Inc. by Articles of Amendment filed on April 10, 1996. The Debtor subsequently changed its name to Charles & Colvard, Ltd. by Articles of Amendment filed on May 17, 2000.

At all relevant times, the Debtor was a globally recognized fine jewelry company specializing in lab-created gemstones. Its common stock was quoted on the OTC Experts Market under the symbol "CTHR." The Debtor manufactured, marketed, and distributed Charles & Colvard Created Moissanite® including its premium moissanite gemstone brand, Forever One™, as well as Caydia®, its brand of premium lab-grown diamonds. The Debtor offered gemstones and finished jewelry featuring its proprietary moissanite jewels, premium lab-grown diamonds, created color gemstones, and most recently, lab-grown diamonds in color, for sale in the worldwide fine jewelry market through two operating segments: its Online Channels segment, which encompassed its digital properties components, comprised of its charlesandcolvard.com, moissaniteoutlet.com, charlesandcolvarddirect.com, and madenetwork.com websites; e-commerce outlets, including marketplaces, drop-ship customers, and other pure-play, exclusively e-commerce customers; and its Traditional segment, which consisted of domestic and international distributors and retail customers, including end-consumers through its first Charles & Colvard Signature Showroom, which opened in October 2022. As of the Petition Date, the Debtor had a total of 26 full-time employees and 1 part-time employee.

Over the last decade, lab-grown diamonds and gemstones have transformed the diamond industry; consumers have shifted towards lab-grown diamonds and gemstones as a more affordable alternative to natural diamonds in fine jewelry and engagement rings. The market has seen a steep increase in consumer demand for lab-grown diamonds and gemstones; however, increasing saturation in the market of companies producing lab-grown diamonds and gemstones continues to drive down the value of these gems. There has also been increasing competition in e-commerce for consumer fine jewelry (Blue Nile, Brilliant Earth, others).

In recent years, there has been a dramatic decline in prices for moissanite and lab-grown diamond gemstones, relative to the Debtor's investment in moissanite inventory. This has been coupled with a significant increase in prices for precious metals, which the Debtor uses in settings for finished jewelry. Additionally, inflation, economic headwinds, and an evolving competitive landscape have negatively impacted the jewelry and gemstone industry in recent years.

In 2025, due to inflationary concerns, continued economic headwinds, and an evolving competitive landscape that continued to negatively impact the jewelry industry, the Debtor took steps to mitigate the effects on its business. These strategic measures included a reduction in headcount, a review and renegotiation of vendor contracts, consolidation of its supply chain, and a shift to a more cost-effective freight partner.

In addition to these market pressures, the Debtor faced a variety of financial and legal difficulties in the last few years, including, but not limited to, major changes in the company's Board of Directors and executive leadership, the company's delisting from the Nasdaq Stock

Exchange in April of 2025, a confidential arbitration dispute with Wolfspeed, Inc., as well as legal challenges to certain corporate actions by Riverstyx Fund, L.P., and litigation commenced by Ethara Capital, LLC. In the months leading to the Petition Date, the Debtor struggled to recover from the hardships it faced over the previous several years, and the filing was precipitated by these various factors. Additionally, in the months leading to filing, the Debtor unsuccessfully sought alternative financing and exhausted all alternative transactions. As a result, the Debtor filed this case on March 2, 2026. The Debtor filed this case to explore opportunities to market and sell its assets for fair market value, for the benefit of all creditors.

On a post-petition basis, the Debtor has complied with all Bankruptcy Rule 4002 requirements as required by the local rules. The 341 Meeting of Creditors was held on April 13, 2026 and the intake conference was completed on April 6, 2026.

On April 15, 2026, the Debtor filed a Motion for Order (I) Approving Private Sale of Personal Property Free and Clear of Liens, Claims, Encumbrances, and Interests; (II) Approving Stalking Horse Bidder; (III) Approving Stalking Horse Break-Up Fee; (IV) Approving Overbid Procedures and Auction; and (V) Scheduling Hearing for Final Approval of Sale of Assets filed on April 15, 2026 [DE# 71] (the "Stalking Horse Motion").

The Stalking Horse Motion was initially allowed by Order entered on April 29, 2026 [DE# 86] (the "Stalking Horse Order"), which scheduled an auction sale as well as a final sale hearing for June 22, 2026. On June 22, 2026, the Court held a final hearing on the Stalking Horse Motion (the "Final Sale Hearing") in Raleigh, North Carolina to approve and confirm the sale of the Assets to the Successful Bidder.

Following the Final Sale Hearing, the Court entered a Final Order: (I) Approving Private Sale of Personal Property Free and Clear of Liens, Claims, Encumbrances, and Interests; and (II) Approving Successful Bidder [DE# 114] (the "Final Sale Order"), whereby AJS Creations, Inc. ("AJS") was approved as the Successful Bidder (as defined in the Stalking Horse Order) with a winning bid in the amount of $2,700,000.00 for the Assets (as defined in the Final Sale Order). The Debtor received the balance of the $2,700,000.00 purchase price (less the required deposit previously received) from AJS on July 1, 2026 (the "Liquidation Proceeds").

On August 10, 2026, the Debtor filed a Motion for Order Authorizing Disbursement of Sale Proceeds [DE# 134] seeking authorization to disburse the Liquidation Proceeds (the "Disbursement Motion"). The Disbursement Motion remains pending.

## IV. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Except as specified in this Plan or as otherwise set forth in separate Motions before this Court, all contracts which exist between the Debtor and any individual or entity, whether such contract be in writing or oral, which have not heretofore been rejected or otherwise approved by Orders of the Court are hereby specifically rejected.

## V. MEANS OF IMPLEMENTATION AND EXECUTION OF THE PLAN

A. **Overview**. The Plan provides for payments to creditors consistent with the priority provisions of the Bankruptcy Code. The Debtor shall make payments under the Plan from cash on hand, from Litigation Proceeds, and from the net proceeds from the sale, liquidation, or other disposition of the Remaining Assets (including the litigation of Retained Causes of Action). The Plan also creates a mechanism for the Litigation Trustee to pursue claims and Causes of Action, including Chapter 5 Actions and potential D&O Claims to enable recoveries to Creditors herein.

B. **Establishment of Litigation Trust; Appointment of Litigation Trustee**. Prior to the Effective Date, the Debtor shall execute the Litigation Trust Agreement. The Litigation Trust Agreement is incorporated into the Plan in its entirety as if set forth in full therein. The Litigation Trust Agreement contains provisions customary to trust agreements utilized in comparable circumstances, including, but not limited to, provisions necessary to ensure the continued treatment of the Litigation Trust as a grantor trust.

On the Effective Date, and in accordance with the Confirmation Order, the Estate's title to all the Assets shall automatically pass to the Litigation Trust, free and clear of all Claims and Equity Interests in accordance with Section 1141 of the Bankruptcy Code. Notwithstanding the foregoing, the Debtor reserves the right to modify the Plan to exclude certain Assets from transfer to the Litigation Trust. The Confirmation Order shall constitute a determination that the transfers of the Assets to the Litigation Trust are legal and valid and consistent with the laws of the State of North Carolina.

All parties shall execute any documents or other instruments as necessary to cause title to the applicable Assets to be transferred to the Litigation Trust. The Assets will be held in trust for the benefit of all holders of Allowed Claims pursuant to the terms of the Plan and the Litigation Trust Agreement.

The Litigation Trustee shall be John C. Bircher III or such other person that may be identified in a Plan supplement to be filed prior to confirmation. The Litigation Trustee will pay or otherwise make distributions on account of all Allowed Claims against the Debtor in accordance with the terms of the Plan.

**The Plan shall be interpreted so as to afford, for the benefit of all holders of Allowed Claims, the greatest opportunity for maximum recovery by the Litigation Trustee on the Assets, Chapter 5 Actions, potential D&O Claims, and rights in and to proceeds of any insurance policies. The proceeds of all Causes of Action will potentially increase recoveries to Creditors herein**.

C. **Income Tax Status of Litigation Trust**. For federal income tax purposes, all parties (including, without limitation, the Debtor, the Litigation Trustee, and the Beneficiaries of the Litigation Trust Estate) shall treat the Litigation Trust as a liquidating trust within the meaning of Treasury Income Tax Regulation section 301.7701-4(d) and IRS Revenue Procedure 94-45, 1994-2 C.B. 124. For federal income tax purposes, the transfer of Assets to the Litigation Trust

under the Plan shall be treated as a deemed transfer to the Beneficiaries of the Litigation Trust Estate in satisfaction of their Claims followed by a deemed transfer of the Assets by the Beneficiaries to the Litigation Trust. For federal income tax purposes, the Beneficiaries will be deemed to be the grantors and owners of the Litigation Trust and its Assets. For federal income tax purposes, the Litigation Trust will be taxed as a grantor trust within the meaning of Internal Revenue Code ("IRC") sections 671-677 (a non-taxable passthrough tax entity) owned by the Beneficiaries. The Litigation Trust will file federal income tax returns as a grantor trust under IRC section 671 and Treasury Income Tax Regulation section 1.671-4 and report, but not pay tax on, the Litigation Trust's tax items of income, gain, loss deductions, and credits ("Tax Items"). The Beneficiaries will report such Tax Items on their federal income tax returns and pay any resulting federal income tax liability. All parties will use consistent valuations of the Assets transferred to the Litigation Trust for all federal income tax purposes. The Assets shall be valued based on the Litigation Trustee's good faith determination of their fair market value.

D. **Powers and Authority of the Litigation Trustee**. The powers of the Litigation Trustee are set forth in full in the Litigation Trust Agreement and shall include, among other things: (a) the power to sell, lease, license, abandon, or otherwise dispose of all remaining Assets of the Litigation Trust Estate subject to the terms of this Plan; (b) the power to effect distributions under this Plan to the holders of Allowed Claims; (c) the authority to pay all costs and expenses of administering the Litigation Trust Estate after the Effective Date (including the Post-Effective Date Expenses), including the power to employ and compensate persons or professionals to assist the Litigation Trustee in carrying out any of his duties hereunder, and to obtain and pay premiums for insurance and any other powers necessary or incidental thereto; (d) the power to implement this Plan including any other powers necessary or incidental thereto; (e) the authority to prosecute all Causes of Action on behalf of the Debtor and the Litigation Trust Estate, including Chapter 5 Actions and D&O Claims; (f) the authority to settle Claims, applicable Causes of Action, or disputes as to amounts owing to the Estate in his sole discretion; (g) the authority to participate in any post-Effective Date motions to amend or modify this Plan or the Litigation Trust Agreement, or appeals from the Confirmation Order; (h) the authority to participate in actions to enforce or interpret this Plan; (i) the authority to manage the Litigation Trust Estate; and (j) the power to bind the Litigation Trust. Each of the foregoing powers may be exercised by the Litigation Trustee without further order of the Bankruptcy Court. Notwithstanding any of the foregoing, the Litigation Trustee may not materially amend or alter the terms and provisions of this Plan.

E. **Funding of the Litigation Trust**. The funding of the Litigation Trust for the payments to be made to holders of Allowed Claims under the Plan and the payment of Post-Effective Date Expenses will be from (i) the Litigation Trust Expense Reserve, (ii) the Debtor's cash on hand as of the Effective Date, which will be transferred to the Litigation Trust as of the Effective Date and proceeds from any investment of such cash, and (iii) the proceeds of the liquidation of the Assets, including, without limitation, any claims or Causes of Action.

F. **Litigation Trust's Post-Effective Date Expenses**. All expenses related to implementation of the Plan incurred from and after the Effective Date through the date on which the Litigation Trust is dissolved will be expenses of the Litigation Trust, and the Litigation Trustee will disburse funds from the Litigation Trust Expense Reserve, as appropriate, for purposes of paying the Post-Effective Date Expenses of the Litigation Trust without the need for any further

Order of the Court and in his sole discretion. The Post-Effective Date Expenses shall include, but are not limited to, the fees and expenses of the Litigation Trustee, the fees and expenses of the Professionals employed by the Litigation Trustee, fees and expenses of the board members to assist the Litigation Trustee, and other costs, expenses and obligations of the Litigation Trust until the date the Litigation Trust is terminated in accordance with section VI(J) hereof and the Litigation Trust Agreement.

Prior to making a distribution to any holders of Allowed Claims under the Plan, the Litigation Trustee may place in reserve and/or in a separate account any funds that may be needed to pay Claims that are subject to dispute and Claims that have otherwise not been Allowed in the event that all or a portion of such Claims become Allowed Claims (the **"Distribution Reserve"**). When a Claim is Allowed or Disallowed (and thus becomes an Allowed Claim or a Disallowed Claim, in whole or in part), the funds set aside on account of such Claim shall be released from the Distribution Reserve and shall be available for distribution in accordance with the terms of this Plan to either (i) the Holder of the Claim that has become an Allowed Claim, or (ii) if Disallowed, the Holders of Allowed Claims. Consistent with the terms of this Plan, the Litigation Trustee, in his sole discretion, on and after the Effective Date, shall have authority to increase or decrease the Distribution Reserve, as reasonably necessary and appropriate, and upon satisfaction of all Allowed Claims required to be paid from the Distribution Reserve, to transfer amounts held therein for distribution pursuant to the Plan.

G. **Use of Existing Accounts**. The Litigation Trustee may use the Debtor's existing bank accounts (as of the Effective Date) for the purposes set forth herein, to the extent possible and desired. The Litigation Trustee also may close the Debtor's existing bank accounts, at his discretion, and transfer all amounts therein to one or more accounts, in accordance with the terms of this Plan. Alternatively, notwithstanding any provisions to the contrary in this Plan, the Litigation Trustee may invest some or all the funds that would otherwise be deposited into the accounts established pursuant to the Plan in allowed investments under applicable non-bankruptcy law.

H. **Employment and Compensation**. The Litigation Trustee shall be bonded and shall receive compensation for serving as Litigation Trustee as set forth in the Litigation Trust Agreement. At any time after the Effective Date and without further Order of the Bankruptcy Court, the Litigation Trustee may employ Persons or Entities, including Professionals (which may, but need not, include Professionals previously or currently employed in the Chapter 11 Case) reasonably necessary to assist the Litigation Trustee in the performance of his duties under the Litigation Trust Agreement and this Plan. Such Persons or Entities shall be compensated and reimbursed by the Litigation Trustee for their reasonable and necessary fees and out of pocket expenses on a monthly basis in arrears.

I. **Litigation Trustee as Successor in Interest to the Debtor**. The Litigation Trustee is the successor in interest to the Debtor, and thus, after the Effective Date, to the extent this Plan requires an action by the Debtor, the action shall be taken by the Litigation Trustee. For federal and applicable state income tax purposes, all parties (including, without limitation, the Debtor, the Litigation Trustee, and the Beneficiaries of the Litigation Trust Estate) shall treat the transfer of Assets to the Litigation Trust as a sale by the Debtor of such Assets to the Litigation Trust Estate

at a selling price equal to the fair market value of such Assets on the Effective Date. The Litigation Trust shall be treated as the owner of all Assets that it holds.

J. **Termination of the Litigation Trust Estate**. The existence of the Litigation Trust and the authority of the Litigation Trustee will commence as of the Effective Date and will remain and continue in full force and effect until the earlier of (a) the date on which all of the Assets are liquidated in accordance with the Plan, the funds in the Litigation Trust have been completely distributed in accordance with the Plan, all tax returns and any other filings or reports have been filed with the appropriate state or federal regulatory authorities and the Order closing the Chapter 11 Case is a Final Order; or (b) seven (7) years after the date of creation of the Litigation Trust, unless extended by the Bankruptcy Court as provided in the Litigation Trust Agreement.

At such time as the Litigation Trust has been fully administered (*i.e.*, when all things requiring action by the Litigation Trustee have been done, and the Plan has been substantially consummated) and in all events within sixty (60) days after the Final Distribution Date, the Litigation Trustee will file an application for approval of his final report and the entry of the final decree by the Bankruptcy Court.

K. The Debtor or Litigation Trustee, as appropriate, will execute and deliver all documentation to the Court and to all parties in interest who are entitled to receive the same as required by the terms of the Plan and the Code.

L. The Debtor or Litigation Trustee, as appropriate, shall take such other action as necessary to satisfy the other terms and requirements of the Plan and the Code.

M. Default. If not otherwise specified within each class treatment, the Litigation Trustee shall have thirty (30) days to cure any payment default upon written notice from the creditor to the Litigation Trustee.

N. Confirmation of the Plan shall constitute a finding that the Debtor (or Litigation Trustee, as appropriate) does not waive, release or discharge, but rather retains and reserves any and all pre-petition claims and any and all post-petition claims that it could or might assert against any party or entity arising under or otherwise related to any state or federal statute, state or federal common law, and ,any and all violations arising out of rights or claims provided for by Title 11 of the United States Code, by the Federal Rules of Bankruptcy Procedure, or by the Local Rules of this Court, including all rights to assert and pursue any and all avoidance actions, preference actions, and any other actions pursuant to 11 U.S.C. §§ 545, 546, 547, 548, 549 and 550, except to the extent such avoidance actions, preference actions, or other actions were assigned to a creditor(s) as part of this Plan. Further, the Litigation Trustee shall have the right to assert and pursue all claims under 11 U.S.C. § 542, including without limitation actions to seek turnover of estate assets, actions to recover accounts receivable, and/or actions to invalidate setoffs.

O. Administrative claims unpaid on the Effective Date will be paid from funds on hand, from Liquidation Proceeds or as the parties may otherwise agree.

P. All objections to claims, fee applications and adversary proceedings will be filed

with the Court within ninety (90) days of the Effective Date; provided however, that the Litigation Trustee shall retain the right to object or otherwise pursue any claims against secured creditors relating to the payoff and/or satisfaction of their secured claims. Further, no professional shall be required to seek Court approval for fees incurred following the entry of the Order Confirming Plan.

Q. Injunction. From and after the Confirmation Date, in accordance with Section 1141 of the Bankruptcy Code, all holders of "Claims" (including, without limitation, Secured Claims, Priority Claims, General Unsecured Claims, and Claims on account of asserted Interests) against the Debtor and the Debtor in Possession are permanently restrained and enjoined (a) from commencing or continuing in any manner, any action or other proceeding of any kind with respect to any such Claim against the Debtor (or Litigation Trustee, as appropriate), its officers, directors, employees, and agents, (b) from enforcing, attaching, collecting, or recovering by any manner or means, any judgment, award, decree, or order against the Purchaser, the Debtor (or Litigation Trustee, as appropriate) and its officers, directors, employees, and agents, or the Assets, (c) from creating, perfecting, or enforcing any encumbrance of any kind against the Debtor (or Litigation Trustee, as appropriate) and its officers, directors, employees, and agents, or the Assets, (d) from asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due the Debtor, and (e) from performing any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; provided, however, that each holder of a contested Claim may continue to prosecute its proof of Claim in accordance with the Plan and all holders of Clams shall be entitled to enforce their rights under the Plan.

R. Revocation of Plan. The Debtor has reserved the right to revoke and withdraw the Plan before the entry of the Confirmation order. If the Debtor revokes or withdraws the Plan, or if confirmation of the Plan does not occur, then, with respect to the Debtor, the Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtor, as the case may be, or any other Person or to prejudice in any manner the rights of such Debtor, as the case may be, or Person in any further proceedings involving such Debtor.

S. Authority of the Debtor. The Debtor, consistent with the direction of its voting board members, shall have the authority to implement any term or provisions of the Plan. To the extent that any right is granted to the Debtor under the Plan, then the Debtor shall have authority for so long as the corporation is in existence to carry out any and all acts necessary to fulfill the terms of the Plan. Any authority granted to the Debtor-in-Possession pursuant to the Plan, shall be construed as authority granted to the Debtor.

T. Exemption from stamp tax or transfer tax. Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under the Plan, the creation of any mortgage, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, deeds, or bills of sale or assignments of personal property executed in connection with any of the transactions contemplated under the Plan, will not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax. All sale transactions consummated by the Debtor and approved by the Bankruptcy Court on and after the Petition Date through and including the Effective Date, including, without limitation,

the sale by the Debtor of owned property pursuant to Section 363(f) of the Bankruptcy Code and the assumption, assignment and sale by the Debtor of unexpired leases of non-residential property pursuant to Section 365(a) of the Bankruptcy Code, will be deemed to have been made under, in furtherance of, or in connection with the Plan and, thus, will not be subject to any stamp, real estate transfer, mortgage recording or other similar tax. In addition, each of the relevant state or local governmental officials or agents will forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment consistent with the applicable provisions of this Plan.

U. Except as expressly stated in the Plan, or allowed by a Final Order of the Court, no interest, penalty, or late charge shall be allowed on any claim subsequent to the Petition Date, unless otherwise required by the Code. No attorney's fees or expenses shall be paid with respect to any claim except as specified herein or as allowed by a final Order of the Court.

V. Unclaimed Property. If any distribution remains unclaimed for a period of ninety (90) days after it has been delivered, or attempted to be delivered, such unclaimed property shall be forfeited by such holder of the claim and the Disbursing Agent as defined in the Plan shall not attempt to make any further distribution of such holder of the claim. Undistributed property shall be returned to the Debtor for further distribution in accordance with the Plan.

## VI. ACCEPTANCE OR REJECTION OF PLAN; EFFECT OF REJECTION BY AN IMPAIRED CLASS

A. Each Impaired Class Entitled to Vote Separately. Each impaired class of claims shall be entitled to have the holder of claims therein vote separately as a class to accept or reject the Plan.

B. Acceptance by a Class of Creditors. Consistent with §1126(c) of the Bankruptcy Code, and except as provided in §1126(e) of the Bankruptcy Code, a class of claims shall have accepted the Plan if the Plan is accepted by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the allowed claims of that class that have timely and properly voted to accept or reject the Plan.

C. Claimants Entitled to Vote. Holders of impaired claims shall be entitled to vote if:

(1) Such claim has been filed against the Debtor in a liquidated amount or has been listed on the Debtor's schedules other than as contingent, unliquidated or disputed, and as to which no proof of claim has been filed. The claim shall be allowed solely for the purpose of voting on the Plan in the amount in which such claim has been filed or listed on the Debtor's schedules;

(2) Such claim has been filed against the Debtor or listed on the Debtor's schedules and is the subject of an existing objection filed by the Debtor, and is temporarily allowed for voting purposes by order of the Court in accordance with Bankruptcy Rule 3018;

(3) Such claim has been filed in an undetermined amount, in which case the creditor shall not be entitled to vote unless the Debtor and the holder of the claim agree on an amount for voting purposes or the Court enters an order setting the amount of the claim that the creditor may ballot.

(4) Any entity holding two or more duplicate claims shall be entitled to vote only one claim.

D. Confirmation Hearing. The Court will set a hearing on the confirmation of the Plan to determine whether the Plan has been accepted by the requisite number of creditors and whether the other requirements for confirmation of the Plan have been satisfied.

E. Acceptances Necessary to Confirm the Plan. At the hearing of confirmation of the Plan, the Court shall determine, among other things, whether the Plan has been accepted by each impaired class. Under §1126 of the Bankruptcy Code, an impaired class of Creditors is deemed to accept the Plan if at least two-thirds (2/3) in amount and more than one-half (1/2) in number vote to accept the Plan. Further, unless there is unanimous acceptance of the Plan by an impaired class, the Court must also determine that class members will receive property with a value, as of the Effective Date of the Plan, that is not less than the amount that such class member would receive or retain if the Debtor was liquidated as of the Effective Date of the Plan under Chapter 7 of the Bankruptcy Code.

F. Confirmation of Plan without Necessary Acceptances. The Bankruptcy Code provides that the Plan may be confirmed even if it is not accepted by all impaired Classes. In order to be confirmed without the requisite number of acceptances of each impaired class, the Court must find that at least one impaired class has accepted the Plan without regard to the acceptances of insiders, and the Plan does not discriminate unfairly against, and is otherwise fair and equitable, to such impaired class. In the event that any class votes against the Plan, the Debtor hereby requests and moves the court under the provisions outlined in Section VII herein, for confirmation pursuant to the "cramdown" provisions of 1129(b) of the Bankruptcy Code. In connection therewith, the Debtor shall be allowed to modify the proposed treatment of the allowed claims in any class that votes against the Plan consistent with 1129(b)(2).

## VII. "CRAMDOWN" FOR IMPAIRED CREDITORS NOT ACCEPTING THE PLAN

With respect to any class of creditors impaired but not accepting the Plan by the requisite majority in number or two-thirds in amount, the proponent of this Plan requests the Court to find that the Plan does not discriminate unfairly and is fair and equitable in respect to each class of claims or interests that are impaired under the Plan and that the Court confirm the Plan without such acceptances by the said impaired classes. The Debtor will also request that the Court establish a value for any assets, the value of which is in dispute between the Debtor and any secured creditor, at a valuation hearing under Section 506 of the Bankruptcy Code, to be scheduled at the same time as the hearing on confirmation of the Plan.

## VIII. DISCLAIMER

All parties are advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan or before voting on any other matter as provided for herein.

Statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan itself, the Disclosure Statement, and all exhibits annexed thereto. The statements contained in this Disclosure Statement are made only as of the date hereof. No assurances exist that the statements contained herein will be correct any time hereafter.

The information contained in this Disclosure Statement is included herein for purposes of soliciting acceptances of the Plan and may not be relied upon for any purpose other than to determine how to vote on the Plan. No representations concerning the Debtor are authorized by the Debtor other than as set forth in this Disclosure Statement. Any other representations or inducements made to solicit your acceptance that are not contained in this Disclosure Statement should not be relied upon by you in arriving at your decision to accept or reject the Plan.

With respect to adversary proceedings, contested matters, other actions or threatened actions, this Disclosure Statement shall not constitute or be construed as an admission of any fact or liability, stipulation, or waiver; rather, this Disclosure Statement shall constitute statements made in connection with settlement negotiations.

This Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving the Debtor or any other party. Furthermore, this Disclosure Statement shall not be construed to be conclusive advice on the legal effects, including, but not limited to the tax effects, of the Debtor's Plan of Reorganization. You should consult your legal or tax advisor on any questions or concerns regarding the tax or other legal consequences of the Plan.

The information contained herein is not the subject of a certified audit and formal appraisals. The Debtor's records are dependent upon internal accounting methods. As a result, valuations and liabilities are estimated. Although substantial efforts have been made to be complete and accurate, the Debtor is unable to warrant or represent the full and complete accuracy of the information contained herein

## IX. PAYMENTS UNDER PLAN ARE IN FULL AND FINAL SATISFACTION OF DEBT

Except as otherwise provided in Section 1141 of the Bankruptcy Code, or the Plan, the payments and distributions made pursuant to the Plan will be in full and final satisfaction, settlement, release, and discharge, as against the Debtor, of any and all claims against, and interest in, the Debtor, as defined in the Bankruptcy Code, including, without limitation, any Claim or Equity Interest accrued or incurred on or before the Confirmation Date, whether or not (i) a proof of claim or interest is filed or deemed filed under Section 501 of the Bankruptcy Code, (ii) such Claim or Equity Interest is allowed under Section 501 of the Bankruptcy Code, or (iii) the holder of such Claim or Equity Interest has accepted the Plan.

## X. POTENTIAL MATERIAL FEDERAL TAX CONSEQUENCES

The following discussion is a summary of certain federal income tax aspects of the Plan for general information only. It should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a Claim or Interest. This discussion does not purport to be a complete analysis or listing of all potential tax factors.

The following discussion is based upon existing provisions of the Internal Revenue Code ("IRC"), existing regulations thereunder, and current administrative rulings and court decisions. No assurance can be given that legislative or administrative changes or court decisions may not be forthcoming which would require significant modification of the statements expressed in this section. Moreover, the tax consequences to holders of the Claims and Interests may vary based upon the individual tax circumstances of each such holder. Nothing herein purports to describe any state, local or foreign tax consequences.

**NO RULING HAS BEEN SOUGHT OR OBTAINED FROM THE IRS WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN OBTAINED BY THE DEBTOR WITH RESPECT THERETO. NO REPRESENTATIONS OR ASSURANCES ARE BEING MADE WITH RESPECT TO THE FEDERAL INCOME TAX CONSEQUENCES AS DESCRIBED HEREIN. CERTAIN TYPES OF CLAIMANTS AND INTEREST HOLDERS MAY BE SUBJECT TO SPECIAL RULES NOT ADDRESSSED IN THIS SUMMARY OF FEDERAL INCOME TAX CONSEQUENCES. THERE MAY ALSO BE STATE, LOCAL, OR FOREIGN TAX CONSIDERATIONS APPLICABLE TO A HOLDER OF A CLAIM OR INTEREST, WHICH ARE NOT ADDRESSED HEREIN. EACH HOLDER OF A CLAIM OR INTEREST AFFECTED BY THE PLAN MUST CONSULT, AND RELY UPON, HIS OR HER OWN TAX ADVISOR REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO THAT HOLDER'S CLAIM OR INTEREST. THIS INFORMAITON MAY NOT BE USED OR QUOTED IN WHOLE OR IN PART IN CONNECTION WITH THE OFFERING FOR SALE OF SECURITIES.**

### A. Tax Consequences to the Debtor

Under the IRC, a taxpayer generally must include in gross income the amount of any discharge of indebtedness income realized during the taxable year. Section 108(a)(1)(A) of the IRC provides an exception to this general rule, however, in the case of a taxpayer that is under the jurisdiction of a bankruptcy court in a case brought under the Bankruptcy Code where the discharge of indebtedness is granted by the court or is pursuant to a plan approved by the court, provided that the amount of discharged indebtedness that would otherwise be required to be included in income is applied to reduce certain tax attributes of the taxpayer. Section 108(e)(2) of the IRC provides that a taxpayer will not realize income from the discharge of indebtedness to the extent that satisfaction of the liability would have given rise to a deduction. As a result of §§ 108(a)(1)(A) and 108(e)(2) of the IRC, the Reorganized Debtor may not recognize any income from the discharge of indebtedness through the chapter 11 case. It is not likely that the confirmation of the plan will have a material effect on the reorganized Debtor. The Debtor is a

North Carolina corporation and, as elected, is subject to Federal and State taxation at the company level.

**B. Tax Consequences to Creditors**

A Creditor who receives cash or other consideration in satisfaction of any Claim may be required to recognize ordinary income to the Internal Revenue Service or other tax authorities. The impact of such ordinary income, as well as the tax year for which the income will be recognized, will depend upon the individual circumstances of each Claimant, including the nature and manner of organization of the Claimant, the applicable tax bracket for the Claimant, and the taxable year of the Claimant. Each creditor is urged to consult with its tax advisor regarding the tax implications of any payments or distributions under the Plan.

**THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR CONSULTATION WITH A TAX ADVISOR. THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OR HER OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.**

CIRCULAR 230 NOTICE: To comply with requirements imposed by the United States Treasure Department and/or IRS, any information regarding any U.S. federal tax matters contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, as advice for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein. A formal and thorough written tax opinion would first be required for any tax advice contained in this communication to be used to avoid tax related penalties. Please consult your own tax professional.

## XI. PROVISIONS FOR VOTING ON A PLAN

A. Creditors Allowed to Vote and Deadline. Creditors holding allowed claims are entitled to vote to accept or reject the Debtor's Plan of Reorganization. The Court has fixed a date by which ballots upon the proposed Plan must be filed with counsel for the Debtor as an agent of the Court. Even though a creditor may not choose to vote, or may vote against the Plan, the creditor will be bound by the terms and treatment set forth in the Plan if the Plan is accepted by the requisite majorities in each class of creditors and/or is confirmed by the Court. Creditors who fail to vote will not be counted in determining acceptance or rejection of the Plan. Allowance of a claim or interest for voting purposes does not necessarily mean that the claim will be allowed or disallowed for purposes of distribution under the terms of the Plan. Any claim to which an objection has been or will be made will be allowed for distribution only after determination by the Court. Such determination of allowed status may be made before or after the Plan is confirmed.

B. Voting Provisions. In order for the Plan to be accepted by the class of creditors holding unsecured claims (Class VI under the Plan), creditors that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in the total number of allowed claims of creditors voting on the Plan must accept the Plan. Under certain limited circumstances more fully described in 11 U.S.C. Section 1129(b), the Court may confirm the Plan by a "cramdown" notwithstanding the rejection thereof by more than one-third (1/3) in amount or one-half (1/2) in number of the creditors voting on the Plan. The Debtor intends to seek confirmation under 11 U.S.C. Section 1129(b) in the event any class of creditors rejects the Plan.

C. Representations Limited. No representation concerning the Debtor, particularly regarding future business operations or the value of the Debtor's assets, has been authorized by the Debtor except as set forth in this statement. You should not rely on any other representations or inducements offered to you to secure your acceptance or decide how to vote on the Plan. Any person making representations or inducements concerning acceptance or rejection of the Plan should be reported to counsel for the Debtor.

While every effort has been made to provide the most accurate information available, the Debtor is unable to warrant or represent that all information is without inaccuracy. No known inaccuracies are set forth herein. Further, much of the information contained herein consists of projections of future performance. While every effort has been made to ensure that the assumptions are valid and that the projections are as accurate as can be made under the circumstances, the Debtor has not undertaken to certify or warrant the absolute accuracy of the projections.

## XII. ACCEPTANCE AND CONFIRMATION

The Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing to consider confirmation of the Plan. The confirmation hearing will be scheduled at a time and place to be determined by the Bankruptcy Court. The confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the confirmation hearing.

At the confirmation hearing, the Bankruptcy Court will determine whether the requirements of Section 1129 of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan. These requirements include determinations by the Bankruptcy Court that (i) the Plan has classified Claims in a permissible manner; (ii) the Plan is in the "best interests" of all Creditors; (iii) the Plan is feasible; (iv) the Plan has been accepted by the requisite number and amount of Creditors in each Class entitled to vote on the Plan, or that the Plan may be confirmed without such acceptances; (v) the Plan and its proponent comply with various technical requirements of the Bankruptcy Code; (vi) the Debtor has proposed the Plan in good faith; (vii) any payments made or promised in connection with the Plan are subject to the approval of the Bankruptcy Court as reasonable; and (viii) the Plan provides specified recoveries for certain priority claims. The Debtor believes that all of these conditions have been or will be met prior to the Confirmation hearing.

**A.** **<u>Classification of Claims</u>**. The Bankruptcy Code requires that a plan place each creditor's claim in a class with "substantially similar" claims. The Debtor believes that the Plan's classification of claims complies with the requirements of the Bankruptcy Code and applicable case law.

**B.** **<u>The Best Interests Test</u>**. Notwithstanding acceptance of the Plan in accordance with Section 1126 of the Bankruptcy Code, the Bankruptcy Court must find, whether or not any party in interest objects to Confirmation, that the Plan is in the best interests of the Creditors. Bankruptcy courts have generally defined "best interests" as the Bankruptcy Code's requirement that, under any plan of reorganization, each member of an impaired class of creditors must receive or retain, on account of its claim, property of a value, as of the effective date of the plan, that is not less than the amount such creditor would receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code. The Debtor believes that the Plan is in the best interests of all Creditors.

To determine what the Creditors would receive if the Debtor was liquidated under chapter 7, the dollar amount that would be generated from the liquidation of the Debtor's assets in a chapter 7 liquidation case needs to be considered. The amount that would be available for the satisfaction of Claims would consist of the Debtor's interest in the net proceeds resulting from the disposition of the Estate's assets, augmented by the Debtor's interest in the cash on hand. The Estate's interest would be further reduced by the amount of any Secured Claims, the costs and expenses of the liquidation, and such additional Administrative Claims and Priority Claims that may result from the liquidation of the Debtor's estate. These calculations are set forth in a liquidation analysis attached to this Disclosure Statement.

The costs of liquidation under chapter 7 would become Administrative Claims with the highest priority against the proceeds of liquidation. Such costs would include the fees payable to a chapter 7 trustee, as well as those which might be payable to attorneys, financial advisors, appraisers, accountants and other professionals that such a trustee may engage to assist in the liquidation. After satisfying Administrative Claims arising in the course of the chapter 7 liquidation, the proceeds of the liquidation would then be payable to satisfy any unpaid expenses incurred during the time the Case was pending under chapter 11, including compensation for the Debtor, attorneys, financial advisors, appraisers, accountants and other professionals retained by the Debtor.

For the reasons discussed above, the Debtor has concluded that the Plan provides Creditors with a recovery that has a present value at least equal to the present value of the distribution that such Person would receive if the Estate were liquidated under chapter 7 of the Bankruptcy Code.

**BECAUSE THE LIQUIDATION ANALYSIS ARE BASED UPON A NUMBER OF ASSUMPTIONS AND ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES THAT ARE BEYOND THE DEBTOR'S CONTROL, THERE CAN BE NO ASSURANCE THAT THE LIQUIDATION VALUES WOULD, IN FACT, BE REALIZED IN THE EVENT OF A LIQUIDATION UNDER CHAPTER 7 OR THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED.**

**C. Feasibility of the Plan**. Section 1129(a)(11) of the Bankruptcy Code requires a judicial determination that confirmation of the Plan will not likely be followed by liquidation or the need for further financial reorganization of the Debtor or any other successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan. The Debtor believes that it will be able to meet its obligations under the Plan.

**D. Confirmation.** The Plan may be confirmed if the holders of impaired Classes of Claims accept the Plan. Classes of Claims that are not impaired are deemed to have accepted the Plan. A Class is impaired if the legal, equitable or contractual rights attaching to the Claims or interests of that Class are modified other than by curing defaults and reinstating maturities or by full payment in cash.

The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by the holders of two-thirds in dollar amount and a majority in number of allowed claims in that class. This calculation includes only those holders of claims who actually vote to accept or reject the Plan. Votes on the Plan are being solicited only from holders of Allowed Claims in impaired Classes who are expected to receive distributions.

In the event that an impaired Class does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Debtor's request if (i) all other requirements of Section 1129(a) of the Bankruptcy Code are satisfied, and (ii) as to each impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such non-accepting Class. **THE DEBTOR BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF ALL CREDITORS AND STRONGLY RECOMMENDS THAT ALL PARTIES ENTITLED TO VOTE CAST THEIR BALLOTS IN FAVOR OF ACCEPTING THE PLAN.** Nevertheless, the Debtor has requested that the Bankruptcy Court confirm the Plan over the rejection of any non-accepting Class in the event all other elements of Section 1129(a) of the Bankruptcy Code are satisfied.

A plan "does not discriminate unfairly" if the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are intertwined with those of the non-accepting class, and no class receives payments in excess of that which it is legally entitled to receive. The Debtor believes that, under the Plan, all holders of impaired Claims are treated in a manner that is consistent with the treatment of other holders of Claims with which any of their legal rights are intertwined. Accordingly, the Debtor believes the Plan does not discriminate unfairly as to any impaired class of Claims.

The condition that a plan be "fair and equitable" generally requires that an impaired class that has not accepted the plan must receive certain specified recoveries, as set forth in Section 1129(b)(2) of the Bankruptcy Code. The Debtor believes that the Plan meets the thresholds specified in this section of the Bankruptcy Code.

## XIII. EFFECT OF CONFIRMATION

A. Except as otherwise provided in the Plan, the confirmation of the Plan vests all of the property of the estate in the Debtor.

B. Injunction. From and after the Confirmation Date, except as otherwise provided in Sections 1141(d)(3), the Plan, or the Confirmation Order, all holders of "Claims" (including without limitation Secured Claims, General Unsecured Claims, all Priority Claims and any other claim, equity interest, or other debt or liability) against the Debtor and the Debtor-in-Possession are permanently restrained and enjoined (a) from commencing or continuing in any manner, any action or other proceeding of any kind with respect to any such Claim against the Debtor, (b) from enforcing, attaching, collecting, or recovering by any manner or means, any judgment, award, decree, or order against the Debtor, or the Debtor's assets, (c) from creating, perfecting, or enforcing any encumbrance of any kind against the Debtor or the Debtor's assets, (d) from asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due the Debtor, and (e) from performing any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; provided, however, that each holder of a contested Claim may continue to prosecute its proof of Claim in accordance with the Plan and all holders of Claims shall be entitled to enforce their rights under the Plan. Notwithstanding the foregoing, except as otherwise expressly provided in the Plan, the Plan does not release or waive any claims the Debtor may have against any party in interest.

## XIV. RECOMMENDATION AND CONCLUSION

**THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE GREATEST AND EARLIEST RECOVERY TO CREDITORS AND IS IN THE BEST INTEREST OF CREDITORS, THEREFORE, THE DEBTOR RECOMMENDS THAT ALL CREDITORS VOTE TO ACCEPT THE PLAN.**

## XV. OTHER SOURCES OF INFORMATION AVAILABLE TO CREDITORS AND PARTIES IN INTEREST

Additional motions, affidavits, orders or other documentation which might be of interest to any holder of a claim against the Debtor in this proceeding are shown on the docket sheet maintained by the Clerk's office. Copies of the docket sheet and actual items can be obtained from the office of the Clerk of the Bankruptcy Court:

Stephanie Butler, Clerk
U.S. Bankruptcy Court
P.O. Box 791
Raleigh, NC 27602
(919) 856-4752

Respectfully submitted, this the 31st day of August, 2026.

**HENDREN, REDWINE & MALONE, PLLC**

s/ Rebecca Redwine Grow
Jason L. Hendren (NC State Bar No. 26869)
Rebecca Redwine Grow (NC State Bar No. 37012)
Benjamin E.F.B. Waller (NC State Bar No. 27680)
Lydia C. Carpenter (NC State Bar No. 56697
4600 Marriott Drive, Suite 150
Raleigh, NC 27612
Telephone: (919) 573-1422
Facsimile: (919) 420-0475
Email: jhendren@hendrenmalone.com
rredwine@hendrenmalone.com
bwaller@hendrenmalone.com
lcarpenter@hendrenmalone.com
*Counsel for the Debtor*

**CHARLES & COLVARD, LTD.**

s/Michael Levin
Michael Levin, Board Chair

**CERTIFICATE OF SERVICE**

I, Rebecca Redwine Grow, of 4600 Marriott Drive, Suite 150, Raleigh, North Carolina 27612, hereby certify:

That I am, and at all times hereinafter mentioned was, more than eighteen (18) years of age;

That on this day I served copies of the foregoing document on the parties listed below, either electronically or by depositing a copy of the same in the United States mail bearing sufficient postage.

I certify under penalty of perjury that the foregoing is true and correct.

Respectfully submitted, this the 31st day of August, 2026.

**HENDREN, REDWINE & MALONE, PLLC**

s/ Rebeca Redwine Grow

Jason L. Hendren (NC State Bar No. 26869)
Rebecca Redwine Grow (NC State Bar No. 37012)
Benjamin E.F.B. Waller (NC State Bar No. 27680)
Lydia C. Carpenter (NC State Bar No. 56697
4600 Marriott Drive, Suite 150
Raleigh, NC 27612
Telephone: (919) 573-1422
Facsimile: (919) 420-0475
Email: jhendren@hendrenmalone.com
rredwine@hendrenmalone.com
bwaller@hendrenmalone.com
lcarpenter@hendrenmalone.com
*Counsel for the Debtor*

TO:

Brian Behr **(via CM/ECF)**
*Office of the Bankruptcy Administrator*

Charles & Colvard, Ltd.
170 Southport Drive
Morrisville, NC 27560

**EXHIBIT "A"**
**ASSETS**

| | | Market Value |
|---|---|---|
| Wells Fargo Operating #2156 | $ | 4,953.77 |
| Wells Fargo Deposit Acct #2180 | $ | 44,339.70 |
| JP Morgan Money Market #0561 | $ | - |
| JP Morgan Money Market #1963 | $ | - |
| JP Morgan Checking #0913 | $ | 4,589.91 |
| JP Morgan Checking #0996 | $ | - |
| Paypal #UDYN | $ | - |
| Paypal #AELS | $ | - |
| First Citizens #7223 | $ | 1,237.02 |
| Escrow Account- Remaining Sale Proceeds | $ | 2,016,306.65 |
| Anticipated Refunds | $ | 265,000.00 |
| Potential NOLs | $ | - |
| Potential causes of action | $ | - |
| **TOTAL ASSETS** | **$** | **2,336,427.05** |

**EXHIBIT "B"**
**LIABILITIES**

| LIABILITIES | CLAIM # | DISPUTED | | AMOUNT |
|---|---|---|---|---|
| **Cost of Administration** | | | | |
| Hendren, Redwine & Malone, PLLC | | | $ | 100,000.00 |
| OCP Professionals | | | $ | 31,803.75 |
| 2nd Quarter Bankruptcy Fee | | | $ | 17,410.00 |
| SBP Office Owner Admin Claim | | | $ | 364,033.19 |
| Trailing Expenses | | | $ | 200,000.00 |
| General Administration | | | $ | 250,000.00 |
| **TOTAL ADMINISTRATION CLAIMS:** | | | **$** | **963,246.94** |
| **Secured Claims** | | | | |
| VLJ (potential legal fees) | | X | $ | 82,350.00 |
| Wolfspeed, Inc. | 29 | | $ | 475,000.00 |
| **TOTAL SECURED CLAIMS:** | | | **$** | **557,350.00** |
| **Priority Claims** | | | $ | - |
| Arizona Dept of Revenue | | | $ | - |
| California Dept of Revenue | 20 | | $ | 1,005.97 |
| Clint Pete | 34 | | $ | 50,688.40 |
| Flordia Dept of Revenue | | | $ | - |
| Illinois Dept of Revenue | | | $ | - |
| Internal Revenue Service | 27 | | $ | 244.29 |
| Kentucky Dept of Revenue | | | $ | - |
| Louisiana Dept of Revenue | | | $ | - |
| Massachusetts Dept of Revenue | 11 | | $ | 19,965.68 |
| Minnesota Dept of Revenue | | | $ | - |
| Missouri Dept of Revenue | | | $ | - |
| North Carolina Dept of Revenue | | | $ | - |
| New Jersey Dept of Revenue | | | $ | - |
| New York Dept of Revenue | 35 | | $ | 1,937.24 |
| Pennsylvania Dept of Revenue | | | $ | - |
| Rhode Island Dept of Revenue | | | $ | - |
| Tennessee Dept of Revenue | 9 | | $ | 1,869.30 |
| Wake County Dept of Revenue | | | $ | - |
| Wisconsin Dept of Revenue | 32 | | $ | 61.12 |
| **TOTAL PRIORITY CLAIMS:** | | | **$** | **75,772.00** |
| **Unsecured Claims** | | | | |
| Aaron Shum Jewelry Ltd. | | | $ | 58,497.00 |
| Acceleration Partners, LLC | | | $ | 22,098.00 |
| Accentuate Staffing Inc. | | | $ | 6,358.00 |
| ACNielsen Corporation | | | $ | 7,520.00 |
| Adwar Casting Company | | | $ | 732.00 |
| Agio Inc | | | $ | 116,040.00 |

| | | | | |
|---|---|---|---|---|
| American Express Travel Services | 10 | | $ | 139,200.00 |
| Ammante Jewells LLP | | | $ | 138,472.00 |
| Art Tec Jewelry Designs LTD | | | $ | 62,692.00 |
| Barcode Warehouse | | | $ | 657.00 |
| BDO USA LLP | 13 | | $ | 105,717.00 |
| Beehive Industries Ltd | | | $ | 7,035.00 |
| Brex Treasury LLC | 12 | | $ | 205,077.40 |
| Broadridge ICS | 7 | | $ | 2,149.09 |
| Butler Advisors LLC | | | $ | 8,125.00 |
| Cannella Media LLC | 14 | | $ | 28,990.00 |
| Canon Financial Sevices | | | $ | 4,073.00 |
| Cherry Bekart Advisory LLC | 33 | | $ | 17,106.88 |
| CISION US INC | 21 | | $ | 25,000.00 |
| Cloudnexa Inc | | | $ | 29,372.00 |
| Dcarbon Inc | | | $ | 17,219.00 |
| Deloitte Tax LLP | | | $ | 40,900.00 |
| Digital Media Innovations, LLC | | | $ | 7,738.00 |
| Duc Pham | | | $ | 62,430.00 |
| Ede Consulting | | | $ | 4,171.00 |
| Equiniti Trust Company | 5 | | $ | 1,298.86 |
| Essential Lab Grown Diamonds Inc. | | | $ | 66,024.00 |
| Ethara Capital LLC | 23 | X | $ | 2,143,432.52 |
| Evoqua Water Technologies, LLC | | | $ | 1,680.00 |
| Federal Express Corporation | | | $ | 8,512.00 |
| First Insurance Funding | | | $ | 22,275.00 |
| First Insurance Funding | | | $ | 23,389.00 |
| Fremada Gold Inc | 4 | | $ | 1,849.00 |
| Genesys Cloud Services, Inc | | | $ | 2,035.00 |
| GM Casting House Inc | | | $ | 49,205.00 |
| Google LLC | 18 | | $ | 280,302.01 |
| Heartland Video Systems, Inc | | | $ | 1,652.00 |
| Honest Stone House | | | $ | 12,259.00 |
| iHeart Communications Inc | | | $ | 103,164.00 |
| Insightsoftware LLC | | | $ | 13,751.00 |
| Iron Mountain | | | $ | 1,646.00 |
| Jewelers Bond of Trade | | | $ | 1,295.00 |
| Jones & Hale LLP | 3 | | $ | 3,600.00 |
| Joseph Castings Inc | 25 | | $ | 11,310.22 |
| Joshua Averbeck | | | $ | 13,126.00 |
| K&L Gates LLP | | | $ | 262,358.00 |
| Kegan Overton | 36 | | $ | 1,322.83 |
| Kira Jewels Inc | | | $ | 3,099.00 |
| Level 3 Communications | | | $ | 1,335.00 |
| Litmus Software Inc | | | $ | 7,750.00 |
| Lividini & Company LLC | | | $ | 87,049.00 |
| Mango Technologies, Inc | | | $ | 7,680.00 |
| Mary Beth LLC | | | $ | 5,000.00 |
| Massachusetts Dept. of Revenue | 11 | | $ | 5,146.25 |
| Mediant Communications Inc. | | | $ | 6,011.74 |

| | | | | |
|---|---|---|---|---|
| MERCIER INC | | | $ | 15,000.00 |
| Mimecast North America Inc | | | $ | 3,929.00 |
| NBC Universal LLC | 19 | | $ | 182,103.34 |
| nClouds Inc | | | $ | 13,307.00 |
| Neal Goldman | | | $ | 10,000.00 |
| Nestor Alfonso | | X | $ | - |
| NY Dept. of Revenue | 35 | | $ | 1,797.70 |
| Overnight Mountings | | | $ | 13,399.00 |
| Pacific Northern Inc | | | $ | 11,807.00 |
| Peninsula | | | $ | 23,555.00 |
| Peninsula | | | $ | 1,594.00 |
| Prime Direct Limited | | | $ | 5,929.00 |
| Rakuten Marketing LLC | | | $ | 4,979.00 |
| Riskified, Inc | | | $ | 2,029.00 |
| Rivers Agency LLC | | | $ | 7,280.00 |
| Riverstyx Capital Management | | | $ | 270,078.90 |
| Rosenthal Jewelers Supply Corp | | | $ | 8,714.00 |
| Euler Hermes NA, Agent for Royal Chai | 16 | | $ | 36,939.39 |
| SBP Office Owner, LP | 31 | | $ | 863,655.70 |
| Securitas Technology Corporation | | | $ | 273.00 |
| Sheer ID Inc | | | $ | 2,400.00 |
| Smith Anderson LLP | | | $ | 15,986.00 |
| Southport Graphics LLC | | | $ | 11,160.00 |
| Stephen Gould | | | $ | 3,187.00 |
| Sterling Seacrest Pritchard Inc | | | $ | 13,871.00 |
| Taxually International Ltd | | | $ | 5,350.00 |
| Tealium Inc. | 17 | | $ | 96,250.00 |
| Tennessee Dept. of Revenue | 9 | | $ | 65.00 |
| Tennis Connection | 8 | | $ | 2,932.89 |
| The NASDAQ Stock Market LLC | | | $ | 35,333.00 |
| Three Fives Consulting LLC | | | $ | 39,775.00 |
| TOPPAN MERRILL LLC | 6 | | $ | 1,672.00 |
| Tosyali International Ltd | | | $ | 24,006.00 |
| Uline Inc | | | $ | 1,721.00 |
| UPS | 15 | | $ | 3,918.99 |
| UPS Supply Chain Solutions Inc | | | $ | 48.00 |
| Vaco Raleigh LLC | 2 | | $ | 89,368.93 |
| Valor Gems Co, Ltd. | 24 | | $ | 333,880.24 |
| Victor Settings | 26 | | $ | 14,381.65 |
| Virtual Graffiti Inc | | | $ | 148.00 |
| W R Cobb Company | 1 | | $ | 9,268.58 |
| WC Inc dba Western Computer | | | $ | 39,217.00 |
| Webfargo Data Security | | | $ | 3,218.00 |
| Wisconsin Dept of Revenue | 32 | | $ | 35.00 |
| Wolcott Group LLC | | | $ | 26,125.00 |
| Wolfspeed (unsecured portion) | | | $ | 1,962,095.89 |
| Women's Marketing/Stella Rising | 30 | | $ | 205,089.28 |
| Wunderkind Corporation | | | $ | 72,105.00 |
| Wyrick Robbins Yates & Ponton LLC | | | $ | 196,149.00 |

| | | |
|---|---|---|
| **TOTAL UNSECURED CLAIMS:** | **$** | **8,951,054.28** |
| **TOTAL LIABILITIES** | **$** | **10,547,423.22** |

**EXHIBIT "C"**
**LIQUIDATION ANALYSIS**

| ASSETS | LIENHOLDER / AMOUNT OF LIEN | LIQUIDATION VALUE | EQUITY |
|---|---|---|---|
| Wells Fargo Operating #2156 | | $ 4,953.77 | $ 4,953.77 |
| Wells Fargo Deposit Acct #2180 | | $ 44,339.70 | $ 44,339.70 |
| JP Morgan Money Market #0561 | | $ - | $ - |
| JP Morgan Money Market #1963 | | $ - | $ - |
| JP Morgan Checking #0913 | | $ 4,589.91 | $ 4,589.91 |
| JP Morgan Checking #0996 | | $ - | $ - |
| Paypal #UDYN | | $ - | $ - |
| Paypal #AELS | | $ - | $ - |
| First Citizens #7223 | | $ 1,237.02 | $ 1,237.02 |
| Escrow Account- Remaining Sale Proceeds | VLJ (potential legal fees)<br>$ 82,350.00<br>Wolfspeed, Inc.<br>$ 475,000.00 | $ 2,016,306.65 | $ 1,458,956.65 |
| Anticipated Refunds | | $ 265,000.00 | $ 265,000.00 |
| Potential NOLs | | $ - | $ - |
| Potential causes of action | | $ - | $ - |

**TOTALS** Gross Equity before Ch 7 Expense **$ 1,779,077.05**

**LESS:**

**ALL ASSETS**

**Real Property Marketing Expense**

| | |
|---|---|
| Commission 6% | $ - |
| Closing Costs and Upkeep 1% | $ - |
| | **$ -** |

**Auctioneer Fees Personal Property**

| | |
|---|---|
| 20% of first $20,000 | $ - |
| 10% of next $20,000.00 to $50,000.00 | $ - |
| 8% of balance over $50,000.00 | $ - |
| | **$ -** |

**Trustee's Commission/Expense**

| | |
|---|---|
| 25% of first $5000 | $ 1,250.00 |
| 10% of next $5000-$50,000 | $ 4,500.00 |
| 5% of next $50,000-$1,000,000 | $ 47,500.00 |
| 3% of the balance | $ 23,372.31 |
| Trustee's Attorney Fees (estimated) | $ 20,000.00 |
| | **$ 96,622.31** |

| | |
|---|---|
| Administrative Claims/Court Appointed Professionals | $ 963,246.94 |
| Priority Claims | $ 75,772.00 |
| | **$ 1,039,018.94** |

**Total Net Equity Available**
**to Unsecured Creditors in Chapter 7:** **$ 643,435.80**